UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**MDL No. 2599**
**Master File No. 15-02599-MD-MORENO**
**Economic Loss No. 14-24009-CV-MORENO**

IN RE:

**TAKATA AIRBAG PRODUCTS**
**LIABILITY LITIGATION**

_____

THIS DOCUMENT RELATES TO ALL
ECONOMIC LOSS TRACK CASES
_____/

**ORDER GRANTING IN PART AND DENYING IN PART**
**MOTIONS TO DISMISS BY DEFENDANTS FCA, GENERAL MOTORS,**
**MERCEDES, AUDI, AND VOLKSWAGEN**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 3

BACKGROUND .............................................................................................................. 4

LEGAL STANDARD ....................................................................................................... 5

ANALYSIS ....................................................................................................................... 6

I.  STANDING ............................................................................................................. 6
   A. Legal Standard ................................................................................................. 7
   B. "Injury in Fact" ................................................................................................ 8
      1. Mercedes and Volkswagen ......................................................................... 8
         a) Manifestation of Defect ........................................................................ 8
         b) Economic Injury .................................................................................. 11
      2. General Motors ......................................................................................... 12
         a) Manifestation of Defect ...................................................................... 13
         b) Economic Injury .................................................................................. 16
   C. "Fairly Traceable" ......................................................................................... 18
      1. Volkswagen Sub-Class Claims and Audi Sub-Class Claims.................... 18
      2. Remaining "Fairly Traceable" Arguments ............................................... 22
         a) The Takata Plea Agreement ................................................................ 22
            (1) Request for Judicial Notice............................................................ 23
            (2) Plaintiffs' "Fairly Traceable" Allegations ................................... 25
         b) The Takata Letters .............................................................................. 28
   D. Conclusion ...................................................................................................... 30

II. JURISDICTION ..................................................................................................... 30
   A. Primary Jurisdiction and Preemption ............................................................ 32
   B. Role of *Bristol-Myers* .................................................................................... 33
   C. General Personal Jurisdiction ........................................................................ 39
      1. Domestic Defendants ................................................................................ 39
         a) Transferor Actions .............................................................................. 40
         b) Direct-File Actions ............................................................................. 40
      2. Foreign Defendants – Transferor and Direct-File Actions ...................... 41
      3. Conclusion ................................................................................................ 42
   D. Specific Personal Jurisdiction ....................................................................... 42
      1. Domestic Defendants in Direct-File Actions ........................................... 43

a) Florida Long-Arm Statute ......................................................... 43

b) RICO Nationwide Service of Process Provision........................ 49

(1) "Colorable" Claims............................................... 51

(2) Statutory Basis ..................................................... 51

(3) Constitutional Basis ............................................. 52

2. Foreign Defendants in Transferor and Direct-File Actions ....................... 55

a) Constitutional Due Process .......................................... 55

b) Federal Long-Arm Statute ........................................... 62

c) "Stream of Commerce" Theory.................................... 65

3. Conclusion ........................................................................... 72

E. Jurisdictional Discovery ....................................................... 72

F. Conclusion ........................................................................... 75

**III. RICO .................................................................................................. 75**

A. "Pattern of Racketeering Activity" – Section 1962(c) ........................ 76

B. "Conspiracy to Violate RICO" – Section 1962(d) ............................ 85

**IV. REMAINING CLAIMS IN DIRECT-FILE ACTIONS – PENDENT PERSONAL JURISDICTION .................................................................................. 92**

**CONCLUSION ............................................................................................ 94**

## INTRODUCTION

This multidistrict litigation ("MDL") consolidates allegations of economic loss and personal injury related to airbags manufactured by defendants Takata Corporation and TK Holdings (collectively, "Takata") and equipped in vehicles manufactured by Defendants FCA US LLC ("FCA"), General Motors Company, General Motors Holdings LLC, General Motors LLC (collectively, "General Motors"), Daimler AG, Mercedes-Benz USA, LLC (collectively, "Mercedes"), Audi Aktiengesellschaft, Audi of America, LLC (collectively, "Audi"), Volkswagen Aktiengesellschaft, and Volkswagen Group of America, Inc. (collectively, with Audi, "Volkswagen") (all automotive manufacturers collectively, "Defendants"). While the Court divided the MDL's component cases into two tracks—economic loss for plaintiffs alleging purely

3

economic damages and personal injury for plaintiffs alleging damages to a person—this Order pertains only to economic loss cases.

THIS CAUSE comes before the Court upon Defendant FCA's Motion to Dismiss **(D.E. 2983)**, Defendant General Motors's Motion to Dismiss **(D.E. 2981)**, Defendants Mercedes's and Volkswagen's Motion to Dismiss **(D.E. 2988)**, and Defendant Mercedes's Separate Motion to Dismiss for Lack of Standing **(D.E. 2982)**. Individually, the Motions seek to dismiss all claims alleged in three separate Amended Consolidated Class Action Complaints: *Boyd v. FCA US LLC* ("*Boyd*") **(D.E. 2758)**; *Whitaker v. General Motors Company, et al.* ("*Whitaker*") **(D.E. 2759)**; and *Puhalla v. Volkswagen Aktiengesellschaft, et al.*[1] ("*Puhalla*") **(D.E. 2762)** (collectively, the "Amended Consolidated Class Action Complaints").

THE COURT has thoroughly reviewed the Amended Consolidated Class Action Complaints, the Defendants' Motions to Dismiss, the Plaintiffs' Omnibus Response in Opposition **(D.E. 3034)** (the "Omnibus Response" or "Opposition"), and the Defendants' Reply memoranda **(D.E. 3094, 3098, 3103)**. The Court also heard oral argument from the parties on certain issues raised in the moving papers. (*See* **D.E. 3139**). This Order pertains only to standing, personal jurisdiction, and the sufficiency of Plaintiffs' claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"). The Court reserves ruling on all other claims not discussed (including all claims advanced by the Automotive Recycler Plaintiffs). For the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** the Defendants' Motions to Dismiss.

## BACKGROUND

---

[1] The *Puhalla* Complaint asserts claims against Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Audi Aktiengesellschaft, Audi of America, LLC, Mercedes-Benz USA, LLC, and Daimler AG.

Plaintiffs are consumers of Defendants' vehicles that are equipped with Takata airbags containing the propellant ammonium nitrate. Plaintiffs allege ammonium nitrate is an innately volatile and unstable propellant that imposes an unreasonable risk of serious foreseeable harm or death upon drivers of Defendants' vehicles. The crux of Plaintiffs' legal claims is that Defendants knew or should have known of these defects prior to installing the Takata airbags in their vehicles, and that Defendants concealed from, or failed to notify, the Plaintiffs and the general public of the full and complete nature of the defect, despite being aware of problems arising during the design and testing process, and through various rupture incidents and recalls. The Defendants vigorously contest both the constitutional bases for this Court to exercise jurisdiction, and the sufficiency of the allegations supporting Plaintiffs' substantive legal claims.

## LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Detailed factual allegations are not required, but a pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." *Twombly*, 550 U.S. at 555.

Where a cause of action sounds in fraud, however, Federal Rule of Civil Procedure 9(b) must be satisfied in addition to the more relaxed standard of Rule 8. Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake," although "conditions of a person's mind," such as malice, intent, and knowledge may be alleged generally. Fed. R. Civ. P. 9(b). "The 'particularity' requirement serves an important purpose in fraud actions

by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (quoting *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

## ANALYSIS

Defendants move to dismiss the Amended Consolidated Class Action Complaints in their entirety on several justiciability grounds, and on grounds that Plaintiffs fail to adequately plead their substantive legal claims. This Order addresses: (1) the standing challenges brought by Mercedes, Volkswagen, and General Motors; (2) all the Defendants' personal jurisdiction attacks; and (3) all the Defendants' objections to the sufficiency of Plaintiffs' RICO claims. The Court will also address preemption and primary jurisdiction challenges made by Mercedes and Volkswagen, and the background issue of pendent personal jurisdiction. The Court will begin by deciding the extensively briefed standing and personal jurisdiction issues, and then proceed to rule on the sufficiency of Plaintiffs' RICO allegations. Then the Court will conclude by resolving the parties' pendent personal jurisdiction dispute.

## I.    STANDING

Mercedes and Volkswagen, and separately General Motors, move to dismiss in full on standing grounds the *Puhalla* and *Whitaker* Complaints. Mercedes and Volkswagen argue Plaintiffs fail to sufficiently plead the "injury in fact" and "fairly traceable" elements of the standing test established by the United States Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). General Motors limits its standing challenge to the "injury in fact" element. These Defendants also ask the Court to judicially notice several pieces of extrinsic evidence. For instance, Mercedes asks the Court to judicially notice the Takata Plea Agreement, and then

conclude the Plaintiffs' alleged injuries are not "fairly traceable" to Mercedes's conduct because Takata pleaded guilty to defrauding several auto manufacturers. General Motors asks the Court to judicially notice three "Petitions for Inconsequentiality" that General Motors filed with the National Highway Traffic and Safety Administration ("NHTSA"), and then conclude Plaintiffs have not suffered an "injury in fact" because the alleged airbag inflator defects have not manifested in certain models of General Motors vehicles. In their Omnibus Response, Plaintiffs assert they have more than adequately alleged standing, and characterize Defendants' Motions as an attempt to relitigate prior rulings based upon selectively chosen, and heavily disputed, extrinsic evidence.

## A.    LEGAL STANDARD

Article III of the United States Constitution limits federal court jurisdiction to actual cases and controversies. *See* U.S. Const. art. III, § 2, cl. 1. "The standing doctrine is an aspect of this case or controversy requirement, and has its origins in 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Cone Corp. v. Fla. Dep't of Trans.*, 921 F.2d 1190, 1204 (11th Cir. 1991) (citing *Flast v. Cohen*, 392 U.S. 83, 94–101 (1968); quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Standing is jurisdictional, and thus a motion to dismiss for lack of standing is treated as a motion for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (*per curiam*) (citing *Cone Corp.*, 921 F.2d at 1232). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan*, 504 U.S. at 561.

Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* In a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct" may be sufficient to allege standing because on a motion to dismiss courts presume that general allegations embrace those specific facts that are

necessary to support the claim. *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). More specifically, constitutional standing requires: (1) that the plaintiff suffered an injury in fact—an invasion of a legally protected interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560 (citations omitted).

## B.    "INJURY IN FACT"

### 1.    Mercedes and Volkswagen

Mercedes and Volkswagen[2] argue that the Plaintiffs have not established they suffered an "injury in fact" because the Plaintiffs only allege "possibly future injury," which is not a "certainly impending" injury. (D.E. 2988 at 65–66.) Mercedes and Volkswagen further argue that Plaintiffs fail to establish an economic injury in fact because "all Plaintiffs will receive a replacement inflator as soon as parts are available, at no cost to them." *Id.* at 65.

#### a)    Manifestation of Defect

---

[2] The *Puhalla* Complaint makes clear that "'Volkswagen' and 'Volkswagen Defendants' refers to VW AG, VW America, Audi AG, and Audi America." (D.E. 2762 at ¶ 30.) Accordingly, throughout this Order, all references to Volkswagen necessarily encompass Audi AG ("Audi Aktiengesellschaft") and Audi America ("Audi of America, LLC"), unless and to the extent that the Audi entities are specifically discussed.

Mercedes and Volkswagen assert that there is no injury in fact because Plaintiffs do not allege that "any Takata inflator at issue in this case ruptured in *any* vehicle sold by Defendants," and thus, Plaintiffs "have alleged only non-actionable hypothetical harm." (D.E. 2988 at 65 (emphasis in original).)

Upon close review of the *Puhalla* Complaint, the Court finds that Plaintiffs sufficiently allege an injury in fact. Plaintiffs allege that "[a]ll Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in Defendants' defectively designed inflators." (D.E. 2762 at ¶ 4.) Plaintiffs then plead several issues with Takata airbags that were installed in Mercedes's and Volkswagen's vehicles, stemming from the use of ammonium nitrate. For example, Plaintiffs allege that: Mercedes had concerns about "module cover tearing," "cushion tearing," and "the module having integrity during and post-deployment"; Mercedes was aware Takata airbags had "performance problems plaguing the inflators" and had "difficulty meeting USCAR standards"; and Mercedes forwent "key performance variables" in order to approve Takata airbags. *Id.* at ¶¶ 182–84, 186.

As to Volkswagen, Plaintiffs allege Volkswagen "had repeated quality issues with Takata," including "failed airbag modules during testing" and "airbag tearing." *Id.* at ¶¶ 163–64. Plaintiffs then plead that Volkswagen later "reported [the] torn airbag to Takata" and expressed concern "over a flame that occurred during testing, and apparent cushion ruptures." *Id.* at ¶ 164. Plaintiffs also allege incidents of Takata airbag issues during testing conducted by Volkswagen, such as "ammonium-nitrate inflators [coming] apart during bonfire testing" and "an inflator rupture[] in Brazil during testing." *Id.* at ¶¶ 165–66. Plaintiffs further allege "Takata also informed Volkswagen that a greater propellant surface area . . . could significantly increase the burn rate and

inflator pressurization, to the point of rupture," and thus Volkswagen knew that Takata's ammonium-nitrate propellant "could be susceptible to long-term aging and degradation." *Id.* at ¶ 167.

Notwithstanding Plaintiffs' allegations—that Mercedes and Volkswagen experienced a series of performance issues with Takata airbags installed in their vehicles, which were defective because they contained innately unstable ammonium nitrate—Mercedes and Volkswagen contend that the Plaintiffs merely allege "non-actionable hypothetical harm" because they do not allege that "any Takata inflator at issue in this case ruptured in *any* vehicle sold by Defendants." (D.E. 2988 at 65 (emphasis in original).) This argument attempts to relitigate the same manifestation of defect argument the Court already rejected earlier in this litigation. Previously, Mazda moved to dismiss certain claims arguing the plaintiffs did not allege that "any other Mazda model, or any Mazda vehicle for model years 2003-2007 . . . ever manifested the alleged defect." (*See* D.E. 608 at 210.) The Court rejected this argument and explained that "[i]f Takata had installed grenades in its airbags that may or may not explode on impact, a court would not require an explosion to demonstrate manifestation of a defect." *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016). The point, the Court emphasized, was that the defective airbags *might* protect vehicle occupants, or *may not* protect vehicle occupants at all, or the airbags *may* create a more dangerous situation than having no airbag at all by expelling metal shrapnel. *Id.*

In *Tershakovec v. Ford Motor Co.*, the Court followed its ruling in *In re Takata* and declined to dismiss breach of express warranty claims at the motion to dismiss stage. 2018 WL 3405245, at *6 (S.D. Fla. July 12, 2018). The Court explained that it was "premature to dismiss claims at the motion to dismiss stage because of a plaintiff's failure to encounter the alleged

defect," because "even though the[] Florida Plaintiffs did not experience [the defect], the alleged breach of express warranty could have manifested itself when their vehicles were assembled." *Id.* Thus, "the possibility of encountering [the defect]—as alleged—was not hypothetical, but a virtual certainty." *Id.*

Here, Plaintiffs allege the airbags installed in Mercedes's and Volksagen's vehicles are defective because they contain innately unstable ammonium nitrate, and thus create an unreasonable and imminent risk of injury to vehicle occupants. Consistent with this Court's prior rulings in *In re Takata* and *Tershakovec*, the Court finds these allegations sufficiently plead injury in fact.

### b) Economic Injury

Mercedes and Volkswagen also argue that Plaintiffs fail to allege any economic injury in fact. Specifically, Mercedes and Volkswagen argue Plaintiffs cannot have suffered an economic injury because the recall notices make clear that Plaintiffs "will receive a replacement inflator as soon as parts are available, at no cost to them." (D.E. 2988 at 65.)

In the Eleventh Circuit, "[e]conomic harm and physical injury are well-established injuries-in-fact under federal standing jurisprudence." *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014). Following *Adinolfe*, the Court in *Melton v. Century Arms, Inc.* denied a motion to dismiss for lack of standing where the plaintiffs alleged they suffered "economic harm such as overpayment, loss of value, or loss of usefulness emanating from the loss of their benefit of the bargain" stemming from an alleged manufacturing defect. 243 F. Supp. 3d 1290, 1298–99 (S.D. Fla. 2017). And earlier in this litigation, the Court rejected the very argument advanced by Mercedes and Volkswagen here, ruling that the plaintiffs adequately pleaded an economic injury in fact. Previously, Takata moved to dismiss RICO claims arguing that the plaintiffs did

not allege "any specific loss," and that "any loss related to the inflator defect [could] be alleviated if a consumer avail[ed] himself of a free replacement airbag offered as part of . . . [the] recall arrangement." *In re Takata Airbag Prod. Liab. Litig.*, 2015 WL 9987659, at *2 (S.D. Fla. Dec. 2, 2015). The Court denied Takata's motion to dismiss on this ground, finding sufficient the plaintiffs' allegations that they overpaid for vehicles based on misinformation regarding vehicle safety, they overpaid for airbags within the vehicles, and the vehicles they purchased diminished in value after the public learned about the airbag defect. *Id.*

Like their predecessors, the Plaintiffs here assert they suffered economic injuries and are entitled to damages comprising the value they overpaid for their vehicles based on misinformation about vehicle safety, and for the diminution in value of the vehicles following the negative publicity about vehicle safety. (D.E. 2762 at ¶¶ 18, 20.) Plaintiffs further allege they suffered a variety of other economic injuries including out-of-pocket expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care. *Id.* at ¶ 36. Finally, each Plaintiff individually alleges they would not have purchased or leased a class vehicle if they knew about the airbag defect. *See id.* at ¶¶ 39–127.

In short, Plaintiffs' allegations are identical to those the Court previously found sufficient. Accordingly, the Court finds that Plaintiffs sufficiently allege an economic injury in fact as to Mercedes and Volkswagen.

### 2. General Motors

General Motors argues Plaintiffs have not established they suffered an injury in fact because they "do not (and cannot) allege a manifest defect." (D.E. 2981 at 54.) General Motors further argues Plaintiffs cannot establish an economic injury in fact because the Plaintiffs "whose vehicles did not manifest a defect [cannot] have cognizable claims based on allegations that the

vehicles have a diminished resale value." *Id.* at 53.

### a) <u>Manifestation of Defect</u>

Despite acknowledging that the Court "previously deferred ruling on manifest defect arguments until the summary judgment stage," General Motors maintains that Plaintiffs "do not (and cannot) allege a manifest defect" and thus "each and every plaintiff should be dismissed." *Id.* at 50, 54–55.

Plaintiffs allege that General Motors "began equipping its vehicles with Takata's airbags in the early 2000s" and that "[a]ll Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators." (D.E. 2759 at ¶¶ 6, 105.) Plaintiffs further allege Takata airbags made for General Motors's vehicles ruptured during testing on numerous occasions, *see id.* at ¶¶ 110–11, 115–17, and that General Motors also experienced at least three field ruptures, which on one occasion left the driver "completely blind in one eye," *id.* at ¶¶ 119, 121. Plaintiffs allege these ruptures, or "energetic disassemblies," involve "an explosion of the inflator that causes the inflator to break apart and fire metal particulate out of the airbag." *Id.* at ¶ 110. After reviewing the *Whitaker* Complaint, the Court finds—as it did with the allegations against Mercedes and Volkswagen—that Plaintiffs sufficiently allege injury in fact with respect to General Motors.

General Motors maintains the allegations leveled against it "are different" from Mercedes and Volkswagen because, as set forth in General Motors's "Petitions for Inconsequentiality" filed

with NHTSA,[3] "the Takata airbags in GMT900 vehicles have *never* ruptured and there is no indication any ever will." (D.E. 2981 at 51 (emphasis in original).) The GMT900 "is a specific vehicle platform that forms the structural foundation for a variety of GM trucks and sport utility vehicles, including the Chevrolet Silverado 1500, GMC Sierra 1500, Chevrolet Silverado 2500/3500, GMC Sierra 2500/3500, Chevrolet Tahoe, Chevrolet Suburban, Chevrolet Avalanche, GMC Yukon, GMC Yukon XL, Cadillac Escalade, Cadillac Escalade ESV, and Cadillac Escalade EXT."[4] General Motors does not, however, extend this argument to the Takata airbags installed in non-GMT900 vehicles—such as the Chevrolet Cruze, a vehicle the Plaintiffs allege suffered at least two field inflator ruptures, and which left one driver "completely blind in one eye." (D.E. 2759 at ¶ 121). And Plaintiffs also allege the Chevrolet Cruze is "subject to current or future recalls due to the Inflator Defect," along with several other vehicles manufactured by General Motors that extend beyond the GMT900 platform, such as the Buick LaCrosse, Cadillac XTS, GMC Terrain, Saab 9-3, Saturn Astra, and the Chevrolet Camaro, Equinox, and Malibu. *Id.* at ¶ 77.

Again, General Motors's argument is essentially the same manifestation of defect argument advanced by Mazda earlier in this litigation. In moving to dismiss all damages claims for failure

---

[3] General Motors asks the Court to judicially notice the three Petitions for Inconsequentiality that it filed with NHTSA. For the same reasons stated below regarding Mercedes's request for judicial notice of the Takata Plea Agreement, *see infra* Section I.C.2.a.1, the Court takes judicial notice of the fact General Motors filed Petitions for Inconsequentiality with NHTSA and that the contents say what they say; but the Court cannot judicially notice the contents of the Petitions for their truth—as to do so would "bypass[] the safeguards which are involved with the usual process of proving facts by competent evidence in district court," *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

[4] *See General Motors LLC's Petition for Inconsequentiality and Request for Deferral of Determination Regarding Certain GMT900 Vehicles Equipped with Takata "SPI YP" and "PSPI-L YD" Passenger Inflators* at 2, available at https://www.regulations.gov/document?D=NHTSA-2016-0124-0002 (last visited June 20, 2019).

to allege manifestation of a defect, Mazda emphasized that the plaintiffs alleged "only one manifestation of an Inflator Defect in a Mazda vehicle—a December 31, 2014 incident in a 2008 Mazda 6—and that vehicle owner [was] not a named plaintiff." (D.E. 608 at 10.) Mazda further emphasized that the plaintiffs failed to allege "that any other Mazda model, or any Mazda vehicle for model years 2003-2007 . . . ever manifested the alleged defect." *Id.*

The Court declined to dismiss all claims for damages against Mazda because—regardless of whether ruptures occurred in certain vehicles—Plaintiffs' allegations were that ammonium nitrate was innately unstable; so "[b]y definition" this alleged instability would mean that the defective airbags *might* protect vehicle occupants, or *may not* protect vehicle occupants at all, or the airbags *may* even create a more dangerous situation than having no airbag at all by expelling metal shrapnel. *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d at 1335. As such, because there was "no way to know whether the airbags at issue would perform satisfactorily in an accident," the Court refused to "require an explosion to demonstrate manifestation of a defect." *Id.*; *see also Tershakovec*, 2018 WL 3405245, at \*6 (denying motion to dismiss because "the alleged breach of express warranty could have manifested itself when the[] vehicles were assembled," and thus "the possibility of encountering [the defect]—as alleged—was not hypothetical, but a virtual certainty"); *In re General Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 458 n.30 (S.D.N.Y. 2017) ("[I]t would be perverse to require [plaintiff] to be involved in an accident to prove that her car manifested the defect . . . .") (citing *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d at 1335)).

Throughout this case, the Court has reapplied this rationale to other defendants seeking dismissal on similar grounds. *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, 255 F. Supp. 3d 1241, 1258 (S.D. Fla. 2017) (rejecting Honda's manifestation of defect argument "[c]onsistent

with the Court's Mazda Order"); *In re Takata Airbag Prod. Liab. Litig.*, 2017 WL 2406711, at *10 (S.D. Fla. June 1, 2017) (same as to Takata); *In re Takata Airbag Prod. Liab. Litig.*, 2017 WL 775811, at *4 (S.D. Fla. Feb. 27, 2017) (same as to Ford); *In re Takata Airbag Prod. Liab. Litig.*, 2016 WL 5848843, at *5 (S.D. Fla. Sept. 21, 2016) (same as to Toyota); *In re Takata Airbag Prod. Liab. Litig.*, 2016 WL 6072406, at *10 (S.D. Fla. Oct. 14, 2016) (same as to BMW). And like all the previous plaintiffs, the Plaintiffs here allege that Takata airbags installed in General Motors's vehicles contain innately unstable ammonium nitrate, and thus create an unreasonable and imminent risk of injury to vehicle occupants. *See supra.* Accepting these allegations as true, the Court finds that Plaintiffs adequately plead injury in fact.

Holding aside the Court's prior rulings, the significance of a petition for inconsequentiality is that, once granted, a manufacturer's vehicles and replacement equipment are "exempt[ed] . . . from the [National Traffic and Motor Vehicle Safety Act's] notice and remedy requirements." 49 C.F.R. § 556.1. But filing a petition does not "constitute a concession by the manufacturer of, nor will it be considered relevant to, the existence of a defect related to motor vehicle safety or a nonconformity." 49 C.F.R. § 556.4(c). And to date, the Court is not aware of any final ruling by NHTSA on General Motors's Petitions. So, General Motors attempts to dismiss itself from this litigation on the basis that *one platform* of its vehicles *might* be clear of recall obligations imposed by NHTSA. The Court declines to depart from its prior rulings on this basis.

### b) Economic Injury

General Motors also asserts that Plaintiffs fail to allege any economic injury in fact. Unlike Mercedes and Volkswagen, General Motors argues that there is no economic injury in fact because the "plaintiffs whose vehicles did not manifest a defect [cannot] have cognizable claims based on allegations that the vehicles have a diminished resale value." (D.E. 2981 at 53.)

In support, General Motors relies on *Cahen v. Toyota Motor Corp.*, a Northern District of California case where the plaintiffs sought damages based on "the risk of future harm from the alleged product defect (that defendants' cars [were] susceptible to hacking by third parties)." 147 F. Supp. 3d 955, 966 (N.D. Cal. 2015). General Motors correctly notes that *Cahen* found the risk that "vehicles might be hacked at some point in the future" insufficient to constitute a "credible risk of hacking." *Id.* at 969. But General Motors fails to note that *Cahen* made clear that its analysis was "not to say that a future risk of harm can never satisfy injury in fact analysis," because "[a]lthough a speculative future risk will not suffice, 'a credible threat of harm is sufficient to constitute actual injury for standing purposes.'" *Id.* at 968 (quoting *Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045, 1052 (N.D. Cal. 2015)). In finding that the plaintiffs' risk of harm allegations lacked credibility, *Cahen* emphasized that the plaintiffs did not allege "that anybody outside of a controlled environment [had] ever been hacked." *Id.* at 969.[5]

Here, unlike the alleged risk of future harm in *Cahen*, the *Whitaker* Complaint sets forth numerous allegations of a universal vehicle defect (*i.e.* the airbags are inherently dangerous because they contain innately unstable ammonium nitrate), which are further supported by numerous alleged instances of General Motors's vehicles experiencing airbag ruptures during testing and in the field. (*See* D.E. 2759 at ¶¶ 6, 110–11, 115–17, 119, 121.) Taking these allegations as true, the Court finds Plaintiffs credibly allege a risk of future harm sufficient to establish standing. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab.*

---

[5] Even though the plaintiffs in *Cahen* abandoned their "injuries from the risk of hacking" argument on appeal, the Ninth Circuit still affirmed the district court on this point, noting that the plaintiffs did not allege that "any of their vehicles [had] actually been hacked" and that the plaintiffs did not allege "that they [were] aware of any vehicles that [had] been hacked outside of controlled environments." *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 723 & n.1 (9th Cir. 2017).

*Litig.*, 295 F. Supp. 3d 927, 950 (N.D. Cal. 2018) (noting that in contrast to the allegations in *Cahen*, "when a complaint includes concrete allegations of a *current universal* vehicle defect . . . those allegations plausibly and specifically support an overpayment theory of injury") (emphasis in original). And as explained above regarding Mercedes and Volkswagen, Plaintiffs' claims for economic damages resulting from the diminution of value caused by the allegedly defective Takata airbags installed in their vehicles, constitute an economic injury in fact for purposes of standing. *See supra*; *In re Takata Airbag Prod. Liab. Litig.*, 2015 WL 9987659, at *2; *Melton*, 243 F. Supp. 3d at 1298–99. Therefore, General Motors's Motion to Dismiss the *Whitaker* Complaint for lack of standing is **DENIED**.

### C.      "FAIRLY TRACEABLE"

Next, Mercedes and Volkswagen advance several arguments that the Plaintiffs have not pleaded that their injuries are "fairly traceable" to Mercedes's and Volkswagen's actions. Each argument is addressed in turn.

#### 1.   <u>Volkswagen Sub-Class Claims and Audi Sub-Class Claims</u>

First, Volkswagen argues the Court should dismiss any claims asserted against Volkswagen by purchasers or lessees of Audi vehicles, and any claims asserted against Audi by purchasers or lessees of Volkswagen vehicles, on grounds these Plaintiffs cannot establish their alleged injuries are "fairly traceable" to manufacturers that they did not purchase or lease vehicles from. (D.E. 2988 at 67–68.) In their Opposition, Plaintiffs argue their allegations—that "VW America, Audi AG, and Audi America are 'wholly owned subsidiar[ies]' of Volkswagen AG" and that Volkswagen and Audi "together 'engineered, designed, developed, manufactured or installed the Defective Airbags in the Volkswagen- and Audi-branded Class Vehicles [ ] and approved the Defective Airbags for use in those vehicles'"—are sufficient to confer standing. (*See* D.E. 3034 at 93 (quoting D.E. 2762 at ¶¶ 26–30).)

In the Eleventh Circuit, "it is well-settled that prior to the certification of a class . . . the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). This means "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Id.* at 1280 (quoting *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987)).

Following *Prado-Steiman*, courts repeatedly dismiss claims under the rule that a named plaintiff in a consumer class action "cannot raise claims relating to those other products which he did not purchase." *Toback v. GNC Holdings, Inc.*, 2013 WL 5206103, at *5 (S.D. Fla. Sept. 13, 2013) (citing *Prado-Steiman*, 221 F.3d at 1279–80); *see also, e.g.*, *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1394 (S.D. Fla. 2014) (same); *Holliday v. Albion Labs., Inc.*, 2015 WL 10857479, at *5 (S.D. Fla. June 9, 2015) (same); *Barron v. Snyder's-Lance, Inc.*, 2015 WL 11182066, at *17 (S.D. Fla. Mar. 20, 2015) (same); *Bohlke v. Shearer's Foods, LLC*, 2015 WL 249418, at *3–4 (S.D. Fla. Jan. 20, 2015) (same).

Another case, *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203 (S.D. Fla. 2017), is directly on point. In *Leon*, the court dismissed consumer class action claims relating to Mercedes-Benz GLK Class vehicles that were brought by plaintiffs who only purchased Mercedes-Benz C Class model vehicles—even though the plaintiffs alleged both classes of vehicles "contained the same defect." *Id.* at 1221–22 ("Plaintiffs have Article III standing to bring their claims against MBUSA, *with the exception of* those claims advanced on behalf of owners of vehicle models they do not own.") (emphasis added).

Notably, *Leon* dismissed claims against a *single* defendant concerning products the plaintiffs *did not* purchase, but which the plaintiffs tried to couple together with claims linked to

products they *did* purchase. *Id.* The standing analysis here is less rigorous because standing is

defendant specific. *See DaimlerChrysler Corp.*, 547 U.S. at 342 (noting that to establish Article

III standing, a plaintiff "must allege personal injury fairly traceable *to the defendant's* allegedly

unlawful conduct . . . .") (emphasis added). And here, the Plaintiffs attempt to couple together

claims related to products purchased from *two different* manufacturers; no less asserting these

claims against manufacturers from which they never purchased or leased their vehicle. For

example, despite none of the Alabama sub-class Plaintiffs having purchased or leased a

Volkswagen vehicle (*see* D.E. 2762 at ¶¶ 55, 79, 111), this sub-class asserts claims against

Volkswagen under Alabama statute and common-law, *see id.* at ¶¶ 353, 376, 411. The Court finds

the Alabama sub-class Plaintiffs, and the sub-classes that repeat this pleading pattern, "cannot

conceivably allege any injuries from products that [they] never purchased or used." *Dapeer v.

Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015) (dismissing "all of Plaintiff's claims

related to unpurchased products"). Therefore, the Audi sub-classes lack Article III standing to

bring claims against Volkswagen, and vice versa.

While Plaintiffs argue there are "no material differences between the Defective Inflators in

Audi Class Vehicles and VW Class Vehicles" (D.E. 3034 at 93), this "sufficient similarity"

argument (though recognized by some out-of-circuit authority) has been rejected time and again

by courts in this district that have followed the Eleventh Circuit's ruling in *Prado-Steiman*. *See

Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, 347 F. Supp. 3d 1207, 1222 (S.D.

Fla. 2018) (dismissing claims on standing grounds and rejecting plaintiffs' arguments that

defendant's products "all contain identical SSBS systems with the same defect" because

"similarity between products does not confer standing in the Eleventh Circuit"); *Leon*, 301 F. Supp.

3d at 1221–22 (dismissing claims on standing grounds and noting the "'sufficient similarity'

argument has not been adopted in the Eleventh Circuit"); *Garcia*, 43 F. Supp. 3d at 1393 (dismissing claims on standing grounds and noting "a named plaintiff in a consumer class action lacks standing to challenge a non-purchased product because there is no injury-in-fact as to that product, even if he purchased a substantially similar product.") (citing *Toback*, 2013 WL 5206103 at *4–5); *Bohlke*, 2015 WL 249418, at *4 (dismissing claims on standing grounds and noting "Southern District of Florida courts have declined to apply the 'sufficiently similar' test, citing *Prado–Steiman*, and this Court agrees with those well-reasoned opinions.") (citations omitted).

Plaintiffs also argue that courts have "consistently certified classes against VW represented by class representatives with an Audi vehicle and vice versa." (D.E. 3034 at 93.) But this argument relies exclusively on non-binding out-of-circuit authority, which is far outweighed by the consensus of authority in the Eleventh Circuit that a named plaintiff in a consumer class action cannot raise claims relating to products that he or she did not purchase. *See supra*. The Court finds no basis to break away from the weight of authority that has rejected the "sufficient similarity" approach.

Finally, because Article III standing must be established on a claim-by-claim basis, "deferring the standing determination to the class certification stage will yield no different result." *Toback*, 2013 WL 5206103, at *4. Thus, the Court declines Plaintiffs' invitation to defer ruling on this standing objection.

For these reasons, Mercedes's and Volkswagen's Motion to Dismiss the claims brought by the purported Audi sub-classes against Volkswagen, and the claims brought by the purported Volkswagen sub-classes against Audi, is **GRANTED**. Accordingly, all claims asserted by the Alabama, Michigan, and Virginia sub-classes against Volkswagen; and all claims asserted by the

Arizona, Arkansas, California, Connecticut, Indiana, Kentucky, Ohio, Pennsylvania, South Carolina, and Wisconsin sub-classes against Audi, are **DISMISSED**.[6]

## 2. **Remaining "Fairly Traceable" Arguments**

Next, Mercedes and Volkswagen argue *all* claims should be dismissed because Plaintiffs have "merely plead[ed] that they have been harmed by the *risk* of rupture" and that such risk is supported only by allegations relating "*solely* to incidents in *other* vehicles manufactured by *other* parties." (D.E. 2988 at 66 (emphasis in original).) In support of this argument, Mercedes and Volkswagen ask the Court to take judicial notice of the Takata Plea Agreement,[7] which they claim "demonstrates that any fraudulent conduct purportedly experienced by Plaintiffs stemmed from Takata's actions, not Defendants." *Id.* Additionally, Mercedes separately moves to dismiss all claims against them on grounds they are "uniquely situated because Takata sent multiple letters providing specific reassurances" that the Takata inflators in Mercedes's vehicles "were *not* defective," and thus Plaintiffs cannot plead the "fairly traceable" element. (D.E. 2982 at 4 (emphasis in original).)

The Court will first address Mercedes's and Volkswagen's request for judicial notice, and then decide whether Plaintiffs sufficiently allege the "fairly traceable" element.

### a) **The Takata Plea Agreement**

---

[6] As discussed above, *supra* at n.2, Plaintiffs make clear that in the *Puhalla* Complaint, "'Volkswagen' and 'Volkswagen Defendants' refers to VW AG, VW America, Audi AG, and Audi America," (D.E. 2762 at ¶ 30). Thus, while the allegations within each count only refer to Volkswagen, the Court interprets the *Puhalla* Complaint as asserting these counts against Audi AG and Audi America as well.

[7] *See* Rule 11 Plea Agreement in *United States v. Takata Corp.*, Case. No. 16-20810 (E.D. Mich. Jan. 13, 2018), available at https://www.justice.gov/usao-edmi/page/file/930821/download (last visited June 20, 2019).

## (1) Request for Judicial Notice[8]

Mercedes and Volkswagen contend the Takata Plea Agreement should be judicially noticed as a public record because "as an agreement between the government and certain Defendants, the accuracy of such matter cannot be questioned." (D.E. 2977 at 6–7.) In their Opposition to Automotive Defendants' Request for Judicial Notice, Plaintiffs assert it would be "inappropriate" to take judicial notice of the Takata Plea Agreement's contents because, *inter alia*, the contents are heavily disputed and are unclear as to specific auto manufacturers' conduct. (D.E. 3031 at 9–12.) Mercedes and Volkswagen reply that the Takata Plea Agreement contains "adjudicative facts" that relate to the immediate parties, which cannot be reasonably disputed because the statements were made "under oath in a court-approved document in support of [a] criminal guilty plea," and its source as a court-approved public record cannot be reasonably questioned. (D.E. 3099 at 5–7.)

Taking judicial notice of facts is "a matter of evidence law" and "a highly limited process." *Shahar*, 120 F.3d at 214. "The reason for this caution is that the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Id.* Under Federal Rule of Evidence 201(b), the Court may take judicial notice of certain facts without formal proof, but only where the fact in question is "not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction," or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Indisputability is a prerequisite" to judicial

---

[8] Mercedes's and Volkswagen's request for judicial notice of the Takata Plea Agreement appears to come from the Request for Judicial Notice in Support of Automotive Defendants' Motion to Dismiss Recyclers' First Amended Complaint, which Mercedes and Volkswagen joined. (*See* D.E. 2977 at 2.) Because Mercedes and Volkswagen note in their moving papers on multiple occasions that the Takata Plea Agreement is subject to a request for judicial notice (*see* D.E. 2982 at 9 n.3; D.E. 2988 at 30 n.7), the Court interprets these citations as incorporating by reference the arguments in the Automotive Defendants' Request for Judicial Notice.

notice. *Grayson v. Warden, Comm'r, Alabama Doc*, 869 F.3d 1204, 1225 (11th Cir. 2017) (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)). "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of [issue preclusion] would be superfluous." *Id.* (quoting *Jones*, 29 F.3d at 1553) (alteration in original).

Here, the parties heavily dispute the veracity and meaning of the statements in the Takata Plea Agreement. Mercedes and Volkswagen vigorously argue that Takata's admissions demonstrate that Mercedes and Volkswagen "were fraudulently induced to purchase allegedly defective airbag inflators from Takata," because Takata admitted that throughout the course of its business dealings it "'provided the [Original Equipment Manufacturers] with materially false, fraudulent, and misleading test information and data' relating to the airbag inflators." (D.E. 2982 at 9 (quoting Takata Plea Agreement at pp. 49–50 ¶ 22; p.53 ¶ 32).)

Plaintiffs strenuously dispute the notion that Takata's admissions absolve Mercedes and Volkswagen of any liability. For instance, Plaintiffs focus on the use of the "Original Equipment Manufacturer" language in the Takata Plea Agreement to emphasize that the plea agreement never mentions "any of the Defendants by name," and thus "[i]t is pure speculation, especially at this stage, to assume that Mercedes, VW, or Audi, or any particular Defendant is part of this undefined group of [Original Equipment Manufacturers]." (D.E. 3034 at 70–71.) Plaintiffs contend the lack of specificity is particularly troubling because the evidence collected to support the plea agreement is "unknown," and therefore the government "could have been relying on evidence relating to Takata's dealings with other automakers." *Id.* at 71. Plaintiffs further argue Takata's admissions in the plea agreement cannot "go to Defendants' state of mind and knowledge," and accordingly constitute "unreliable hearsay upon hearsay." *Id.*

No matter how reliable the admissions in the Takata Plea Agreement are, or what the contents mean, prove, or do not prove, it is clear the parties heavily dispute the *contents*. And because "[i]ndisputability is a prerequisite" to judicially noticing facts under Rule 201(b), *Grayson*, 869 F.3d at 1225 (quoting *Jones*, 29 F.3d at 1553), the Court cannot judicially notice the Takata Plea Agreement's contents for their truth. To do so would "bypass[] the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar*, 120 F.3d at 214. Consequently, Mercedes's and Volkswagen's Motion to Dismiss for lack of standing based on the contents of the Takata Plea Agreement is **DENIED**.[9]

The Court may, however, judicially notice a public record because a document filed in another court is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)). The effect of such judicial notice is limited, however, and is taken "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Jones*, 29 F.3d at 1553 (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388–89 (2d Cir. 1992)). Following this guide, the Court judicially notices the fact Takata entered into a court-approved criminal plea agreement and that the contents say what they say.

### (2) Plaintiffs' "Fairly Traceable" Allegations

Even without the Takata Plea Agreement, Mercedes and Volkswagen maintain Plaintiffs have not pleaded their injuries are "fairly traceable" to Mercedes's and Volkswagen's conduct because the Plaintiffs "merely plead that they have been harmed by the *risk* of rupture" and that

---

[9] Mercedes's Separate Motion to Dismiss reasserts the same argument concerning the Takata Plea Agreement. (*See* D.E. 2982 at 8–10.) The Court's ruling applies with equal force to this separate Motion, which is thus also **DENIED** on this point.

such risk is supported only by allegations relating "*solely* to incidents in *other* vehicles manufactured by *other* parties." (D.E. 2988 at 66 (emphasis in original).)

Reviewing the *Puhalla* Complaint, the Court finds Plaintiffs sufficiently allege their injuries are "fairly traceable" to Mercedes's and Volkswagen's conduct. Plaintiffs allege that Mercedes and Volkswagen "were intimately involved in the design and testing of the airbags that contained the Inflator Defect," and that "[p]rior to installing the Defective Airbags in their vehicles, [Mercedes and Volkswagen] knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate." (D.E. 2762 at ¶¶ 7, 238.) Plaintiffs further allege Mercedes and Volkswagen "concealed from, or failed to notify, Plaintiffs, Class members, and the public of the full and complete nature of the Inflator Defect" even though Mercedes and Volkswagen "were made aware through problems arising during the design process, testing, ruptures and other adverse events, public reports of ruptures and adverse events, and regular recalls starting no later than 2008." *Id.* at ¶ 238.

Specific to Mercedes, Plaintiffs allege, *inter alia*, that Mercedes: "regularly audited and reviewed Takata's manufacturing processes, including visits to, and checks of, Takata's facilities," *id.* at ¶ 175; "closely reviewed proposed airbag designs from Takata, and employed extensive design and product validation processes," *id.*; and "was aware of Takata's use of ammonium nitrate, including all technical details of allegedly phase stabilized ammonium-nitrate inflators, prior to its approval of the Defective Airbags for use in Mercedes Class Vehicles," *id.* at ¶ 180. Plaintiffs further allege Mercedes had "specific 'concerns' regarding the performance of the Defective Inflators prior to approving them for use in the Class Vehicles," which included issues with "module cover tearing," "cushion tearing," and "the module having integrity during and post-deployment." *Id.* at ¶¶ 182–83. Plaintiffs also allege "the defective Takata Airbags failed to meet

Mercedes's own requirements for approval," and allege several instances of performance issues to support this claim. *See id.* at ¶¶ 183–87. Finally, Plaintiffs allege that "[n]otwithstanding recalls and notices by other manufacturers, and Mercedes's awareness of the risks and/or dangers presented by ammonium-nitrate dependent inflators, Mercedes buried its head in the sand, claiming it did not become aware of the issues requiring recalls of the Class Vehicles" until 2016. *Id.* at ¶ 192.

Specific to Volkswagen, Plaintiffs allege Volkswagen "approved the airbags for use in its vehicles" even though it "knew not only that the airbags used ammonium nitrate propellant, but that propellant degradation could cause a loss of the inflator's structural integrity." *Id.* at ¶ 8. Plaintiffs further allege "[p]ersistent quality problems and disturbing test results provided further warning to Volkswagen, including a number of inflators coming apart during testing in 2004, and ruptures during testing in February 2009," which was "punctuated by a rupture in April 2009 that led Volkswagen and Takata to directly discuss precisely the failure mechanisms and risks." *Id.* at ¶ 9. And as discussed above, Plaintiffs allege Volkswagen had "repeated quality issues with Takata" including: failed airbag modules during testing; reporting a torn airbag to Takata; experiencing airbag tearing; expressing concern over a flame that occurred during testing; and apparent cushion ruptures. *See supra* Section I.B.1.a. Plaintiffs also allege Volkswagen experienced incidents of ammonium-nitrate inflators coming apart during bonfire testing conducted by Volkswagen, and an inflator rupture in Brazil during testing by Volkswagen. *See id.* Finally, Plaintiffs allege "Takata also informed Volkswagen that a greater propellant surface area . . . could significantly increase the burn rate and inflator pressurization, to the point of rupture," and therefore "Volkswagen . . . knew in 2009 and earlier—that Takata's ammonium-nitrate propellant could be susceptible to long-term aging and degradation." *Id.* at ¶ 167.

These allegations sufficiently plead that the alleged injuries in fact (*i.e.* the risk of physical injury, and actual economic injuries) are "fairly traceable" to Mercedes's and Volkswagen's conduct, because Mercedes and Volkswagen knew or should have known of the alleged inflator defect. Even when considering the fact Takata pleaded guilty to "provid[ing] the [Original Equipment Manufacturers] with materially false, fraudulent, and misleading test information and data" relating to the airbag inflators (D.E. 2982 at 9 (quoting Takata Plea Agreement at pp. 49–50 ¶ 22; p.53 ¶ 32)), Plaintiffs have sufficiently alleged Mercedes and Volkswagen had independent knowledge of the risks posed by installing Takata airbags in their vehicles. Therefore, Mercedes's and Volkswagen's Motion to Dismiss all claims against them, on grounds that Plaintiffs fail to allege the "fairly traceable" element of the *Lujan* standing test, is **DENIED**.

### b) The Takata Letters

Finally, Mercedes separately moves to dismiss all claims against them on grounds they are "uniquely situated because Takata sent multiple letters providing specific reassurances" that the Takata inflators in Mercedes's vehicles "were *not* defective," and thus Plaintiffs cannot plead the "fairly traceable" element. (D.E. 2982 at 4 (emphasis in original).) Mercedes factually attacks the basis for standing by presenting the Court with three letters from Takata.

A motion to dismiss for lack of standing is treated as a motion for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Stalley*, 524 F.3d at 1232. Where a litigant factually attacks subject-matter jurisdiction under Rule 12(b)(1), they challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). In such instances, "matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* But when a factual jurisdictional challenge implicates the merits

of the underlying claim, then "the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case . . . ." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (quoting *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997)).

Here, the thrust of Mercedes's standing challenge is that they did not install defective airbags in any of their vehicles, which is confirmed by Takata's correspondence with them, and thus Mercedes did not defraud any consumers. In order words, any purported harm Plaintiffs suffered "can be traced only to Takata's fraudulent conduct," and not Mercedes's conduct. (D.E. 2982 at 3.) Mercedes's challenge directly implicates the merits of the case because it attacks the Plaintiffs' theory of fraud: that Mercedes was "intimately involved in the design and testing of the airbags" and so they "knew, and certainly should have known, that the Takata airbags installed in millions of vehicles were defective," and thus Mercedes is liable for having "conceal[ed] their knowledge of the nature and extent of the defect from the public, while continuing to advertise their products as safe and reliable." (D.E. 2762 at ¶¶ 7,17.)

Because Mercedes's Separate Motion to Dismiss implicates the merits of Plaintiffs' case, the Court must "treat[] the motion as a motion for summary judgment under Rule 56 and refrain[] from deciding disputed factual issues." *Morrison*, 323 F.3d at 925. Defendants maintain the three Takata letters absolve them of liability. Plaintiffs argue these letters "are clearly not the entire universe of communications between Takata and Mercedes," and maintain that Mercedes is liable for a host of violations of federal and state law. (D.E. 3034 at 76.) In a multidistrict litigation case spanning several years and entailing voluminous records, the Court finds it premature to decide factual issues and dismiss the entire lawsuit against Mercedes on the basis of three letters containing unsworn hearsay statements, without the benefit of a fully developed factual record.

Once that record is developed, the Court will entertain the expected motions for summary judgment. At this stage, however, Mercedes's Separate Motion to Dismiss for lack of standing based on these Takata letters is **DENIED** as premature.

### D. CONCLUSION

The Court finds Plaintiffs' allegations establish Article III standing—except with respect to the claims brought by the purported Audi sub-classes against Volkswagen, and the claims brought by the purported Volkswagen sub-classes against Audi. To be clear, the Court's analysis and ruling are limited to the nature of the motion to dismiss stage, where the Court must take Plaintiffs' allegations as true. Mercedes, Volkswagen, and General Motors will surely have the opportunity at summary judgment or trial to present evidence concerning their knowledge of, and other causes and factors contributing to, the alleged inflator defects. For now, Plaintiffs sufficiently allege Article III standing.

## II. JURISDICTION

Recently, the Court ruled the Transferor Plaintiffs' legal actions ("Transferor Actions") were "separate legal actions" from the Direct-File Plaintiffs' legal actions ("Direct-File Actions"). (*See* D.E. 3394 at 16–19.) The Court further explained that "when pretrial proceedings end, the Court will sever (or recommend that the [Judicial Panel on Multidistrict Litigation] sever) any remaining claims asserted by the Transferor Plaintiffs—including any claims amended directly in this MDL proceeding." *Id.* at 19. The Court further explained that these "legal actions will then 'resume their separate identities' upon remand to the appropriate transferor court." *Id.* (citing *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 592 (6th Cir. 2013)). In this Order, then, the Court will resolve the personal jurisdiction issues raised by Defendants by analyzing personal jurisdiction over the claims advanced in the Transferor Actions separately from the claims advanced in the Direct-File Actions.

The presence of foreign-based defendants adds additional layers to the Court's personal jurisdiction analysis. Mercedes, Volkswagen, and Audi contend the Court lacks personal jurisdiction over the foreign-based parent corporations: Daimler AG, Volkswagen Aktiengesellschaft, and Audi Aktiengesellschaft (collectively, the "Foreign Defendants"). Accordingly, the Court will divide its analysis again, this time between the Foreign Defendants, and their domestic-based subsidiary corporations: FCA, General Motors, Mercedes-Benz USA, LLC, Volkswagen Group of America, Inc., and Audi of America, LLC (collectively, the "Domestic Defendants"). Finally, within the confines of the Transferor Actions and the Direct-File Actions, the Court must also address—as to both the Domestic Defendants and the Foreign Defendants—two types of personal jurisdiction: "'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1779–80 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Moving separately, each Defendant seeks to dismiss with prejudice the Amended Consolidated Class Action Complaints under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Defendants argue that the Court entirely lacks general jurisdiction under the multidistrict litigation transfer provision, 28 U.S.C. Section 1407, because the Plaintiffs direct-filed the complaints in this multidistrict litigation transferee court, and because none of the Defendants are jurisdictionally "at home" in Florida. Defendants then proffer several reasons that the Court entirely lacks specific jurisdiction over any of the Defendants. First, Defendants argue that the Florida long-arm statute, Fla. Stat. Section 48.193, does not provide a basis for specific jurisdiction over any Defendant because Plaintiffs fail to allege sufficient factual matter to establish Florida directed conduct by Defendants. Second, Defendants add that because the

Plaintiffs fail to state plausible RICO claims, there is no basis to exercise specific jurisdiction over the Domestic Defendants pursuant to the RICO statute's nationwide service of process provision, 18 U.S.C. Section 1965(d), by way of Federal Rule of Civil Procedure 4(k)(1)(c). Third, Defendants further argue that there is no basis to exercise specific jurisdiction over the Foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2), the federal long-arm statute. Finally, Defendants contend that the Supreme Court's ruling in *Bristol-Myers* requires that the Court dismiss all claims advanced by the non-Florida putative class members for lack of specific jurisdiction.

In their Omnibus Response, Plaintiffs articulate several bases for the Court to exercise personal jurisdiction over Defendants. Specifically, Plaintiffs argue the Court can exercise: (1) general jurisdiction over the Domestic Defendants and specific jurisdiction over the Foreign Defendants pursuant to the Court's authority as an MDL transferee court under Section 1407; (2) specific jurisdiction over all Defendants under the Florida long-arm statute; (3) specific jurisdiction over the RICO claims asserted against the Domestic Defendants pursuant to the RICO statute's nationwide service of process provision; (4) specific jurisdiction over the Foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2), the national long-arm statute; and (5) pendent personal jurisdiction over all remaining federal, state, and common-law claims. Plaintiffs also assert the Court's exercise of specific jurisdiction over any of the non-Florida putative class members' claims against any of the Defendants is not precluded by *Bristol-Myers*.

Before diving into the thorny long-arm statute analyses, the Court will quickly resolve Mercedes's and Volkswagen's subject-matter jurisdiction challenge, and the parties' dispute over the role of *Bristol-Myers*.

## A.    PRIMARY JURISDICTION AND PREEMPTION

Mercedes and Volkswagen argue the Court lacks subject-matter jurisdiction over Plaintiffs' requests for injunctive relief on grounds this relief should be denied as preempted by the National Traffic and Motor Vehicle Safety Act, or alternatively, subject to the primary jurisdiction of the National Highway Transportation Safety Administration's ("NHTSA") authority to approve, administer, and supervise recalls. (D.E. 2988 at 85–87.) Plaintiffs respond that they "agree not to seek recall-related injunctive relief that would interfere with NHTSA's [Coordinated Remedy Order.]" (D.E. 3034 at 179.) Accordingly, Mercedes's and Volkswagen's contention is moot. *See In re Takata Airbag Prod. Liab. Litig.*, 2015 WL 12641693, at *3 (S.D. Fla. Sept. 21, 2015) (denying motion to stay the case based on the primary jurisdiction of NHTSA where the plaintiffs agreed not to seek recall-related injunctive relief). Notwithstanding, to the extent Plaintiffs seek injunctive relief going forward that will "unduly and directly interfere with NHTSA's investigatory and regulatory functions," or interfere with NHTSA's Coordinated Remedy Order, the Court can address this issue at that time. *See id.* Accordingly, Mercedes's and Volkswagen's Motion to Dismiss on these grounds is **DENIED**.

## B.  ROLE OF *BRISTOL-MYERS*

Defendants argue that the Supreme Court's decision in *Bristol-Myers* requires the Court to dismiss all claims advanced by the non-Florida[10] putative class members. In *Bristol-Myers*, a group of plaintiffs—consisting of 86 California residents and 592 residents from 33 other States—

---

[10] The Court notes that while Defendants' *Bristol-Myers* contentions are limited to non-Florida putative class members, these arguments targeted the complaints that were direct-filed here in Florida. Furthermore, Defendants' arguments were advanced before the Court clarified the relationship between the Direct-File Complaints and the Transferor Complaints. Since the Court's prior order established that there are separate legal actions (*i.e.* the Direct-File Actions and the Transferor Actions), the Court's analysis will construe the Defendants' *Bristol-Myers* arguments as also precluding the exercise of specific jurisdiction by the transferor courts over the claims advanced by the Transferor Plaintiffs who are not residents of the states where those actions were filed.

filed eight separate suits as a mass-tort action in California state court, alleging injuries caused by the pharmaceutical drug Plavix, which was manufactured by Bristol-Myers Squibb, a non-California resident. 137 S. Ct. at 1777–78. The Supreme Court ruled that for the California state court to exercise personal jurisdiction over the nonresident defendant, "there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Id.* at 1780 (quoting *Goodyear*, 564 U.S. at 919) (alteration in original). The Supreme Court further explained that "[t]he mere fact that *other* plaintiffs were prescribed, obtained, and ingested [the drug] in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* at 1781 (emphasis in original; alteration added).

Applying *Bristol-Myers*, Defendants argue the non-Florida putative class members' claims must be dismissed because they are premised on alleged injuries sustained entirely outside of Florida, and are based on alleged conduct that did not take place in Florida. (*See* D.E. 2981 at 29–32; D.E. 2983 at 34–35; D.E. 2988 at 44–46.) Plaintiffs disagree and argue that "not one source of this Court's authority to exercise personal jurisdiction over Defendants is affected by the Supreme Court's decision in *Bristol-Myers*." (D.E. 3034 at 63.) Specifically, Plaintiffs argue *Bristol-Myers* is limited to state court litigation, does not apply in the context of the "unique jurisdiction of a federal [multidistrict litigation transferee] court," and in any event, does not preclude exercising pendent personal jurisdiction. *Id.* at 63–65.

The Court agrees with Plaintiffs, and is "persuaded by the growing body of law amongst district courts in this Circuit holding that *Bristol-Myers* does not bar claims of non-resident members of a putative class from asserting claims in federal court . . . ." *Lee v. Branch Banking & Tr. Co.*, 2018 WL 5633995, at *6 (S.D. Fla. Oct. 31, 2018) (denying motion to dismiss claims

by nonresident putative class members under *Bristol-Myers*); *see also Becker v. HBN Media, Inc.*, 314 F. Supp. 3d 1342, 1345 (S.D. Fla. 2018) (same); *Feldman v. BRP US, Inc.*, 2018 WL 8300534, at *5–6 (S.D. Fla. Mar. 28, 2018) (same); *see also Goodman v. Sun Tan City, LLC.*, 2018 WL 6978695, at *4–5 (S.D. Fla. Dec. 14, 2018) (recommending same), *report and recommendation adopted*, 2019 WL 1112258 (S.D. Fla. Jan. 8, 2019).

As Plaintiffs point out, the Supreme Court made clear that *Bristol-Myers* applied "settled principles [of] specific jurisdiction," and—critically—was limited to *state* courts exercising personal jurisdiction over nonresident defendants: "[O]ur decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1781, 83–84 (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 102, n.5 (1987)). Indeed, several courts in this district have relied on this explicit limitation in declining to apply *Bristol-Myers* to federal courts exercising jurisdiction over claims advanced by non-Florida residents. *See, e.g.*, *Becker*, 314 F. Supp. 3d at 1345; *Lee*, 2018 WL 5633995, at *6; *Goodman*, 2018 WL 6978695, at *4, *report and recommendation adopted*, 2019 WL 1112258. The Court agrees with these well-reasoned opinions, and finds that because the federalism concerns that drove the *Bristol-Myers* decision are not present in this case, there is no basis to dismiss any claims advanced by the non-Florida putative class members.

There are additional reasons that *Bristol-Myers* does not require dismissal of claims advanced by the non-Florida putative class members. *Bristol-Myers* was a mass action products liability case—not a class action case—which is a "meaningful difference[]" that has "persuaded other district courts to reject efforts to expand [*Bristol-Myers*] to the context of nationwide class actions," *Feldman*, 2018 WL 8300534, at *5 (citations omitted). General Motors maintains that

*Bristol-Myers* applies equally to mass action and putative class actions. (D.E. 2981 at 30.) But this argument has been soundly rejected by a plethora of federal district courts, which have ruled that *Bristol-Myers* does not apply in the class action context. *See, e.g.*, *Sanchez v. Launch Tech. Workforce Sols., LLC*, 297 F. Supp. 3d 1360, 1369 (N.D. Ga. 2018) ("In sum, the undersigned concludes that . . . *Bristol-Myers* simply reaffirms controlling due-process law and does not apply to federal class actions . . . ."); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 127 (D.D.C. 2018) ("[T]he court joins the other courts that have concluded that *Bristol-Myers* does not require a court to assess personal jurisdiction with regard to all non-resident putative class members."); *Tickling Keys, Inc. v. Transamerica Fin. Advisors, Inc.*, 305 F. Supp. 3d 1342, 1351 (M.D. Fla. 2018) ("[T]he Court declines to extend *Bristol–Myers* to the class action context."); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 5971622, at *16 (E.D. La. Nov. 30, 2017) ("[*Bristol*-Myers] does not speak to or alter class action jurisprudence."); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017) ("[T]he Court is not persuaded to extend *Bristol-Myers* to the class action context on these facts."); *see also Becker*, 314 F. Supp. 3d at 1345; *Lee*, 2018 WL 5633995, at *6; *Feldman*, 2018 WL 8300534, at *5–6; *Goodman*, 2018 WL 6978695, at *5, *report and recommendation adopted*, 2019 WL 1112258.

These district courts have explained that in contrast to mass-tort actions—where "each plaintiff is a real party in interest to the complaints, meaning that they were named as plaintiffs in the complaints"—in putative class actions, "one or more plaintiffs seek to represent the rest of the similarly situated plaintiffs, and the 'named plaintiffs' are the only plaintiffs actually named in the complaint." *Becker*, 314 F. Supp. 3d at 1345 (quoting *Fitzhenry-Russell*, 2017 WL 4224723, at *5). Indeed, "[t]he class action is 'an exception to the usual rule that litigation is conducted by

and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Consequently, unlike in a mass-tort action, "for a case to qualify for class action treatment, it needs to meet the additional due process standards for class certification under Rule 23—numerosity, commonality, typicality, adequacy of representation, predominance and superiority." *Molock*, 297 F. Supp. 3d at 126–27 (quoting *In re Chinese–Manufactured Drywall*, 2017 WL 5971622, at \*14). In light of these "additional elements of a class action [which] supply due process safeguards not applicable in the mass tort context," several federal district courts have held that *Bristol–Myers* "does not require a court to assess personal jurisdiction with regard to all non-resident putative class members." *Id.*; *see also supra*.

As a corollary, then, *Bristol-Myers* does not require federal courts to analyze personal jurisdiction as to the claims advanced by all the non-Florida putative class members that have been consolidated in MDL proceedings. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 5971622, at \*20 ("[*Bristol-Myers*] is about limiting a state court's jurisdiction when it tried to reach out-of-state defendants on behalf of out-of-state plaintiffs in a mass action suit. That scenario is inapplicable to nationwide class actions in federal court, such as the cases before this MDL Court."). And imposing such a requirement would turn-upside down the multidistrict litigation statute's goal of promoting the "convenience of parties and witnesses" and the "just and efficient conduct" of consolidated actions. 28 U.S.C. § 1407(a).

Mercedes and Volkswagen argue *Bristol-Myers* precludes the Court from exercising pendent personal jurisdiction over the non-Florida putative class members' claims. (D.E. 2988 at 45 n.19.) But this argument flies in the face of several rulings that *Bristol-Myers* does not *per se* preclude federal courts from exercising pendent personal jurisdiction over claims advanced by

nonresident plaintiffs. *See, e.g., Sloan v. General Motors LLC*, 287 F. Supp. 3d 840, 862 (N.D. Cal. 2018) (exercising pendent personal jurisdiction over claims advanced by nonresident plaintiffs in light of the "absence of interstate sovereignty concerns present in *Bristol-Myers*"); *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1172–73 (S.D. Cal. 2018) (rejecting argument that pendent personal jurisdiction doctrine did not survive *Bristol-Myers*); *Allen v. ConAgra Foods, Inc.*, 2018 WL 6460451, at *4 (N.D. Cal. Dec. 10, 2018) (exercising pendent personal jurisdiction over claims brought by nonresident plaintiffs and noting *Bristol-Myers* did not apply because "the Supreme Court could not have intended to severely narrow the forum choices available to *class* action plaintiffs when it decided a case involving a *mass* action") (emphasis in original).  And the only authority Mercedes and Volkswagen rely on in support of their argument—*Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 875 (N.D. Ill. 2017)—is inapposite because the plaintiffs there brought "only state law claims," *id.* at 871, and thus, importantly, there were no federal claims providing a basis for personal jurisdiction pursuant to a nationwide service of process provision, *see Azalp LLC v. Silverstein*, 2015 WL 12711232, at *5 (S.D. Fla. Aug. 17, 2015) (noting the doctrine of pendent personal jurisdiction arises "where a federal statute authorizes nationwide service of process and the federal and state claims 'derive from a common nucleus of operative facts' . . . .") (quoting *Koch v. Royal Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1374 (S.D. Fla. 2012)).

In short, *Bristol-Myers* does not *per se* preclude this Court, or the transferor courts, from exercising specific jurisdiction or pendent personal jurisdiction over claims advanced by the nonresident putative class members.  Therefore, Defendants' Motions to Dismiss claims asserted by the nonresident putative class members under *Bristol-Myers* are **DENIED**.

The Court will now turn to the core jurisdiction issues in dispute—the exercise of general and specific jurisdiction over the Foreign and Domestic Defendants as to the claims advanced in the Transferor and Direct-File Actions.

## C.    GENERAL PERSONAL JURISDICTION

### 1.  **Domestic Defendants**

For domestic based corporations, the "paradigm forum" for the exercise of general jurisdiction is "one in which the corporation is fairly regarded as at home." *Bristol-Myers*, 137 S. Ct. at 1780 (quoting *Goodyear*, 564 U.S. at 924). This includes "the corporation's place of incorporation and its principal place of business." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *Goodyear*, 564 U.S. at 924).

Generally, once a complaint is filed, the Court determines whether it can exercise general jurisdiction over the asserted claims. But in multidistrict litigation cases, it is well established that "[t]ransfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction and venue." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987) (quoting *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.L. 1976)). Instead, following transfer under Section 1407, "the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *Id.*; *see also In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 n.11 (3d Cir. 2004) ("As correctly concluded by the District Court, the transferee court can exercise personal jurisdiction to the same extent that the transferor court could."). Accordingly, for the Transferor Actions, the Court must determine whether the transferor district courts had general jurisdiction over the corresponding Domestic Defendants; and for the Direct-File Actions, the Court must determine whether *it* can exercise general jurisdiction over the Domestic Defendants.

### a) **Transferor Actions**

Plaintiffs allege, and the Domestic Defendants agree (or otherwise do not contest) that the Transferor Complaints were filed in states where the Domestic Defendants are incorporated or hold their principal places of business. For instance, the *Dwinnells* and *Brugaletta* Complaints were filed in the Eastern District of Michigan, and Plaintiffs allege in the *Boyd* and *Whitaker* Complaints—and FCA and General Motors agree—that FCA and General Motors keep their principal places of business in Michigan. (*See* D.E. 2758 at ¶ 27; D.E. 2983 at 11–12; D.E. 2759 at ¶ 28; D.E. 2981 at 29.) Next, the *Maestri* Complaint was filed in the Northern District of Georgia, the *McBride* Complaint was filed in the Eastern District of Virginia, and the *Krmpotic* and *Alters* Complaints were filed in the District of New Jersey. And Plaintiffs allege in the *Puhalla* Complaint—and the Domestic Defendants do not contest—that Mercedes-Benz USA, LLC kept its principal place of business in New Jersey until 2015 (at which time it moved to Georgia), that Volkswagen Group of America is incorporated in New Jersey and keeps its principal place of business in Virginia, and that Audi of America, LLC keeps its principal place of business in Virginia. (*See* D.E. 2762 at ¶¶ 27, 29, 33; D.E. 2988 at 21, 38.)

Therefore, because the Transferor Complaints were filed where each respective Domestic Defendant is jurisdictionally "at home," the Court finds that each transferor court can exercise general jurisdiction over the appropriate Domestic Defendants. Consequently, as an MDL transferee court, this Court can exercise general jurisdiction over the Domestic Defendants as to the Transferor Actions. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d at 163; *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 297 n.11.

### b) **Direct-File Actions**

It naturally follows from the preceding analysis that the Court cannot exercise general

jurisdiction over the Domestic Defendants as to the Direct-File Actions because none of these Defendants are incorporated or hold their principal places of business in Florida. *See BNSF Ry. Co.*, 137 S. Ct. at 1558 ("The 'paradigm' forums in which a corporate defendant is 'at home,' we explained, are the corporation's place of incorporation and its principal place of business."). And Plaintiffs do not argue otherwise.

There are, however, "exceptional case[s]" where a corporate defendant's operations in another forum "may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 1558 (quoting *Daimler AG*, 571 U.S. at 139 n.19). But this is not one of those exceptional cases. *See id.* (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447–48 (1952) as an exceptional circumstance because war forced the defendant corporation's owner to temporarily relocate the enterprise from the Philippines to Ohio, which then became the center of the corporation's wartime activities). Again, Plaintiffs do not argue otherwise.

Therefore, the Court cannot exercise general jurisdiction over the Domestic Defendants as to the Direct-File Actions. As a result, the Court must find that it can exercise "specific" or "case-linked" jurisdiction over them.

## 2. Foreign Defendants – Transferor and Direct-File Actions

To exercise general jurisdiction over the Foreign Defendants, the Court must determine their affiliations with the United States are "so 'continuous and systematic' as to render [them] essentially at home" in the United States. *Daimler AG*, 571 U.S. at 127 (quoting *Goodyear*, 564 U.S. at 191).

Regarding the Foreign Defendants, Plaintiffs argue that "the transferor courts, and by extension this Court, may exercise specific jurisdiction, as contrasted with general jurisdiction, over Plaintiffs' claims." (D.E. 3034 at 52.) Thus, Plaintiffs concede that neither this Court, nor

the transferor courts, can exercise general jurisdiction over the Foreign Defendants. The Court

agrees with the Plaintiffs. Consequently, the Court must find that it, and the transferor courts, can

exercise "specific" or "case-linked" jurisdiction over the Foreign Defendants.

### 3. Conclusion

For the foregoing reasons, the Court can exercise general jurisdiction over the Domestic

Defendants as to the Transferor Actions; but it cannot exercise general jurisdiction over the

Domestic Defendants as to the Direct-File Actions, or over the Foreign Defendants as to either the

Transferor or Direct-File Actions. Now, the Court will address whether it can exercise specific

jurisdiction.

### D.    SPECIFIC PERSONAL JURISDICTION

Where a district court does not conduct an evidentiary hearing on the question of personal

jurisdiction, the burden is on the Plaintiffs to establish a *prima facie* case of personal jurisdiction

over the nonresident Defendants. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291

(11th Cir. 2000) (citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)). A *prima facie*

case of personal jurisdiction is established if Plaintiffs present "enough evidence to withstand a

motion for directed verdict." *Id.* The Court must accept allegations as true, to the extent that they

are uncontroverted by the Defendants' affidavits and depositions, and must construe all reasonable

inferences in favor of the Plaintiffs. *Id.*

The Court can exercise specific jurisdiction over a nonresident domestic defendant if

authorized by a state long-arm statute or a federal statute. *See Courboin v. Scott*, 596 F. App'x

729, 732 (11th Cir. 2014). When analyzing a motion to dismiss for lack of personal jurisdiction

under Rule 12(b)(2), the Court must "first determine whether the applicable statute potentially

confers jurisdiction over the defendant, and then determine whether the exercise of jurisdiction

comports with due process." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d

935, 942 (11th Cir. 1997) (citing *Sun Bank, N.A., v. E.F. Hutton & Co., Inc.*, 926 F.2d 1030, 1033 (11th Cir. 1991); *Go–Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1413 (9th Cir. 1989)). Thus, the Court must determine whether there is a statutory and a constitutional basis for exercising specific jurisdiction over each nonresident Defendant.

### 1. **Domestic Defendants in Direct-File Actions**

Plaintiffs argue this Court can exercise specific jurisdiction over the Domestic Defendants under the Florida long-arm statute, or alternatively under the RICO statute's nationwide service of process provision. Defendants contest the exercise of specific jurisdiction on both of these bases.

### a) **Florida Long-Arm Statute**

Plaintiffs argue the Florida long-arm statute gives this Court specific jurisdiction because the causes of action arise from the Domestic Defendants: (1) "[o]perating, conducting, engaging in, or carrying on a business or business venture in [Florida] or having an office or agency in [Florida]"; or (2) "[c]omitting a tortious act within [Florida]." (D.E. 3034 at 55 (quoting Fla. Stat. § 48.193(1)(a)(1)–(2).) FCA, Mercedes, and Volkswagen challenge the exercise of specific jurisdiction under the Florida long-arm statute with respect to all the Plaintiffs' claims. (*See* D.E. 2983 at 30–34; D.E. 2988 at 38–41.) General Motors, on the other hand, only challenges the exercise of specific jurisdiction over the non-Florida Plaintiffs' claims. (*See* D.E. 2981 at 28–32.)

To establish a defendant is "carrying on business" under Section 48.193(1)(a)(1), the activities of the Defendants "must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1239 (S.D. Fla. 2015) (quoting *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000)). Relevant factors in this analysis include "the presence and operation of an office in Florida . . ., the possession and maintenance of a license to do business in

Florida . . ., the number of Florida clients served . . ., and the percentage of overall revenue gleaned from Florida clients." *Id.* (quoting *Horizon Aggressive Growth, L.P. v. Rothstein–Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005)). Other relevant factors are the Defendants' marketing and advertising in Florida. *Id.* (citing *Carmel & Co. v. Silverfish, LLC*, 2013 WL 1177857, at *3 (S.D. Fla. Mar. 21, 2013)). To establish a defendant committed a "tortious act" under Section 48.193(1)(a)(2), a plaintiff must allege factual matter showing the Defendants' acts caused injury within Florida—even if the Defendants committed the act outside the state. *Id.* (citing *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 n.9 (11th Cir. 2013)).

Importantly, the Florida long-arm statute "must be strictly construed" and "any doubts about applicability of the statute must be resolved in favor of the defendant and against a conclusion that personal jurisdiction exists." *Keston v. FirstCollect, Inc.*, 523 F. Supp. 2d 1348, 1352 n.2 (S.D. Fla. 2007) (quoting *Gadea v. Star Cruises, Ltd.*, 949 So. 2d 1143, 1150 (Fla. 3d DCA 2007) (citing *Seabra v. Int'l Specialty Imp., Inc.*, 869 So. 2d 732, 733 (Fla. 4th DCA 2004))).

Here, even when accepted as true, Plaintiffs' allegations fail to establish a *prima facie* case of specific jurisdiction under the Florida long-arm statute. Plaintiffs' "explicit jurisdictional allegations" (D.E. 3034 at 58), are that, collectively, the Domestic and Foreign Defendants:

> [C]onduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use. This Court also has personal jurisdiction over Defendants because they consented to jurisdiction by registering to do business in Florida. This Court has pend[e]nt or supplemental personal jurisdiction over the claims of non-Florida Plaintiffs.

(*See* D.E. 2762 at ¶ 22; *see also* D.E. 2758 at ¶ 23; D.E. 2759 at ¶ 24.)

Looking to allegations leveled against specific Domestic Defendants, Plaintiffs allege that General Motors "design[s], build[s], and sell[s] cars, trucks, crossovers and automobile[s] . . . worldwide" through a "dealer network to retail customers." (D.E. 2759 at ¶ 30.) Plaintiffs then allege Volkswagen Group of America—as "a wholly-owned U.S. subsidiary" of its German based parent corporation Volkswagen Aktiengesellschaft—"engages in business activities in furtherance of the interest of" Volkswagen Aktiengesellschaft, including "the advertising, marketing and sale of Volkswagen automobiles worldwide." (D.E. 2762 at ¶ 27.) Plaintiffs assert that Audi of America, LLC—as a "wholly-owned U.S. subsidiary of" its German based parent corporation Audi Aktiengesellschaft—"engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states." *Id.* at ¶ 29. Next, Plaintiffs allege that Mercedes-Benz USA, LLC—collectively with its German based "parent corporation" Daimler AG—"engineered, designed, developed, manufactured, or installed the Defective Airbags in the Mercedes-branded Class Vehicles, and approved the Defective Airbags for use in those vehicles," and also "developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles." *Id.* at ¶ 33. Plaintiffs do not assert any analogous allegations against FCA. (*See* D.E. 2758 at ¶ 27.)

None of these allegations specify or establish any "general course of business activity" *in Florida* "for pecuniary benefit." *Hard Candy, LLC*, 106 F. Supp. 3d at 1239 (quoting *Future Tech.*, 218 F.3d at 1249). Nor do any of these allegations specify or establish "the presence and operation of an office in Florida," "the possession and maintenance of a license to do business in Florida," "the number of Florida clients served," or "the percentage of overall revenue gleaned from Florida clients." *Id.* (quoting *Horizon Aggressive Growth, L.P.*, 421 F.3d at 1167).

Plaintiffs direct the Court to several allegations regarding the advertising and marketing of the Domestic Defendants' vehicles that were purchased by Florida Plaintiffs. (*See* D.E. 3034 at 55; *see also* D.E. 2762 at ¶¶ 47, 52, 73, 81, 86, 90, 108, 114–15, 118–19, 220–221.) Specifically, Plaintiffs allege the Florida Plaintiffs "viewed or heard commercials through television and radio" or "conducted extensive internet research on and read magazine articles about the quality, safety, and durability" of the Domestic Defendants' vehicles. But these allegations do not even identify the Domestic Defendants as the source or producers of the advertisements seen or heard by the Florida Plaintiffs—let alone that the advertisements were seen or heard in Florida or were directed toward Florida citizens. The vaguely alleged connection between the advertisements and the Florida Plaintiffs are further highlighted by several allegations that "specific" representations were made in various marketing materials in brochures "distributed at dealerships" (*see* D.E. 2762 at ¶¶ 220(a)–(g), 221(e)–(g)), and set forth in "press release[s]" on the Defendants' "website[s]," *see id.* at ¶¶ 221(a)–(d). In short, Plaintiffs' allegations, even taken as true, fail to establish the Domestic Defendants directed their advertising and marketing of the allegedly defective vehicles toward the Florida Plaintiffs.

In addition, Plaintiffs direct the Court to several allegations that certain Plaintiffs purchased or leased their vehicles in Florida from the Domestic Defendants. (*See* D.E. 3034 at 55–56; *see also* D.E. 2762 at ¶¶ 47, 52, 73, 81, 86, 90, 108, 114, 118–19, 123.) But none of these allegations establish that the Plaintiffs purchased or leased their vehicles from authorized dealerships, or that the dealerships were acting as agents of the Domestic Defendants. *See id.* At best, Plaintiffs allege—again conclusorily, and in the limited context of certain state law implied warranty claims—they had "sufficient direct dealings with either Defendants or its agents (dealerships) to establish privity of contract." (*See, e.g.*, D.E. 2762 at ¶¶ 344, 701.) These allegations cannot

establish an agency relationship between the dealerships and the Domestic Defendants such that the Court can exercise specific jurisdiction under the Florida long-arm statute. *See Hard Candy, LLC*, 106 F. Supp. 3d at 1241 (noting that "[a]gency-based personal jurisdiction exists where the parent entity exercises operational control over a subsidiary," in other words, "day-to-day control of the internal affairs or basic operations of the subsidiary") (quoting *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 2012 WL 5830590, at *3 (M.D. Fla. Nov. 16, 2012)); *cf. Consol. Dev. Corp.*, 216 F.3d at 1293 (noting a parent corporation "is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there").

Despite failing to allege "specific facts to fit within" Sections 48.193(1)(a)(1)–(2), Plaintiffs argue they can plead a *prima facie* showing of personal jurisdiction by "track[ing] the language of § 48.193, without pleading supporting facts." (D.E. 3034 at 55 (quoting *Gregory v. EBF & Assocs., L.P.*, 595 F. Supp. 2d 1334, 1339 (S.D. Fla. 2009).) The Court disagrees, as the Eleventh Circuit has held that such "vague and conclusory allegations . . . are insufficient to establish a prima facie case of personal jurisdiction." *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1217–18 (11th Cir. 1999) (*per curiam*)); *see also Catalyst Pharm., Inc. v. Fullerton*, 748 F. App'x 944, 946 (11th Cir. 2018) ("Vague and conclusory allegations do not satisfy" a plaintiff's burden to "make out a prima facie case of jurisdiction") (citing *Snow*, 450 F.3d at 1318).

Relying on *Snow*, courts in the Eleventh Circuit have repeatedly declined to exercise specific jurisdiction over a nonresident defendant on the basis of generalized and conclusory allegations—like those advanced by Plaintiffs here. *See, e.g., Castillo v. Allegro Resort Mktg.*, 603 F. App'x 913, 916 (11th Cir. 2015) (*per curiam*) (affirming district court's dismissal for lack of personal jurisdiction where plaintiff alleged that defendant had "contacts with [Florida] 24/7

and 365 days a year," yet "made no specific factual allegations of these contacts"); *Leon*, 301 F. Supp. 3d at 1216 & n.6 (finding general allegations that Honda "conduct[ed] substantial business in this District" insufficient to allege specific jurisdiction under the Florida long-arm statute because the complaint contained "no detail to support this statement," which left the court "unable to infer which of Honda's contacts with Florida support[ed] specific personal jurisdiction"); *Accurate Ins. Grp., Corp. v. Accurate Ins. Servs. Inc.*, 2015 WL 11233072, at *2 (S.D. Fla. Mar. 2, 2015) (finding allegation that "Defendant's false assertions of infringement were directed to the Plaintiff in the State of Florida and as such Defendant is subject to the personal jurisdiction of this Court" to be "vague and conclusory allegations . . . wholly insufficient to establish personal jurisdiction over Defendant under Florida's long-arm statute"); *Bulpit, LLC v. DeCanio*, 2013 WL 12126313, at *4 (S.D. Fla. June 7, 2013) (finding "no basis" to exercise specific jurisdiction under Florida long-arm statute where plaintiff alleged the defendant "conduct[ed] business throughout interstate commerce and in all fifty states of the United States . . . and in particular conduct[ed] business in the Southern District of Florida"); *Vision Int'l Prod. Inc. v. Liteco S.R.L.*, 2007 WL 9700539, at *4 (S.D. Fla. Aug. 8, 2007) (finding allegations that defendant "offered for sale and continued to offer for sale in this District and elsewhere in the United States dispensing capsules . . . covered by one or more of the patents in suit" to be "formulaic conclusory averments insufficient to satisfy Plaintiffs' burden" of establishing a "general course of business activity in the State for pecuniary benefit," as required by the Florida long-arm statute).

Therefore, for these reasons—and the additional reason that the Florida long-arm statute "must be strictly construed" with "any doubts about applicability of the statute [being] resolved in favor of the defendant and against a conclusion that personal jurisdiction exists," *Keston*, 523 F. Supp. 2d at 1352 n.2 (quoting *Gadea*, 949 So. 2d at 1150 (citing *Seabra*, 869 So. 2d at 733))—the

Court finds no basis to exercise specific jurisdiction over the Domestic Defendants as to the Direct-File Actions under the Florida long-arm statute.[11] Consequently, the Court need not determine whether exercising specific jurisdiction under the Florida long-arm statute would comport with due process. *See Hard Candy, LLC*, 106 F. Supp. 3d at 1250 n.7.

### b) RICO Nationwide Service of Process Provision

As an alternative to the Florida long-arm statute, Plaintiffs assert the Court can exercise specific jurisdiction over the Domestic Defendants as to the RICO claims pursuant to the RICO statute's nationwide service of process provision in 18 U.S.C. Section 1965(d). Plaintiffs further contend that once the Court exercises specific jurisdiction over the RICO claims, it can then exercise pendent personal jurisdiction over the remaining federal, state, and common-law claims. Defendants challenge both applications of jurisdiction.

Defendants vigorously oppose Plaintiffs' theory, arguing that the RICO nationwide service of process provision cannot provide a basis for specific jurisdiction because Plaintiffs fail to state plausible RICO claims. But the "general rule" is that courts "address issues relating to personal jurisdiction *before* reaching the merits of a plaintiff's claims." *Republic of Panama*, 119 F.3d at 940 (citing *Madara*, 916 F.2d at 1513–14 & n. 1; Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, Civil 2d § 1351, at 243–44 (1990)) (emphasis added). The rationale for this rule is that "[a] defendant . . . not subject to the jurisdiction of the court cannot be bound by

---

[11] Even though General Motors only challenged the exercise of specific jurisdiction over the non-Florida plaintiffs' claims (*see* D.E. 2981 at 28–32), the Court still finds it lacks specific jurisdiction under the Florida long-arm statute as to *all* plaintiffs advancing claims against General Motors in the Direct-File Complaints. *See Courboin*, 596 F. App'x at 735 ("A district court may on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related.") (citing *Loman Dev. Co. v. Daytona Hotel & Motel Suppliers, Inc.*, 817 F.2d 1533, 1537 (11th Cir. 1987); *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1336 (11th Cir. 2011)).

its rulings." *Id.* (citing *Madara*, 916 F.2d at 1514). Consequently, the Court must determine if it has the power to bind the Domestic Defendants with a ruling before it can reach the sufficiency of Plaintiffs' RICO allegations. *See id.*

Section 1965(d) can serve as "the statutory basis for personal jurisdiction." [12] *Id.* at 942 (citing *In re Chase & Sanborn Corp.*, 835 F.2d 1341, 1344 (11th Cir. 1988), *rev'd on other grounds sub. nom, Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987)). This Section provides that process may be served "on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). But Plaintiffs are "entitled to take advantage of [RICO's] nationwide service of process provision" only "insofar as" the underlying RICO claim "is not wholly immaterial or insubstantial." *Republic of Panama*, 119 F.3d at 942. In other words, whether a basis exists for exercising specific jurisdiction under Section 1965(d) depends on whether the Direct-File Actions state "colorable" RICO claims. *Courboin*, 596 F. App'x at 732 (citing *Republic of Panama*, 119 F.3d at 942). It necessarily follows, then, that determining whether the Direct-File RICO claims are "colorable"—or "not wholly immaterial or insubstantial"—is a separate and distinct question from whether the RICO claims are plausibly alleged. *See Am. Heritage Enters., Inc. v. Am. Paramount Fin., Inc.*, 2011 WL 13225179, at *3–4 (S.D. Fla. Feb. 14, 2011) (addressing whether the plaintiff's RICO claim was "colorable" for jurisdictional purposes, before addressing whether the RICO claim was plausibly alleged under

---

[12] Under Federal Rule of Civil Procedure 4(k)(1)(C), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." Here, Plaintiffs and all Defendants stipulated to waiver of service. (*See* D.E. 2840.) Therefore, the service of process requirement is satisfied. Importantly, at the time service was waived, Defendants "expressly reserve[d] all arguments and defenses with respect to the actions, including as to jurisdiction." *Id.* at 2 n.1. Thus, the Court finds that Defendants have properly preserved their jurisdiction challenges.

*Twombly*, *Iqbal*, and Federal Rule of Civil Procedure 9(b)). Accordingly, at this juncture, the Court will only determine whether the RICO claims are "not wholly immaterial or insubstantial," and will later address the sufficiency of the RICO claims.

### (1) "Colorable" Claims

The Court finds the RICO claims asserted against the Domestic Defendants are "not wholly immaterial or insubstantial" because the underlying allegations are sufficiently similar to allegations this Court previously determined to state plausible RICO claims. *See In re Takata Airbag Prod. Liab. Litig.*, 2015 WL 9987659, at *1–2 (denying Takata's and Honda's motions to dismiss RICO claims). This limited finding simply means the Direct-File Plaintiffs may "take advantage of" the RICO nationwide service of process provision. *Republic of Panama*, 119 F.3d at 942. Now the Court must determine whether Section 1965(d) "confers jurisdiction" over the Domestic Defendants. *Id.* (citing *Sun Bank, N.A.*, 926 F.2d at 1033; *Go–Video, Inc.*, 885 F.2d at 1413).

### (2) Statutory Basis

Section 1965(d) requires that the Court examine the Domestic Defendants' "aggregate contacts with the nation as a whole," as opposed to their "contacts with the forum state." *Id.* at 946–47. This is because the federal RICO statute was enacted to "bestow jurisdiction on federal courts over national conspiracies." *BankAtlantic v. Coast to Coast Contractors, Inc.*, 1997 WL 33807846, at *3 (S.D. Fla. Nov. 30, 1997). Thus, to "ensure that far-flung conspiracies [could] be tried together in one action," the statute created "special venue rules and [a] nationwide service of process provision." *Id.*

In this case, the Domestic Defendants do not dispute that they conduct substantial business throughout the United States.[13] Accordingly, the Court finds Section 1965(d) provides a statutory basis for exercising specific jurisdiction over the Domestic Defendants as to the RICO claims. *See Republic of Panama*, 119 F.3d at 948 (concluding same as to U.S. based corporate defendant); *Leon*, 301 F. Supp. 3d at 1230–31 (same).

### (3) Constitutional Basis

The Court must now decide whether exercising specific jurisdiction comports with due process. *Republic of Panama*, 119 F.3d at 942. To evaluate whether the Fifth Amendment requirements of fairness and reasonableness have been satisfied, courts should "balance the burdens imposed on the individual defendant against the federal interest involved in the litigation." *Id.* at 946 (citing *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 114 (1987); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). But, the Court must engage in this balancing "only if a defendant has established that his liberty interests actually have been infringed. Only when a defendant challenging jurisdiction has 'present[ed] a compelling case that . . . would render jurisdiction unreasonable,' should courts weigh the federal interests favoring the exercise of jurisdiction." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

In determining whether the Domestic Defendants have met the burden of establishing constitutionally significant inconvenience, the Court considers the factors used in determining fairness under the Fourteenth Amendment. *Id.* Even though the Domestic Defendants have minimum contacts with the United States as a whole, this does not "automatically satisfy the due

---

[13] This stands in contrast to the heavily disputed, generalized and conclusory allegations that the Domestic Defendants caused injuries in Florida, and conducted business activity in and directed toward Florida.

process requirements of the Fifth Amendment" because "[t]here are circumstances, although rare, in which a defendant may have sufficient contacts with the United States as a whole but still will be unduly burdened by the assertion of jurisdiction in a faraway and inconvenient forum." *Id.* at 947. But "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Id.* (citing *Asahi Metal Indus. Co.*, 480 U.S. at 116 (1987) (Brennan, J., concurring in part and concurring in the judgment) (noting that only in "rare cases" will inconvenience become constitutionally unreasonable))). Ultimately, "[t]he burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will 'make litigation 'so gravely difficult and inconvenient' that [he] unfairly is at a 'severe disadvantage' in comparison to his opponent.'" *Id.* at 948 (quoting *Burger King Corp.*, 471 U.S. at 478).

Here, the Domestic Defendants' moving papers fail to demonstrate "constitutionally significant inconvenience." Indeed, modern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum. *World-Wide Volkswagen Corp.*, 444 U.S. at 292–93 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222–23 (1957)). Given modern communication and transportation, the Court concludes that defending this lawsuit in Florida will not be "so gravely difficult and inconvenient," or put the Domestic Defendants at a "severe disadvantage" relative to the Plaintiffs. As such, the Court need not evaluate whether the Fifth Amendment requirements of fairness and reasonableness have been satisfied by "balance[ing] the burdens imposed on the individual defendant[s] against the federal interest involved in the litigation." *Republic of Panama*, 119 F.3d at 946 (citing *Asahi Metal Indus. Co.*, 480 U.S. at 114; *World-Wide Volkswagen Corp.*, 444 U.S. at 292).

Now, FCA argues the Court must follow a prior ruling in this case, which dismissed directly filed personal injury cases for lack of specific jurisdiction. (D.E. 2983 at 29 (citing D.E.

887).) But that ruling dismissed personal injury claims against defendants where "the accidents . . . did not take place in Florida and Plaintiffs fail[ed] to indicate any relevant conduct linking the Defendants to Florida." (D.E. 887 at 3.) That is, the Court dismissed those personal injury cases because the Plaintiffs did not allege "facts that would give the Court specific jurisdiction over Defendants." *Id.* at 2–3. The critical distinction here is that the Direct-File Complaints assert claims under the RICO statute, which contains a nationwide service of process provision that can serve as "the statutory basis for personal jurisdiction." *Republic of Panama*, 119 F.3d at 942 (citations omitted). As a result, the personal jurisdiction calculus in this situation is entirely different than in the context of personal injury claims. Thus, dismissal on this ground is not appropriate.

Furthermore, FCA suggests that for the Court to remain consistent with its prior ruling— and thus dismiss the directly filed claims for lack of specific jurisdiction—the Court must adhere to its own words that "inefficiency does not circumvent Defendants' right to have suits filed against them in an appropriate court." (D.E. 2983 at 29 (quoting D.E. 887 at 3 n.1).) But the Court's latest order—which ruled that the Transferor Actions would be remanded to the transferor courts for trial—resolved this contention. (*See* D.E. 3394 at 19 ("[W]hen pretrial proceedings end, the Court will sever (or recommend that the [Judicial Panel on Multidistrict Litigation] sever) any remaining claims asserted by the Transferor Plaintiffs—including any claims amended directly in this MDL proceeding.").) Furthermore, the Court's personal jurisdiction ruling here is not premised on any efficiency rationale; the ruling is based on the RICO nationwide service of process provision and binding interpretive case law.

Therefore, the Court finds that the Fifth Amendment's Due Process clause does not preclude exercising specific jurisdiction over the Domestic Defendants as to the RICO claims in

the Direct-File Actions; subject, of course, to Plaintiffs adequately alleging RICO claims.

## 2. Foreign Defendants in Transferor and Direct-File Actions

Plaintiffs argue the Court can exercise specific jurisdiction over the Foreign Defendants under Federal Rule of Civil Procedure 4(k)(2), the federal long-arm statute. But Rule 4(k)(2) is applicable only if "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2)(A); *see also Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1294 (Fed. Cir. 2012) ("[O]ne precondition for applying Rule 4(k)(2) is that the defendant must not be subject to personal jurisdiction in the courts of any state (sometimes called the 'negation requirement').").[14] Thus, the Court must first address specific jurisdiction under the long-arm statute of each state where Plaintiffs commenced their legal actions—*i.e.* Florida, Georgia, New Jersey, and Virginia.

Before beginning this analysis, the Court notes that while the parties briefed the applicability of the Florida long-arm statute, they did not brief the applicability of the Georgia, New Jersey, and Virginia long-arm statutes. This is because the parties did not interpret the Plaintiffs' strategic decision to file complaints in the transferor courts and to also file complaints directly in this multidistrict litigation proceeding as creating separate legal actions, which require additional layers of jurisdictional analysis. The parties did, however, fully brief whether exercising specific jurisdiction over the Defendants satisfied constitutional due process. As such, the Court's analysis begins with constitutional due process.

### a) Constitutional Due Process

---

[14] As an aside, this is the reason that Rule 4(k)(2) does not apply to the Domestic Defendants, all of which are subject to the general jurisdiction of certain states. *See supra* Section II.C.1.a. Relatedly, Rule 4(k)(1)(C) does not provide a basis for specific jurisdiction over the Foreign Defendants because the RICO service of process provision is limited to *nationwide* service, and does not extend to *worldwide* service.

In *Daimler AG v. Bauman*, the Supreme Court reversed the Ninth Circuit's agency theory of jurisdiction that would have "swe[pt] beyond the 'sprawling view of general jurisdiction'" that was rejected in *Goodyear*. *See Daimler AG*, 571 U.S. at 136 (quoting *Goodyear*, 564 at 929). The Ninth Circuit's agency theory would have subjected foreign-based Daimler AG to the general jurisdiction of California state courts because Daimler AG's domestic-based subsidiary Mercedes-Benz USA, LLC—which was Daimler's exclusive importer and distributor in the United States—had multiple California-based facilities and was the largest supplier of luxury vehicles to the California market. *Id.* at 123, 136. In reversing the Ninth Circuit, the Supreme Court explained that the Ninth Circuit "paid little heed to the risks to international comity" that its "expansive view of general jurisdiction posed." *Id.* at 141. The Supreme Court highlighted that in the past, "foreign governments' objections to some domestic courts' expansive views of general jurisdiction [had] . . . impeded negotiations of international agreements on the reciprocal recognition and enforcement of judgments." *Id.* at 141–42 (citing Brief for the United States (citing Juenger, *The American Law of General Jurisdiction*, 2001 U. CHI. LEGAL FORUM 141, 161–62)). In conclusion, the Supreme Court elaborated that "[c]onsiderations of international rapport . . . reinforced [its] determination that subjecting Daimler to the general jurisdiction of courts in California would not accord with the 'fair play and substantial justice' due process demand[ed]." *Id.* at 142 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The Supreme Court's cautious approach to the exercise of jurisdiction over nonresident defendants reemerged in *Bristol-Myers*, this time in the context of specific jurisdiction. As discussed above, the Supreme Court in *Bristol-Myers* ruled that for a California state court to exercise specific jurisdiction over a nonresident defendant, "there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes

place in the forum State and is therefore subject to the State's regulation." 137 S. Ct. at 1780 (quoting *Goodyear*, 564 U.S. at 919). In applying "settled principles [of] specific jurisdiction," the Supreme Court noted that the "primary concern" of jurisdiction generally is "the burden on the defendant," and "[a]ssessing this burden obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." *Id.* at 1780 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 292). Thus, "restrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)).

Mindful of the Supreme Court's concerns for international comity, and the practical issues of subjecting foreign entities to the coercive power of federal courts, the Court will now address specific jurisdiction over the Foreign Defendants.

"Due process requires that a nonresident defendant have certain minimum contacts with the forum so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1274 (11th Cir. 2002) (citing *Int'l Shoe*, 326 U.S. at 316; *Consol. Dev. Corp.*, 216 F.3d at 1291). "[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355–56 (quoting *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010)). Thus, the Court looks to the "affiliation between the forum and the underlying controversy," focusing on any "activity or . . . occurrence that [took] place in the forum State." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1314 (11th Cir. 2018) (quoting *Bristol-Myers*, 137 S.Ct. at 1780).

In specific personal jurisdiction cases, the Court applies a three-part test, which examines: (1) whether the Plaintiffs' claims "arise out of or relate to" at least one of the Defendants' contacts with the forum; (2) whether the nonresident Defendants "purposefully availed" themselves of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355 (citing *Burger King Corp.*, 471 U.S. at 472–75; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984); *Int'l Shoe Co.*, 326 U.S. at 316). The Plaintiffs bear the burden of establishing the first two prongs, and if they do so, the Defendants "must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

Here, Plaintiffs generally allege that the Domestic and Foreign Defendants: "conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District, and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in [Florida] or . . . committing a tortious act in [Florida] . . . ." (D.E. 2762 at ¶ 22.) The Plaintiffs also generally assert that each Foreign Defendant is in the business of designing, developing, manufacturing, marketing, and selling automobiles. *See id.* at ¶¶ 26, 28, 32. In addition, Plaintiffs generally allege that each Foreign Defendant is a German corporation with a principal place of business in Germany, *see id.*, and that each Domestic Defendant is "a wholly-owned U.S. subsidiary" of its Foreign Defendant parent corporation, *id.* at ¶¶ 27, 29, or that the Foreign Defendant is the parent company of the Domestic Defendant counterpart, *id.* at ¶ 33.

As to specific Foreign Defendants, Plaintiffs generally allege that Volkswagen Group of America (as the domestic subsidiary of the foreign based Volkswagen Aktiengesellschaft), "engages in business activities in furtherance of the interests of" Volkswagen Aktiengesellschaft, "including the advertising, marketing and sale of Volkswagen automobiles worldwide." *Id.* at ¶ 27. With respect to Audi, Plaintiffs generally allege Audi of America (as the domestic subsidiary of the foreign based Audi Aktiengesellschaft), "engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states." *Id.* at ¶ 29. Plaintiffs do not set forth any allegations specific to Mercedes, but instead generally allege—as they allege against Volkswagen and Audi—that the domestic and foreign parent corporations collectively "engineered, designed, developed, manufactured, or installed the Defective Airbags" in the class vehicles, and "approved the Defective Airbags for use in those vehicles," while also "develop[ing], review[ing], and approv[ing] the marketing and advertising campaigns designed to sell these Class Vehicles." *Id.* at ¶¶ 31, 33.

The Court finds these generalized allegations are devoid of specificity, and thereby fail to establish that the Foreign Defendants "purposefully availed" themselves of the privileges of conducting activity in Florida, Georgia, New Jersey, or Virginia. *See Castillo*, 603 F. App'x at 916 (*per curiam*) (affirming district court's dismissal for lack of personal jurisdiction where plaintiff "made no specific factual allegations of [defendant's] contacts" with Florida); *Leon*, 301 F. Supp. 3d at 1216 & n.6 (rejecting "generalized statements" that were "devoid of specificity" as failing to establish specific jurisdiction under the Florida long-arm statute); *Accurate Ins. Grp., Corp.*, 2015 WL 11233072, at *2 (rejecting "vague and conclusory allegations . . . [as] wholly insufficient to establish personal jurisdiction over Defendant under Florida's long-arm statute"); *Bulpit, LLC*, 2013 WL 12126313, at *4 (finding "no basis" to exercise specific jurisdiction under

Florida long-arm statute based on generalized allegations); *Vision Int'l Prod. Inc.*, 2007 WL 9700539, at *4 (rejecting "formulaic conclusory averments" as "insufficient" to establish specific jurisdiction under Florida long-arm statute); *see also Canty v. Fry's Elecs., Inc.*, 736 F. Supp. 2d 1352, 1369 (N.D. Ga. 2010) (adopting recommendation that nonresident defendant be dismissed where plaintiff "generally allege[d] that the harm he suffered as a result of [the nonresident defendant's] alleged actions were caused by an act or omission outside Georgia"); *Zelma v. Burke*, 2017 WL 58581, at *3 (D.N.J. Jan. 4, 2017) ("Plaintiffs' speculative and conclusory allegations against the [nonresident] Defendants are insufficient to meet their burden to prove a *prima facia* case of specific jurisdiction with reasonable particularity."); *Peterson v. HVM LLC*, 2016 WL 845144, at *4 (D.N.J. Mar. 3, 2016) ("Other than . . .basic descriptors, the complaint is devoid of allegations relating to the investors. These allegations are insufficient to establish general or specific jurisdiction over the investors."); *FN Herstal, S.A. v. Clyde Armory, Inc.*, 2012 WL 12977880, at *3 & n.3 (E.D. Va. May 30, 2012) (finding allegations that nonresident defendants "transact[ed] business in this district, or offer[ed] to sell their products or [made] their products available or [promoted] the infringing mark to prospective purchasers within this district" insufficient to establish a *prima facie* case of general or specific jurisdiction); *Askue v. Aurora Corp. of Am.*, 2012 WL 843939, at *4 (N.D. Ga. Mar. 12, 2012) (finding allegations that a defendant manufacturer that sold products in a market "undoubtedly derived substantial revenue from the sale of these products," and "engaged in a persistent course of conduct in Georgia by engaging a distributor to sell its products in this market," were "wholly conclusory and insufficient to sustain a finding of jurisdiction under the long-arm statute").

Therefore, the Court finds that Plaintiffs fail to establish a *prima facie* case of specific jurisdiction over the Foreign Defendants.

The Foreign Defendants also argue that Plaintiffs attempt to establish specific jurisdiction over them under a theory of agency—*i.e.* that the Court can exercise specific jurisdiction simply because the Domestic Defendants conduct business in the United States and are wholly-owned subsidiaries of the Foreign Defendants. "It is well established that as long as a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." *Consol. Dev. Corp.*, 216 F.3d at 1293 (11th Cir. 2000) (citing *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 337 (1925)). Thus, "a foreign parent corporation is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there." *Id.*

Here, Plaintiffs' allegations fail to overcome these presumptions. Plaintiffs set forth no allegations establishing the nature of the corporate relationship between the subsidiary Domestic Defendants and their parents, the Foreign Defendants; no allegations that individual plaintiffs purchased or leased their vehicles from dealerships directly owned or operated by the Foreign Defendants; and no allegations that Class Vehicles were "engineered, designed, developed, manufactured, or installed," or that the advertising or marketing campaigns were "developed, reviewed, [or] approved," in or for Florida, Georgia, New Jersey, or Virginia citizens. For these reasons, Plaintiffs' allegations do not demonstrate any "affiliation between the forum[s] and the underlying controvers[ies]" based on any "activit[ies] or . . . occurrence[s] that [took] place in the forum State[s]." *Waite*, 901 F.3d at 1314 (quoting *Bristol-Myers*, 137 S.Ct. at 1780).

Therefore, the Court concludes that based on these allegations, no court in Florida, Georgia, New Jersey, or Virginia can exercise specific jurisdiction over the Foreign Defendants in harmony with constitutional due process. The Plaintiffs' failure to plead allegations sufficient to satisfy constitutional due process would allow the Court to avoid addressing whether their allegations

satisfy any of the state long-arm statutes.[15] Nevertheless, the Court finds that Plaintiffs' allegations against the Foreign Defendants would fail to satisfy the Georgia, New Jersey, and Virginia long-arm statutes for the same reasons that Plaintiffs' allegations fail to satisfy the Florida long-arm statute. *See supra* Section II.D.1.a.

### b) Federal Long-Arm Statute

Plaintiffs also attempt to justify the exercise of specific jurisdiction over the Foreign Defendants under Federal Rule of Civil Procedure 4(k)(2), the federal long arm statute. "Rule 4(k)(2) was implemented to fill a lacuna in 'the enforcement of federal law in international cases.'" *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1337 (S.D. Fla. 2016) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008) (citing Fed. R. Civ. P. 4(k) advisory committee's notes to 1993 amendments)). "Yet, it is a rare occurrence when a court invokes jurisdiction under the rule." *Id.*

Here, the Foreign Defendants are not subject to the general jurisdiction of any state court. *See supra* Section II.C.2. Furthermore, the Foreign Defendants have not identified any other forum where they are amenable to suit. Thus, the Court is entitled to use Rule 4(k)(2). *See Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 & n.22 (11th Cir. 2009) ("[I]f . . . the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).") (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)). Accordingly, the Court can aggregate

---

[15] *See Castillo*, 603 F. App'x at 916 ("Because [plaintiff] failed to plead allegations sufficient to satisfy due process, we need not address personal jurisdiction under Florida's long-arm statute."); *see also Christian Tours v. Homeric Tours*, 239 F.3d 366 (5th Cir. 2000) (*per curiam*) (declining to analyze state long-arm statute because plaintiff failed to satisfy constitution aldue process); *ISO Claims Servs., Inc. v. Bradford Techs., Inc.*, 2011 WL 13176209, at *5 (M.D. Fla. Sept. 28, 2011) (same).

the Foreign Defendants' nationwide contacts to allow for service of process provided that two conditions are met: (1) Plaintiffs' claims "arise under federal law"; and (2) the exercise of jurisdiction is "consistent with the Constitution and laws of the United States." *Consol. Dev. Corp.*, 216 F.3d at 1291 (citing Fed. R. Civ. P. 4(k)(2)). Because there is no dispute that Plaintiffs' RICO and Magnuson-Moss Warranty Act claims arise under federal law, or any dispute that the RICO statute allows for nationwide service of process under Section 1965(d), then the Court can exercise specific jurisdiction over the Foreign Defendants so long as it is "consistent with the Constitution and laws of the United States"; that is, comporting with due process. *Id.*

In specific personal jurisdiction cases, the Court applies a three-part test, which examines: (1) whether the Plaintiffs' claims "arise out of or relate to" at least one of the Defendants' contacts with the forum; (2) whether the nonresident Defendants "purposefully availed" themselves of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355 (citing *Burger King Corp.*, 471 U.S. at 472–73, 474–75; *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 413–14; *Int'l Shoe Co.*, 326 U.S. at 316). The first two requirements are "the constitutional benchmarks of the minimum contacts analysis and ensure that a defendant is only burdened with litigation in a forum where his 'conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there.'" *Oldfield*, 558 F.3d at 1220–21 (quoting *World–Wide Volkswagen Corp.*, 444 U.S. at 297).

Where the Court's personal jurisdiction is invoked based on a federal statute authorizing nationwide or worldwide service of process, "the applicable forum for the minimum contacts

analysis is the United States." *Id.* at 1220 (quoting *Consol. Dev. Corp.*, 216 F.3d at 1291 n.6)).

As the Federal Circuit recognized:

> Rule 4(k)(2) closed a loophole that existed prior to the 1993 amendments of the Federal Rules of Civil Procedure. Before the adoption of Rule 4(k)(2), a non-resident defendant who did not have "minimum contacts" with any individual state sufficient to support exercise of jurisdiction, but did have sufficient contacts with the United States as a whole, could escape jurisdiction in all fifty states. Rule 4(k)(2) was adopted to ensure that federal claims will have a U.S. forum if sufficient national contacts exist.

*Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1414 (Fed. Cir. 2009) (citing *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1295 (Fed. Cir. 2009) (citing Fed. R. Civ. P. 4(k)(2) advisory committee notes to 1993 amendment)).

Here, Plaintiffs fail to allege facts establishing the Foreign Defendants have sufficient contacts with the United States, such that they "purposefully availed" themselves of the privileges and laws of the United States. Plaintiffs set forth several generalized allegations that fail to demonstrate specific conduct by the Foreign Defendants that occurred in, or was targeted toward, the United States. For example, Plaintiffs generally allege that each Foreign Defendant is in the business of designing, developing, manufacturing, marketing, and selling automobiles (*see* D.E. 2762 at ¶¶ 26, 28, 32)—but these allegations taken as true do not establish that the Foreign Defendants conducted this activity in, or targeted it toward, the United States. As for specific Foreign Defendants, Plaintiffs generally allege that Volkswagen Group of America and Audi of America "engage[] in business" activities, such as "the advertising, marketing and sale of" Volkswagen and Audi automobiles, *id.* at ¶ 27, 29—but these allegations, again taken as true, say nothing about the Foreign Defendants' specific conduct, let alone that the conduct occurred in, or was targeted toward, the United States. Furthermore, Plaintiffs generally allege that, collectively, the domestic subsidiaries and the foreign parent corporations "engineered, designed, developed,

manufactured, or installed the Defective Airbags" in the class vehicles, and "approved the Defective Airbags for use in those vehicles," while also "develop[ing], review[ing], and approv[ing] the marketing and advertising campaigns designed to sell these Class Vehicles," *id.* at ¶¶ 31, 33. Once more, these allegations, taken as true, fail to establish any specific conduct by the Foreign Defendants that took place in, or was targeted toward, the United States.

The closest Plaintiffs come to alleging conduct in the United States concerns *only* the Domestic Defendants—but even these allegations are limited to the "advertising, marketing and sale" of only Volkswagen and Audi vehicles. *Id.* at ¶¶ 27, 29. Notably, these allegations fail to specify the nature of the Foreign Defendants' involvement in, or control over, creating and marketing the "advertisements and promotional materials" that described the Class Vehicles as "safe and reliable, while uniformly omitting any reference to the Inflator Defect." *Id.* at ¶¶ 219– 222. And while the Plaintiffs allege they "viewed or heard commercials" promoting the "safety," "durability," and "dependability" of the Class Vehicles, *see generally id.* at ¶¶ 39–127, it necessarily follows from the deficient advertising and marketing allegations that Plaintiffs fail to allege the Foreign Defendants had any contacts with the United States related to these promotional materials.

Put simply, even when taking Plaintiffs' generalized allegations as true, they do not establish that the Foreign Defendants had contacts with the United States, such that they "purposefully availed" themselves of the privileges and laws of the United States. *See Leon*, 301 F. Supp. 3d at 1229 (ruling court lacked specific jurisdiction over nonresident defendants where complaint alleged "only that the Airbag Manufacturer Defendants distributed their products generally across the country and advertised their products over the internet").

### c) "Stream of Commerce" Theory

Plaintiffs also argue the Court can exercise specific jurisdiction under the "stream of commerce" theory. That is, Plaintiffs argue that specific jurisdiction is appropriate because the Foreign Defendants designed and manufactured millions of Class Vehicles containing defective Takata inflators, which were then sold to the Domestic Defendants for sale nationally in the United States, and thus the Foreign Defendants invoked the benefits and protections of the United States. (*See* D.E. 3034 at 59–62.)

In a plurality opinion in *Asahi Metal Industry Co.*, the Supreme Court determined:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

480 U.S. at 112 (plurality). Subsequently, courts coined this the "stream of commerce plus" test. *See Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993) (finding jurisdiction under "stream of commerce plus" analysis).

The Supreme Court revisited this "stream of commerce" analysis in *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011). In an opinion written by Justice Kennedy, a plurality of the Supreme Court opined that a defendant's "transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* at 882 (plurality). In an opinion concurring in judgment, Justice Breyer, joined by Justice Alito, concluded it was "unwise to announce a rule of broad applicability without full consideration of the modern-day consequences," which Justice Breyer concluded the record in *J. McIntyre* did not present. *Id.* at 887–88 (Breyer, J., concurring in judgment). Under existing Supreme Court

precedents and the immediate factual record, Justice Breyer concluded the "'something more,' such as special state-related design, advertising, advice, marketing, or anything else," was lacking—and thus there was no justification for exercising jurisdiction over the foreign defendant. *Id.* at 889.

Because *J. McIntyre* did not produce a majority opinion, the Court must follow the narrowest holding among the plurality opinions in that case. *See Marks v. United States*, 430 U.S. 188, 193 (1977). The narrowest holding comes from Justice Breyer's concurrence, which determined "the law remains the same after *McIntyre*." *See AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012). Accordingly, the Court must follow applicable precedent following the Supreme Court's existing stream-of-commerce analysis. *Id.*

Plaintiffs' stream of commerce argument relies on the Eleventh Circuit's ruling in *Vermeulen v. Renault, U.S.A., Inc.*, where the court applied the "stream of commerce plus" test from the plurality opinion in *Asahi*. 985 F.2d at 1548–52. In *Vermeulen*, a Georgia plaintiff who suffered debilitating spinal injuries in a car accident sued the French state-owned automobile manufacturer Regie Nationale Des Usines Renault ("RNUR") and its American distribution affiliate pursuant to the Foreign Sovereign Immunities Act, alleging design defects in the vehicle that she was driving when she was injured. *Id.* at 1537. The Eleventh Circuit determined the exercise of specific jurisdiction over RNUR satisfied due process because "RNUR *intended* its LeCars to be brought to the United States and took numerous *affirmative* steps to bring that result about . . . ." *Id.* at 1550 (emphasis in original).

In determining that RNUR purposely availed itself of the rights and privileges of the laws of the United States, the Eleventh Circuit emphasized that RNUR "designed the Renault LeCar for the American market," as the record showed that RNUR modified its vehicles "specifically to

accommodate" American consmers. *Id.* at 1549. The Eleventh Circuit also focused on the fact that RNUR "advertised its product in the United States," "had a large hand in directing" the nationwide advertising campaign, and even "reserved the right to veto" any advertising campaigns. *Id.* Furthermore, the Court noted that RNUR "established channels for providing regular advice to customers in the United States," which included establishing dealerships that "incorporated Renault's strategies and vision regarding the distribution of its products." *Id.* RNUR also "created and controlled the distribution network that brought its products into the United States," and the record reflected in Distributor Agreements that RNUR "retained *ultimate* control" over the network. *Id.* at 1550 (emphasis in original). Finally, the Eleventh Circuit noted that RNUR's involvement was further evidenced by "the extensive financial support rendered" to its domestic distributor. *Id.* In short, the Eleventh Circuit determined that the plaintiffs sufficiently demonstrated the "something more" that justified exercising federal jurisdiction over RNUR.

Here, in contrast to *Vermeulen*, and as outlined *supra*, Plaintiffs do not allege any facts that the Foreign Defendants: designed the Class Vehicles in or specifically for the United States; directed any advertising campaign; established any channels for advising customers in the United States; created the distribution network in the United States; provided any financial support to its distributor; or otherwise controlled the Domestic Defendants. Indeed, Plaintiffs allege no facts explaining the corporate relationship, or specifying any contractual agreements, between any of the subsidiary Domestic Defendants and their respective foreign-based parents. Plaintiffs thus leave the Court to infer which of the Foreign Defendants' contacts support a finding of specific jurisdiction. *Cf. Leon*, 301 F. Supp. 3d at 1216 & n.6 (noting the lack of jurisdictional allegations left the court "unable to infer which of Honda's contacts with Florida support[ed] specific personal jurisdiction"). While Plaintiffs allege the Defendants, collectively, marketed and advertised the

Class Vehicles in the United States (D.E. 2762 at ¶¶ 27, 29, 31), and that Plaintiffs observed advertisements about the Class Vehicles, *id.* at ¶¶ 39–127, these allegations, as discussed above, fail to delineate any of the Foreign Defendants' involvement or control over the marketing and advertising campaigns in the United States. In short, Plaintiffs do not allege the necessary "something more" to invoke this Court's jurisdiction over the Foreign Defendants.

Plaintiffs rely on several other non-binding stream of commerce cases, but each is distinguishable. For instance, Plaintiffs cite *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 780 (5th Cir. 2018) for the proposition that it "cannot be . . . nonmanufacturing parents categorically lie beyond the stream of commerce no matter the nature of their contributions." (*See* D.E. 3034 at 49.) But there, the Fifth Circuit found the nonmanufacturing parent corporation defendant engaged in a number of factors that "distinguish[ed] [its] role from the passive parent-subsidiary relationship" that the Fifth Circuit holds to be "insufficient to support jurisdiction." *See id.* at 780 (discussing several factors, including but not limited to, a merger, integrated design teams, patent assignments, and numerous joint advertising and marketing efforts). But as discussed above, Plaintiffs' generalized and conclusory allegations fail to demonstrate the Foreign Defendants engaged in anything more than a "passive parent-subsidiary relationship."

Next, Plaintiffs rely on two Northern District of Alabama cases which, actually, reached opposite conclusions regarding the exercise of specific jurisdiction over foreign-based vehicle manufacturers. Plaintiffs cite *Tomas v. Bayerische Motoren Werke AG*, 2018 WL 4052177, at \*3 (N.D. Ala. Aug. 24, 2018), where the district court initially found it could exercise specific jurisdiction over a "foreign manufacturer [that] sold its vehicles to a related entity, which it knew to have a nationwide distribution channel in the United States." (*See* D.E. 3034 at 50 n.6.) But

upon reconsideration, the *Tomas* court applied the Eleventh Circuit's "stream of commerce plus" test for the first time and reached the opposite conclusion. *See Tomas v. Bayerische Motoren Werke AG*, 2018 WL 6181172, at *3–4 (N.D. Ala. Nov. 27, 2018). Specifically, the court ruled that it previously erred in relying on "hypothetical evidence," which asked the court to "speculate" as to the number of vehicles sold in Alabama. *Id.* at *4. The court also explained that "even assuming" BMW AG "'undoubtedly derived substantial revenue from the sale of these products,' this contention [was] still 'conclusory and insufficient to sustain a finding of jurisdiction under the long-arm statute.'" *Id.* To reach this conclusion, the *Tomas* court distinguished *Johnson v. Chrysler Canada Inc.*, 24 F. Supp. 3d 1118 (N.D. Ala. 2014)—the other case Plaintiffs cite in support (*see* D.E. 3034 at 60 & n.22). In so doing, the court in *Tomas* relied on *Askue v. Aurora Corp. of Am.*, where a district court in Georgia ruled that allegations that a defendant manufacturer "undoubtedly derived substantial revenue from the sale of . . . products" and "engaged in a persistent course of conduct in Georgia by engaging a distributor to sell its products in th[at] market" were "wholly conclusory and insufficient to sustain a finding of jurisdiction under the long-arm statute." 2012 WL 843939, at *4.

Aside from these authorities, the weight of federal Circuit authority demonstrates that specific jurisdiction under the stream of commerce theory will not be sustained upon unspecific and generalized allegations. *See, e.g.*, *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018) ("declin[ing] to adopt the [plaintiffs'] stream-of-commerce theory of specific personal jurisdiction" and noting that "[t]he bare fact that [a nonresident defendant] contracted with a [resident] distributor is not enough to establish personal jurisdiction in the State") (citations omitted); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994) ("To permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply

because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism. Such a rule would subject defendants to judgment in locations based on the activity of third persons and not the deliberate conduct of the defendant, making it impossible for defendants to plan and structure their business contacts and risks."); *St. Jarre v. Heidelberger Druckmaschinen, A.G.*, 19 F.3d 1430 (4th Cir. 1994) (affirming dismissal of lawsuit for lack of personal jurisdiction where there was no evidence the foreign manufacturer defendant "designed the products for the market in Virginia, advertised in Virginia, established channels for providing regular advice to customers in Virginia, or marketed the product through a distributor who agreed to serve as the sales agent in Virginia"); *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 484 n.11 (6th Cir. 2003) (affirming dismissal of all actions against nonresident defendant NTW under stream of commerce plus approach where plaintiff failed to demonstrate grounds for jurisdiction because "no contract language [was] presented" and because plaintiff did not set forth "sufficient facts" to find that NTW "actually required [distributor] to market, distribute, or license" the infringing work in the applicable forum); *Palnik v. Westlake Entm't, Inc.*, 344 F. App'x 249, 252 (6th Cir. 2009) (affirming dismissal of lawsuit against two nonresident defendants under stream of commerce theory—which required focus "on the distribution relationship"—because plaintiff's allegations did not provide "'reasonable particularity' as to" "the relationship between the defendants"; and declining to "infer that an agreement of the sort necessary for jurisdiction under *Bridgeport* . . . existed").

In short, Plaintiffs' generalized and conclusory allegations fail to adequately plead that the Foreign Defendants purposefully availed themselves of the laws and privileges of the United States. Therefore, the Court finds that under these allegations, exercising specific jurisdiction over the Foreign Defendants under Rule 4(k)(2) would not comport with due process.

71

### 3. **Conclusion**

For the foregoing reasons, the Court finds that Plaintiffs' allegations fail to establish a *prima facie* case of specific jurisdiction over the Foreign Defendants pursuant to either the state long-arm statutes or the federal long-arm statute. Therefore, all the claims asserted against the Foreign Defendants in the Transferor and Direct-File Actions are **DISMISSED** for lack of personal jurisdiction.

### E. **JURISDICTIONAL DISCOVERY**

Buried in the Omnibus Response, Plaintiffs argue that in the event the Court "is not convinced that Plaintiffs' allegations establish personal jurisdiction," the Court should "defer ruling . . . until the parties complete jurisdictional discovery." (D.E. 3034 at 65.) Defendants oppose the Plaintiffs' conditional request.

"[F]ederal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729 (11th Cir. 1982) (citations omitted). "[J]urisdictional discovery is favored where there is a genuine dispute concerning jurisdictional facts necessary to decide the question of personal jurisdiction; it is not an unconditional right that permits a plaintiff to seek facts that would ultimately not support a showing a personal jurisdiction." *Bernardele v. Bonorino*, 608 F. Supp. 2d 1313, 1321 (S.D. Fla. 2009). For several reasons, the Court does not find it appropriate to defer ruling on the pending Motions to Dismiss in order to complete jurisdictional discovery.

First, the Eleventh Circuit has explained that in certain cases district courts should not "reserve ruling on [a pending] motion to dismiss in order to allow the plaintiff to look for what the plaintiff should have had—but did not—before coming through the courthouse doors, even though the court would have the inherent power to do so." *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1216 (11th Cir. 2007). And indeed, the party who invokes federal jurisdiction has the burden of

establishing such jurisdiction. *See id.* (citing Fed. R. Civ. P. 8(a)(1) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the grounds for the court's jurisdiction . . . .")). *Lowery*'s guide applies to cases involving invocation of federal personal jurisdiction over nonresident defendants. *See Yepez v. Regent Seven Seas Cruises*, 2011 WL 3439943, at *2 (S.D. Fla. Aug. 5, 2011) (denying motion to stay ruling on motion to dismiss pending jurisdictional discovery and noting the "types of facts plaintiffs are expected to investigate prior to filing suit" include facts related to issues of personal jurisdiction over a foreign corporation) (citing *Lowery*, 483 F.3d at 1216). Here, the Plaintiffs were well-aware of the fact-intensive analysis that federal courts apply when deciding issues of personal jurisdiction over nonresident defendants. In light of Plaintiffs' failure to investigate, collect, and allege sufficient facts prior to initiating this stage of this now 4-year-old complex multidistrict litigation lawsuit, the Court declines to defer ruling on the pending Motions to Dismiss. *See, e.g. id.*; *Thompson*, 174 F. Supp. 3d at 1338–39 (ruling plaintiff was "foreclosed from pursuing jurisdictional discovery in an attempt to marshal facts that he 'should have had—but did not—before coming through the courthouse' doors.") (quoting *Lowery*, 483 F.3d at 1216).

Second, Plaintiffs' informal (and conditional) request fails to "specify what information [Plaintiffs have] sought or how that information would bolster [their] allegations." *See Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 792 (11th Cir. 2017) (ruling district court did not improperly deny jurisdictional discovery). For instance, Plaintiffs summarily assert "[t]he jurisdictional discovery requests Plaintiffs have served aim to identify Defendants' contacts with the United States and various jurisdictions, as well as the connection between these contacts and Plaintiffs' claims." (D.E. 3034 at 66–67.) Without more, the Court is unwilling to defer ruling on the pending Motions to Dismiss. *See Wolf*, 683 F. App'x at 792; *Instabook Corp. v.*

*Instantpublisher.com*, 469 F. Supp. 2d 1120, 1127 (M.D. Fla. 2006) (denying request for jurisdictional discovery and granting defendant's motion to dismiss for lack of jurisdiction where plaintiff did not "explain[] how such discovery would bolster its contentions").

Third, there is no genuine factual dispute concerning personal jurisdiction because none of the parties submitted affidavit or declaration evidence in support of, or in opposition to, the exercise of personal jurisdiction over the Domestic or Foreign Defendants. Without such a dispute, it is unwarranted to extend this protracted litigation any longer by deferring a ruling on the otherwise fully and extensively briefed Motions to Dismiss. *See Bernardele*, 608 F. Supp. 2d at 1321 ("[J]urisdictional discovery is favored where there is a genuine dispute concerning jurisdictional facts necessary to decide the question of personal jurisdiction . . . ."); *Peruyero v. Airbus, S.A.S.*, 83 F. Supp. 3d 1283, 1290 (S.D. Fla. 2014) (denying request for jurisdictional discovery and granting motion to dismiss for lack of specific jurisdiction where there was "no genuine dispute on a material jurisdictional fact").

Fourth, Plaintiffs' hedged request is procedurally improper. Instead of formally moving the Court to defer ruling on the pending Motions to Dismiss, Plaintiffs bury their request within their Omnibus Response—a request that is then conditioned upon the Court not being "convinced that Plaintiffs' allegations establish personal jurisdiction." *See* D.E. 3034 at 65; *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280–81 (11th Cir. 2009) (affirming district court's denial of jurisdictional discovery where the plaintiff "never formally moved the district court for jurisdictional discovery but, instead, buried such requests in its briefs as a proposed alternative to dismissing [defendant] on the state of the current record").

Finally, in addition to never formally filing a motion, Plaintiffs also never attempted to supplement their position with any jurisdictional discovery, or otherwise signaled to the Court that

a deferred ruling was appropriate. *See United Techs. Corp.*, 556 F.3d at 1281 (affirming district court's dismissal on personal jurisdiction grounds prior to jurisdictional discovery because the plaintiff "should have taken every step possible to signal to the district court its immediate need for such discovery," but failed to take any "reasonable steps to seek discovery, or a deferral of a ruling pending discovery" during the several months that the motion to dismiss was pending). Moreover, this litigation has been pending for over 4 years and discovery has indeed been undertaken. Thus, Plaintiffs have had many opportunities to supplement the record on this issue. The fact that they have not is indicative that there is no factual dispute on this issue.

For these reasons, Plaintiffs' informal request to defer ruling on personal jurisdiction—if the Court is not "convinced that Plaintiffs' allegations establish personal jurisdiction"—is **DENIED**.

## F.    CONCLUSION

In short, the Court finds with respect to the Transferor Actions that the transferor district courts can exercise general jurisdiction over the Domestic Defendants; but they cannot exercise general or specific jurisdiction over the Foreign Defendants. As for the Direct-File Actions, the Court finds it likewise cannot exercise general or specific jurisdiction over the Foreign Defendants, but that it can exercise specific jurisdiction over the Domestic Defendants as to the RICO claims. Whether the Court can exercise pendent personal jurisdiction over the Domestic Defendants as to the Plaintiffs' remaining federal, state, and common-law claims in the Direct-File Actions depends upon whether Plaintiffs sufficiently plead plausible RICO claims. *See Koch*, 847 F. Supp. 2d at 1377–78 (noting that "if the only jurisdictionally sufficient claim is dropped or dismissed . . . the pendent claim should be dismissed as well"). The Court will now address the sufficiency of Plaintiffs' RICO allegations.

## III.   RICO

## A.    "PATTERN OF RACKETEERING ACTIVITY" – SECTION 1962(C)

Plaintiffs assert federal RICO claims under 18 U.S.C. Section 1962(c) against each Defendant. To state a plausible Section 1962(c) claim, Plaintiffs must allege that Defendants: (1) engaged in conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006), *abrogated on other grounds by Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016). Racketeering activity is defined as any act indictable under any of the statutory provisions listed in 18 U.S.C. Section 1961(1), which includes mail and wire fraud in violation of 18 U.S.C. Sections 1341 and 1343. *See Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359 (11th Cir. 2004). A "pattern of racketeering activity" requires the commission of at least two such acts within a ten-year period. *See* 18 U.S.C. § 1961(5); *Rajput v. City Trading, LLC*, 476 F. App'x 177, 180 (11th Cir. 2012).

Plaintiffs' pattern of racketeering claims are predicated on mail and wire fraud, and thus "must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal*, but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard, which requires that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Amer. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 n.10 (11th Cir. 2007)). "Given the routine use of mail and wire communications in business operations . . .[,] 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

To comply with Rule 9(b), Plaintiffs must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the

content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (*per curiam*) (citation omitted). In addition, the plaintiff must allege particular facts with respect to each defendant's participation in the fraud. *Id.* at 1381. In other words, a plaintiff is required to set forth specific allegations as to each defendant that will fulfill the "who, what, when, where, and how" pertaining to the underlying fraud. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted). At bottom, the purpose of the particularity rule is to alert defendants to their precise misconduct and protect them against baseless charges of fraudulent behavior. *See Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).

Here, Plaintiffs fail to plead with sufficient particularity that any of the Defendants engaged in a pattern of racketeering activity premised on mail and wire fraud. Far from "precise," Plaintiffs' allegations describe in *general* terms the contents of the Defendants' internal communications, and the Defendants' communications with Takata, government authorities, and the public. By way of examples, Plaintiffs allege Defendants' "pattern of racketeering activity in violation of the mail and wire fraud statutes" include, *inter alia*: internal communications concerning "deviations from" and "approved deviations from" USCAR Specifications, and the "repeated failure of Takata's inflators to meet the USCAR Specifications" (D.E. 2758 at ¶¶ 211(a), (c); D.E. 2759 at ¶ 217(a); D.E. 2762 at ¶ 314(b)(iii)); internal communications concerning "the instability and volatility of ammonium nitrate" (D.E. 2762 at ¶¶ 280(a)–(b)); communications with Takata regarding "countless shipments of, and payments for, millions of inflators" (D.E. 2758 at ¶ 211(b); D.E. 2759 at ¶ 217(b); D.E. 2762 at ¶¶ 279(b), 313(b)); and communications with Takata

concerning "an inflator rupture that occurred during testing" (D.E. 2758 at ¶ 211(d); D.E. 2759 at ¶ 217(d)).

Taken together as true, while Plaintiffs' allegations demonstrate Defendants had knowledge of issues with Takata airbags—and knowledge is not subject to Rule 9(b) pleading requirements, Fed. R. Civ. P. 9(b)—beyond this, the allegations "provide no basis in fact upon which the Court could conclude that any specific act of any specific Defendant[] is indictable for mail or wire fraud," *Brooks*, 116 F.3d at 1381. For instance, Plaintiffs' allegations fail to explain how the "deviations from" or "failure to meet" the USCAR specifications had any connection with vehicle safety or nationwide recalls based on the inflator defect, let alone how those alleged deviations or failures constitute mail or wire fraud. And Plaintiffs' allegations about purchases and shipments of inflators seem to assume these communications are fraud based, but they do not allege additional details explaining how these otherwise routine business communications constitute fraud.

Plaintiffs' failure to link FCA's and Volkswagen's alleged communications to fraudulent conduct are highlighted by the lack of a single quote, from a single communication on a specific date, between any specific personnel at FCA or Volkswagen, with Takata personnel, with federal regulators, or with the public. Consequently, Plaintiffs fail to allege the "who, what, when, where, and how" pertaining to the alleged fraud. *Garfield*, 466 F.3d at 1262; *see also Brooks*, 116 F.3d at 1380–81 (noting that a plaintiff must allege "the precise statements, documents, or misrepresentations made," and "the time, place, and person responsible for the statement").

As for the allegations against General Motors and Mercedes, Plaintiffs include only a handful of allegations involving specific personnel. But these allegations are separately deficient because the Plaintiffs still fail to allege either "the precise statements . . . or misrepresentations

made" or fail to allege the "content and manner in which the[] statements misled the Plaintiffs." *Brooks*, 116 F.3d at 1380–81; *see also Lawrie v. Ginn Dev. Co., LLC*, 656 F. App'x 464, 474 (11th Cir. 2016) ("Rule 9(b) requires more than an allegation that a misrepresentation was made; it requires a plaintiff to identify with precision what the misrepresentation actually was.").

The allegations against General Motors include only a single communication involving a specific General Motors employee. Plaintiffs allege that Leo Knowlden of General Motors sent a communication to (an unspecified person) at Takata that "demanded that Takata 'put the story together that may potentially limit the scope' of a recall, following the field rupture in a 2013 Chevrolet Cruze." (D.E. 2759 at ¶ 217(i).) Plaintiffs then conclusorily allege that Knowlden's statement was made "in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles." *Id.* Plaintiffs do not allege with particularity, however, how this singular statement—which is susceptible to numerous explanations—constitutes fraud.

Then, while Plaintiffs' allegations against Mercedes reference several communications with greater specificity than other Defendants, upon close inspection, these allegations are also deficient. First, Plaintiffs reference multiple email communications between Matthias Haupt, a vice president of Takata AG, and other employees of Takata (D.E. 2762 at ¶¶ 314(e)–(f), and one email exchange between Haupt and Mike Rains, the Government Affairs Specialist at TK Holdings, Inc., *id.* at ¶ 317(h). In these internal Takata communications, Haupt discusses an upcoming visit by Professor Rodolfo Schöneburg, Head of Vehicle Safety, Durability and Corrosion Protection at Mercedes Cars, with Takata's Product Safety Group." *Id.* at ¶ 314(e). Haupt also describes "another high level meeting with Mercedes Cars Purchasing" as going "very well despite the bad news" about certain inflator models, and that "Daimler stays committed to keep [Takata] 'as a player in the industry.'" *Id.* at ¶ 314(f). Then, Haupt and Rains discuss

NHTSA's "Preliminary Evaluation" of inflators, and questionnaire, as applied to Mercedes. *Id.* at ¶ 314(h). Specifically, Rains informs Haupt that "Daimler was [mistakenly] included on our letter to NHTSA yesterday. Our records show that they are not affected by the ranges we posted." *Id.* (alteration in original). Rains later tells Haupt that Takata "verbally told [NHTSA] that Daimler should not be on the list." *Id.* (alteration in original). While these allegations include the "person responsible" for the statements, none of the persons involved in these communications worked for Mercedes. Furthermore, while these communications may help support a RICO claim against Takata, Plaintiffs do not explain how these internal Takata communications can be extended to support a claim that Mercedes committed mail or wire fraud.

Second, Plaintiffs allege multiple internal communications between specific Mercedes employees on specific dates. *Id.* at ¶¶ 314(b)(ii), (iv)–(vi).) But this time, the contents of these communications are described, at best, in general terms. For instance, Plaintiffs allege Brandon Marriott, a Product Engineer for Daimler Chrysler, communicated to Steve Stram, another engineer at Daimler Chrysler, that a Takata ammonium nitrate inflator had performance issues" and that "'hot' inflators" used in tests "highlight an ongoing quality issue." *Id.* at ¶ 314(b)(ii). Plaintiffs then allege that Stram made other communications (to unknown recipients) "regarding" various issues, including "Takata inflator variability," "deployments in which inflator fragments were expelled," and Takata's failure to "comply with USCAR requirements." *Id.* at ¶ 314(e)(v). Plaintiffs also allege Stram made other communications to Takata that "discussed additional performance issues with Takata's inflators" and "regard[ed] his inspection of the Monclova facility after its ammonium-nitrate-fueled explosion." *Id.* at ¶¶ 314(e)(iv), (vi). Holding aside whether

the statements made by Daimler Chrysler[16] employees can be attributed to Mercedes, the contents of these communications taken together do not allege fraudulent conduct by Mercedes—let alone with requisite particularity. Instead, Plaintiffs leave it to the Court to fill in the blanks.

Finally, Plaintiffs do allege one communication between a specific Mercedes employee and a specific Takata employee, on a specific date, that includes specific contents:

> In an email dated January 21, 2016, from Daniel Fahrbach, Executive Assistant to the Executive Vice President of Mercedes Cars Procurement and Supplier Quality at Daimler AG, to other Daimler employees and Takata employees in Germany and the United States, including Matthias Haupt of Takata, Fahrbach summarizes a January 19, 2016, meeting between Daimler and Takata and notes that, as a "technical update" on the "Actual Situation Airbag Inflators," (1) "[t]he higher the temperature is the more likely is the rupture of the inflator in the field"; (2) a "field rupture of a SDI Module in South Carolina" (a module used by "[t]he sprinter" "at the driver airbag"); and (3) "3 [PSDI 5] inflators were ruptured during testing this week . . . . 700.000 MB cars in the U.S. have this module"; and (4) "Daimler states clearly that there is a strong will to continue business with Takata.

*Id.* at ¶ 314(g). Again, though, Plaintiffs do not allege how these specific statements constituted fraud. Indeed, Plaintiffs fail to allege any statements made by Mercedes to federal regulators or to the general public, with requisite particularity, that would allow the Court to infer that Mercedes's internal communications, or its communications with Takata, constitute mail or wire fraud. *See Lawrie*, 656 F. App'x at 474 ("Rule 9(b) requires more than an allegation that a misrepresentation was made; it requires a plaintiff to identify with precision what the misrepresentation actually was.").

---

[16] As Mercedes points out in its Motion to Dismiss, some of Plaintiffs' allegations against Mercedes, such as these, "appear to relate to a separate and distinct Chrysler company." (D.E. 2988 at 48 n.22.) Mercedes argues that the Plaintiffs "conflate two distinct companies: DaimlerChrysler AG and DaimlerChrysler Corporation." *Id.* Mercedes goes on to argue that DaimlerChrysler Corporation "designed, manufactured and sold (and purchased airbag inflators for) Chrysler, Dodge and Jeep vehicles until its bankruptcy in 2009," and "[a]t no time . . . ever design[ed], manufacture[d], or [sold] Mercedes-Benz vehicles." *Id.* It appears that the Plaintiffs' Omnibus Response does not challenge or otherwise clarify Mercedes's argument on this point.

The problem with the overall lack of specificity in Plaintiffs' allegations is further compounded by the fact that Plaintiffs imprecisely lump together each of the Defendants' corporate families. As a prime example, Plaintiffs define "Volkswagen" to include both the domestic-subsidiary corporations (Volkswagen Group of America and Audi of America, LLC) and the two foreign-based parent corporations (Volkswagen Aktiengesellschaft and Audi Aktiengesellschaft) (*see* D.E. 2762 at ¶¶ 30, 280(a)–(l)). Plaintiffs do the same as to the corporate families of General Motors and Mercedes. (*See* D.E. 2759 at ¶¶ 2, 217(a)–(n); D.E. 2762 at ¶¶ 33, 314(a)–(i).)

As the Eleventh Circuit has explained, because "fair notice" is perhaps the most basic consideration underlying Rule 9(b), plaintiffs who plead fraud "must reasonably notify the defendants of their purported role in the scheme." *Brooks*, 116 F.3d at 1381 (internal citations and quotations omitted). This means that in a case involving multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)); *see also Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1362 (S.D. Fla. 2015) (noting that when plaintiffs advance RICO claims premised on mail and wire fraud, the "Defendants are entitled to know the specific allegations that are being brought against each individual Defendant . . . .").

For this additional reason, the Court finds that Plaintiffs' RICO claims, which are predicated on mail and wire fraud, are not alleged with sufficient particularity as required by Rule 9(b). *See Brooks*, 116 F.3d at 1381 (affirming dismissal of RICO claims under Rule 9(b) standards because plaintiffs "simply 'lumped together' all of the Defendants in their allegations of

fraud") (quoting *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994));
*Viridis Corp.*, 155 F. Supp. 3d at 1362.

To be clear, though, the Court declines to dismiss Plaintiffs' RICO claims solely on group
pleading grounds—as Mercedes and Volkswagen request (*see* D.E. 2988 at 48–50)—because
using collective references is not an impermissible pleading form *per se*. *See Sprint Sols., Inc. v.
Fils-Amie*, 44 F. Supp. 3d 1224, 1227 (S.D. Fla. 2014) ("[A] plaintiff may plead claims against
multiple defendants by referring to them collectively, for example by referring to a group of
defendants as 'defendants.'") (citing *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997));
*Toback*, 2013 WL 5206103, at *2 ("Though Plaintiff refers to Defendants collectively as 'GNC,'
he has alleged sufficient factual detail to put Defendants on notice of the nature of the claims
against them, satisfying the requirements of Rule 8."). When plaintiffs use collective references,
they "are construed as applying to each defendant individually," that is, they "simply signal[] that
Defendants are both alleged to have participated in the conduct at issue." *Sprint Sols., Inc.*, 44 F.
Supp. 3d at 1227 (citing *Crowe*, 113 F.3d at 1539). But collectively referencing defendants "most
often create[s] problems when broad allegations are directed at a large and diverse group of
defendants, leaving unclear just who is alleged to have committed which acts." *Id.* Here, the Court
finds Plaintiffs' unspecific allegations "run[] afoul" of Rule 9(b) pleading standards in part because
the allegations fail to give the individual Defendants sufficient notice of the fraud they are alleged
to have committed. *See id.*

In short, while Plaintiffs advance extensive allegations to support their substantive RICO
claim, Rule 9(b) requires that Plaintiffs plead these allegations *with* particularity. As shown above,
Plaintiffs have failed to do so. And Rule 9(b) does not permit the Court to assemble Plaintiffs'
allegations "into a collage of fraud." *Lawrie*, 656 F. App'x at 474.

Now, the Court is mindful that it previously declined to dismiss RICO claims in this case. *See In re Takata Airbag Prod. Liab. Litig.*, 2015 WL 9987659, at *2. But the Court's previous ruling is not inconsistent with finding that Plaintiffs' RICO allegations against these Defendants lack the required particularity under Rule 9(b). During the opening act of this litigation, 4 years ago, the consumer plaintiffs asserted only two claims for violations of RICO: a claim under Section 1962(c) against Takata, and a claim under Section 1962(d) against Takata and Honda. (*See* D.E. 579 at 150, 162.) The consumer plaintiffs did not allege violations of RICO against any of the other automotive manufacturing and distributing defendants that were previously involved in this litigation (*e.g.* BMW, Ford, Mazda, Mitsubishi, Nissan, Subaru, or Toyota). (*See generally* D.E. 579.) Instead, the consumer plaintiffs limited their substantive RICO claim to Takata—the defendant unequivocally at the center of this litigation—and their RICO conspiracy claim to Takata and a single automotive manufacturer and distributor (*e.g.* Honda). The Court readily acknowledges that the plausibility of the allegations underlying those limited RICO claims presented a close question. But ultimately, the Court found those allegations sufficiently particularized under Rule 9(b) to survival dismissal.

In this act, 4 years later and with the opportunity to conduct discovery and supplement the record, the Consumer Plaintiffs here assert eight claims for violations of RICO: claims under Sections 1962(c) and 1962(d) against each of FCA, General Motors, Mercedes, and Volkswagen. (And this does not include the twenty claims for violations of RICO asserted by the "Recycler Plaintiffs," which comprise claims under Sections 1962(c) and 1962(d) against each of FCA, General Motors, Mercedes, Volkswagen, BMW, Honda, Mazda, Nissan, Subaru, and Toyota.) Despite the benefit of years of discovery, the substantive RICO allegations against the immediate Defendants are considerably more general and conclusory than the allegations asserted against

Takata and Honda, which just survived Rule 9(b). (*Compare* D.E. 2758 at ¶¶ 211(a)–(k) (FCA), *and* D.E 2759 at ¶¶ 217(a)–(n) (General Motors), *and* D.E. 2762 at ¶¶ 280(a)–(l), 314(a)–(i) (Volkswagen and Mercedes), *with* D.E. 579 at ¶¶ 427(a)–(u).) Consequently, the Court finds the more general and conclusory allegations presented here certainly lack the specificity required to satisfy Rule 9(b).

Therefore, Plaintiffs fail to allege with sufficient particularity a pattern of racketeering activity under Section 1962(c). Furthermore, because the failure to plead a pattern of racketeering dooms Plaintiffs' Section 1962(c) claims, the Court need not reach Defendants' arguments that Plaintiffs fail to plead association-in-fact or proximate causation. As a result, the Motions to Dismiss the Section 1962(c) claims are **GRANTED**; Count 2 in the *Boyd* Complaint, Count 2 in the *Whitaker* Complaint, and Counts 1 and 3 in the *Puhalla* Complaint are **DISMISSED**.

### B.    "CONSPIRACY TO VIOLATE RICO" – SECTION 1962(D)

Plaintiffs also assert RICO conspiracy claims under Section 1962(d) against each Defendant. Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [Section 1962]." 18 U.S.C. § 1962(d). The Defendants argue that Plaintiffs fail to adequately plead a RICO conspiracy claim. In addition, FCA and General Motors argue that Plaintiffs' conspiracy claims must also fail because the Plaintiffs fail to adequately plead their substantive RICO claims.

Contrary to FCA's and General Motors's suggestion, there is "no controlling authority" in the Eleventh Circuit or in the Supreme Court that requires this Court to dismiss Plaintiffs' conspiracy claims simply because the substantive RICO claims were deficiently alleged. *See Am. Dental Ass'n*, 605 F.3d at 1296 n.6. Instead, the Eleventh Circuit has explained that "where a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, [then] the conspiracy claim necessarily fails." *Rogers v. Nacchio*, 241 F. App'x 602,

609 (11th Cir. 2007). Upon close review of the Amended Consolidated Class Action Complaints, the Court finds that Plaintiffs' conspiracy (or "overt acts") allegations do not "contain additional allegations." It appears the "overt acts" allegations—which substantially rehash the pattern of racketeering allegations—simply reframe the pattern of racketeering allegations in the context of a conspiratorial agreement. Thus, the Court could dismiss Plaintiffs' conspiracy claims on this basis alone.

But even if Plaintiffs' "overt acts" allegations do "contain additional allegations" separate from the pattern of racketeering contentions, the Court still finds that Plaintiffs fail to plausibly allege a RICO conspiracy involving any of the Defendants. "The essence of a RICO conspiracy claim is that each defendant has *agreed* to participate in the conduct of an enterprise's illegal activities." *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1291 (S.D. Fla. 2008) (citing 18 U.S.C. § 1962(d)) (emphasis in original). This Court has previously held that "proof of the agreement is at the heart of a conspiracy claim." *Id.* (quoting *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1345 (S.D. Fla. 2006)). Plaintiffs can establish a RICO conspiracy claim by showing a Defendant: (1) agreed to the overall objective of the conspiracy; or (2) agreed to commit two predicate acts. *Am. Dental Ass'n*, 605 F.3d at 1293 (quoting *Republic of Panama*,119 F.3d at 950). A RICO agreement need not be established by direct evidence; it may be inferred from the conduct of the participants. *Id.*

Unlike Section 1962(c) claims predicated on fraud, conspiracy claims under Section 1962(d) must satisfy Rule 8 pleading requirements. *See id.* at 1290–96 (evaluating Section 1962(d) claim under Rule 8, and fraud-based Section 1962(c) claim under Rule 9(b)); *see also Associated Indus. Ins. Co. v. Advanced Mgmt. Servs., Inc.*, 2014 WL 1237685, at *7 n.7 (S.D. Fla. Mar. 26, 2014) ("Rule 9(b)'s particularity requirement does not apply to RICO conspiracy

claims."). Under Rule 8, though, RICO conspiracy claims cannot be supported by allegations that are "merely conclusory and unsupported by any factual allegations." *Solomon*, 574 F. Supp. 2d at 1291 (quoting *Republic of Panama*, 119 F.3d at 950).

Here, Plaintiffs' conspiracy allegations fare no better than their pattern of racketeering allegations. Plaintiffs generally allege that each Defendant "was associated with" a RICO enterprise that "agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs" of the RICO enterprise. (*See* D.E. 2758 at ¶ 219; D.E. 2759 at ¶ 225; D.E. 2762 at ¶¶ 288, 322.) Plaintiffs then generally allege that each Defendant and Takata:

> [S]hared information about the Defective Airbags' inherent flaws, their inability to meet safety specifications, and abnormal airbag deployments experienced by other automakers; delayed and/or prevented the release of inculpatory information; and maintained a consistent public posture as to the scope of vehicles affected by the Defective Airbags and the safety risks those airbags posed.

(*See* D.E. 2758 at ¶ 220; D.E. 2759 at ¶ 226; D.E. 2762 at ¶¶ 289, 323.) Plaintiffs further allege that Defendants' and Takata's "close cooperation on issues surrounding the Inflator Defect, their concealment of the nature and scope of the Inflator Defect, and their joint participation in predicate acts . . . is evidence of the conspiracy." *Id.*

Looking beyond these general contentions, Plaintiffs also assert allegations against specific Defendants. Like the pattern of racketeering allegations, Plaintiffs allege that FCA "engineers continued to approve the use of ammonium nitrate inflators" "[d]espite being presented with deviation requests and test results from Takata showing that the ammonium nitrate inflators did not meet the USCAR specifications." (D.E. 2758 at ¶ 222(b).) Plaintiffs then allege that after "energetic disassemblies" occurred during testing and in the field between 2010 and 2013, that FCA "did not commence an official recall for its vehicles until 2014," and even then, "limited the

scope of the recall to humid parts of the country." *Id.* at ¶¶ 222(c)–(e). Finally, Plaintiffs allege

that FCA "falsely claimed that the risks caused by the Inflator Defect disappeared to the north of

some arbitrary latitude in the American South" and also "mischaracterized the Inflator Defect as

the product of idiosyncratic manufacturing flaws." *Id.* at ¶ 222(e).

Next, Plaintiffs allege that General Motors knew they were using Takata airbags containing

ammonium nitrate and "expressed concern to Takata about 'AN [ammonium nitrate] propellant

stability,'" but "ultimately did nothing to remedy the problem and kept purchasing inflators from

Takata." (D.E. 2759 at ¶ 227(b).) As with allegations against FCA, Plaintiffs contend that General

Motors was aware of "energetic disassemblies" that occurred in testing, and in the field, between

2010 and 2014, but that General Motors "failed to take proper action and concealed from Plaintiffs

and Class members their knowledge of these events," and then along with Takata, "deceptively

blamed [an] airbag rupture on a manufacturing problem and issued only a limited recall." *Id.* at

¶¶ 227(c)–(d). Plaintiffs then allege that General Motors "did not commence recalls for their

vehicles until approximately February 2014," and then mischaracterized the Inflator Defect as the

product of idiosyncratic manufacturing flaws." *Id.* at ¶ 227(e).

As to Volkswagen, Plaintiffs allege that Volkswagen and Takata "knew that propellant

degradation, including through moisture and temperature, could lead to over-pressurization and

rupture," and "discussed . . . adverse test results" regarding "inflators ruptured during testing" in

October 2004 and February 2009. (D.E. 2762 at ¶¶ 290(a), (c), (f).) Plaintiffs further allege that

the "'Group of Five Working Committee,' of which Volkswagen was a member, discussed

ammonium nitrate propellant with Takata, including module testing, helium leak testing, and

temperature- and moisture related failure modes." *Id.* at ¶ 220(d). Then Plaintiffs assert that

Volkswagen and Takata "communicated various concerns about the inflators" following a Takata

airbag rupture in testing conducted by Volkswagen in April 2009. *Id.* at ¶ 220(e). Collectively, Plaintiffs allege Volkswagen "failed to timely disclose these facts and events to the public in order to conceal the nature and scope of the Inflator Defect." *Id.* at ¶¶ 220(c)–(h).

In addition, Plaintiffs also advance several allegations concerning Takata's "predicate acts in furtherance of the conspiracy." *Id.* at ¶ 291. Notably, these allegations—which are recycled against each of the Defendants (*see generally* D.E. 2758 at ¶¶ 223–24; D.E. 2759 at ¶ 228; D.E. 2762 at ¶¶ 291, 326–327)—do not involve any communications between Takata and any of the Defendants. Instead, these allegations focus entirely on *Takata's* communications with Honda, federal regulators, and class vehicle owners.

Even taking the allegations against FCA, General Motors, and Volkswagen as true, the Court cannot conclude that any of these Defendants entered into an *agreement* with Takata "to commit a criminal act." *Viridis Corp.*, 155 F. Supp. 3d at 1366 (noting that failure to allege "an agreement . . . to commit a criminal act is a glaring deficiency" in pleading a civil conspiracy claim under RICO). These allegations demonstrate FCA, General Motors, and Volkswagen had knowledge that Takata airbags installed in their vehicles could be defective—but the allegations do not rise to the level of demonstrating that these Defendants entered into an *agreement* with Takata *to commit* wire or mail fraud.

The allegations against Mercedes present a closer question. In addition to several general allegations about Mercedes's knowledge of the alleged inflator defects—which are insufficient to plead an agreement to commit a criminal act—Plaintiffs allege that Mercedes "modified its own specifications for the Takata inflators so that they would be easier for Takata to meet, by agreeing to deviations in order to get the Inflators approved for installation." (D.E. 2762 at ¶ 325(c).) Plaintiffs also allege that Mercedes and Takata: "decided together to forego key performance

requirements and resolve testing failures that they knew should have rendered the Defective Inflators unfit for approval"; "agreed to ignore tests related to ballistic performance at hot temperatures"; and later "worked together to try to convince NHTSA to reduce the scope of the recall." *Id.* at ¶¶ 325(d), (g)–(h), (p). Notably, none of these allegations include a single date or identify a single person acting on behalf of Mercedes or Takata. *See id.* at ¶¶ 325(a)–(p).

While Plaintiffs do plead a relationship beyond simple information sharing, they still fail to plausibly allege that Mercedes entered into an *agreement* with Takata *to commit* wire or mail fraud. Earlier in this litigation, this Court allowed RICO conspiracy claims to proceed against Takata and Honda because the plaintiffs alleged that Takata and Honda took a series of joint actions over the course of a decade. *See In re Takata Airbag Prod. Liab. Litig.*, 2015 WL 9987659, at *2. Notably, the plaintiffs' allegations "juxtapose[d] communications between Honda and Takata with a timeline of Takata's alleged conspiratorial conduct to implicate that Honda acted in agreement with the objectives of the alleged conspiracy." *Id.*

For instance, there, the plaintiffs alleged that after an airbag in a 2002 Honda Accord exploded in 2004, "Honda and Takata investigated the incident" and Honda "immediately shared all available information" with Takata." (D.E. 579 at ¶ 438(a).) The plaintiffs also alleged that within the same year, "Takata concealed and destroyed negative results from secret airbag tests it conducted in response to the explosion," and that "Honda was aware of Takata's secret testing" because Honda and Takata communicated about the incident and "agreed to describe the 2004 incident . . . as an 'anomaly.'" *Id.* at ¶ 438(b). The plaintiffs then alleged that in 2007, Honda "reported three airbag ruptures, all causing injuries, to Takata," and that in addition to Honda deciding "not to order a recall but rather to await the results of a 'failure mode analysis' to be performed by Takata," Honda and Takata "again chose to keep vitally important, safety-related

information between only the two of them." *Id.* at ¶ 438(c). The plaintiffs asserted that, also in 2007, Honda "began collecting inflators returned to dealers" and "from scrapyards" and sent them to Takata for investigation, all without informing vehicle owners or regulators," for what turned out to be a year-long study of the Inflator Defect. *Id.* at ¶ 438(d). The plaintiffs also alleged that in September 2011, "Honda and Takata initiated a joint analysis into an 'outside of range' incident that occurred" the same year. *Id.* at ¶ 438(h).

Additionally, the plaintiffs pleaded that in 2009 Takata and Honda "jointly drafted a letter to NHTSA[]" in response to a request for information regarding Honda's recalls—which did not include information about the secret 2004 airbag tests or the issues with Takata's Monclova, Mexico manufacturing plant—and thus Honda and Takata "in concert, knowingly and consciously omitted and withheld crucial information from government regulators in order to prevent regulatory action that would have resulted in a broader recall and possibly regulatory sanctions." *Id.* at ¶ 438(f). And finally, the plaintiffs alleged that also in 2011, before "massive Honda recall expansions [in] December 2011, Takata and Honda "jointly settled at least one personal injury lawsuit" where shrapnel from an exploding airbag severed the driver's carotid artery, suggesting "the joint desire and effort by Takata and Honda to conceal the existence of the Inflator Defect and the risks posed by it from regulators and from the public." *Id.* at ¶ 438(g).

Taken together as true, the allegations against Takata and Honda showed that they "jointly and secretly" investigated possible causes of certain airbag deployments, "delayed and/or prevented the release of inculpatory information," "misled regulatory authorities," and "maintained a consistent public posture as to the scope of vehicles affected by the Defective Airbags and the safety risks those airbags posed." *In re Takata Airbag Prod. Liab. Litig.*, 2015 WL 9987659, at *2.

In stark contrast, Plaintiffs' allegations against Mercedes, even when taken as true, do not demonstrate: a joint effort by Mercedes and Takata to mislead regulatory authorities and the general public by restricting the release of, or exposure to, incriminating conduct; a joint investigation by Mercedes and Takata to determine the causes of a field airbag rupture; any after-the-fact sharing of used inflators for testing purposes; or any joint public position concerning the inflator issues—let alone downplaying a field rupture incident as an "anomaly." Nor do Plaintiffs' allegations include any dates, or identify any specific Mercedes or Takata personnel, that would enable the Court to "juxtapose communications between [Mercedes] and Takata with a timeline of Takata's alleged conspiratorial conduct to implicate that [Mercedes] acted in agreement with the objectives of the alleged conspiracy." *Id.* In short, these glaring pleading deficiencies—which apply with equal vigor to the allegations advanced against FCA, General Motors, and Volkswagen—lead the Court to find that Plaintiffs' allegations fail to sufficiently allege that any of the Defendants entered into an *agreement* with Takata *to commit* wire or mail fraud.

Therefore, the Motions to Dismiss the Section 1962(d) claims are **GRANTED**; Count 3 in the *Boyd* Complaint, Count 3 in the *Whitaker* Complaint, and Counts 2 and 4 in the *Puhalla* Complaint are **DISMISSED**.

## IV. REMAINING CLAIMS IN DIRECT-FILE ACTIONS – PENDENT PERSONAL JURISDICTION

Finally, an issue remains as to whether the Court can exercise personal jurisdiction over the Domestic Defendants as to the Direct-File Plaintiffs' remaining claims, which include Magnuson-Moss Warranty Act claims, and various state statutory and common-law claims. Plaintiffs argue the Court may exercise pendent personal jurisdiction over these claims because they "clearly arise from 'a common nucleus of operative facts'" as the RICO claims. (D.E. 3034 at 56–57.) Defendants assert the Court cannot exercise pendent personal jurisdiction over the

remaining claims because Plaintiffs' RICO claims—the only jurisdictionally sufficient claims—are inadequately pleaded and must be dismissed.

The doctrine of pendent personal jurisdiction arises "where a federal statute authorizes nationwide service of process and the federal and state claims 'derive from a common nucleus of operative facts' . . . ." *Azalp LLC*, 2015 WL 12711232, at *5 (quoting *Koch*, 847 F. Supp. 2d at 1374). In such a case, "the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." *Id.* However, "if the only jurisdictionally sufficient claim is dropped or dismissed, particularly if that occurs early in the litigation, the pendent claim should be dismissed as well." *Koch*, 847 F. Supp. 2d at 1377–78 (quoting 4A Wright & Miller, *Federal Practice and Procedure* § 1069.7, p.236 (2002)).

Earlier in this Order, the Court found that it could exercise specific jurisdiction over the Domestic Defendants as to the RICO claims in the Direct-File Actions pursuant to the RICO nationwide service of process provision. *See supra* Section II.D.1.b. Separately, though, the Court dismissed the Plaintiffs' RICO claims as insufficiently pleaded. *See supra* Section III. As a result, Plaintiffs' remaining claims against the Domestic Defendants are "subject to dismissal unless [they] can 'independently establish personal jurisdiction with respect to those claims.'" *Prou v. Giarla*, 62 F. Supp. 3d 1365, 1374 (S.D. Fla. 2014) (quoting *Koch*, 847 F. Supp. 2d at 1378).

The Court finds that Plaintiffs cannot independently establish personal jurisdiction over the Domestic Defendants as to the Direct-File Actions. First, unlike the federal RICO statute, the Magnuson-Moss Warranty Act—the Plaintiffs' last remaining federal claim—does not provide for nationwide service of process. *See Bluewater Trading LLC v. Fountaine Pajot, S.A.*, 2008 WL 2705432, at *2 (S.D. Fla. July 9, 2008) ("[T]he Magnuson-Moss Act does not authorize nationwide service."), *aff'd*, 335 F. App'x 905 (11th Cir. 2009). And second, the Court already found that it

cannot exercise personal jurisdiction over the Domestic Defendants pursuant to the Florida long-arm statute. *See supra* Section II.D.1.a.

As a result, because Plaintiffs' only jurisdictionally sufficient claims have been dismissed, it necessarily follows that Plaintiffs' pendent claims must also be dismissed. *See Leon*, 301 F. Supp. 3d at 1236 ("Without a surviving RICO claim on which to base pendent personal jurisdiction, the Court cannot consider Plaintiffs' remaining state law claims."); *Prou*, 62 F. Supp. 3d at 1374 ("Had Plaintiff properly pled his Federal RICO claims, the Court would have been able to exercise personal jurisdiction over his remaining state law claims . . . under the doctrine of pendent personal jurisdiction.") (citing *Koch*, 847 F. Supp. 2d at 1377–78 ("[I]f the Plaintiff had adequately pled a RICO cause of action, under the doctrine of pendent personal jurisdiction the Court could have exercised personal jurisdiction over Defendants with respect to the state-law claims . . . .")).

Therefore, the Court **DISMISSES** for lack of personal jurisdiction all remaining claims asserted by the Direct-File Plaintiffs[17] against the Domestic Defendants. Consequently, the Direct-File Actions are **DISMISSED** in their entirety.

## CONCLUSION

Based on the foregoing, it is

---

[17] As delineated in the Court's prior order (*see* D.E. 3394 at 4–5 & n.3), the Florida Direct-File Plaintiffs include: Victor Khoury (*Boyd*); David Whitaker (*Whitaker*); and Jacqueline Carrillo, Steven Levin, Harper Tucker, Michael C. Kaufman, Mary Jackson Robinson, Bladimir Busto, Jr., Ramoncito Ignacio, Silvia Gil, Stephanie Puhalla, and Charles Sakolsky (*Puhalla*) (*see* D.E. 2758 at 23–24; D.E. 2759 at 30; D.E. 2762 at 56–57).

The non-Florida Direct-File Plaintiffs, all from the *Puhalla* Complaint, include: Efrain Ferrer and Sean McGinity (California); Linda Dean (Kentucky); Pattie Byrd (New Jersey); Glenn Miller (New York); Christopher Allen Cobb and Michael Riddick (North Carolina); Angela Cook (Ohio); Angela Dickie and Antonia Dowling (South Carolina); and Alandrix Harris, Latecia J. Jackson, and Chloe Wallace (Texas). (*See* D.E. 2762 at 56–57.)

**ORDERED AND ADJUDGED** that the Defendants' Motions to Dismiss are **GRANTED**
**IN PART** and **DENIED IN PART** as follows:

(1) Mercedes's and General Motors's Motions to Dismiss for lack of standing are **DENIED**.

(2) Volkswagen's Motion to Dismiss for lack of standing is **GRANTED**—but only as to the claims brought by the purported Audi sub-classes against Volkswagen, and the claims brought by the purported Volkswagen sub-classes against Audi. Accordingly:

    (a) All claims asserted by Audi owners or lessees against Volkswagen in Counts 12, 31, 32, 52, 53 are **DISMISSED**. In addition, as for the common-law claims asserted against Volkswagen by Audi owners or lessees: Counts 6 and 8 are **DISMISSED** as to the Alabama, Michigan, and Virginia sub-classes; and Count 7 is **DISMISSED** as to the Virginia sub-class; and

    (b) All claims asserted by Volkswagen owners or lessees against Audi in Counts 13, 14, 15, 16, 17, 18, 19, 23, 24, 26, 40, 42, 43, 46, 47, 48, and 55 are **DISMISSED**. In addition, as for the common-law claims asserted against Audi by Volkswagen owners or lessees: Count 6 is **DISMISSED** as to the Arizona, Arkansas, California, Connecticut, Indiana, Kentucky, Ohio, South Carolina, and Wisconsin sub-classes; Count 7 is **DISMISSED** as to the Arizona, Arkansas, Connecticut, Indiana, Kentucky, Ohio, and Wisconsin sub-classes; and Count 8 is **DISMISSED** as to the Arizona, Arkansas, California, Connecticut, Indiana, Kentucky, Ohio, Pennsylvania, South Carolina, and Wisconsin sub-classes.

(2) Mercedes's and Volkswagens' Motion to Dismiss for lack of subject-matter jurisdiction on preemption and primary jurisdiction grounds is **DENIED**.

(3) Defendants' Motions to Dismiss claims asserted by the nonresident Plaintiffs in the Transferor and Direct-File Actions under *Bristol-Myers* are **DENIED**.

(4) **The Foreign Defendants:** All claims in the Transferor and Direct-File Actions asserted against the Foreign Defendants (Daimler AG, Audi Aktiengesellschaft, and Volkswagen Aktiengesellschaft) are **DISMISSED** for lack of personal jurisdiction. Consequently, Defendants Daimler AG, Audi Aktiengesellschaft, and Volkswagen Aktiengesellschaft are **DISMISSED**.

(5) **The Direct-File Actions:** The Direct-File Actions are **DISMISSED** in their entirety for lack of personal jurisdiction over the Domestic Defendants and Foreign Defendants.

(6) **The Transferor Actions:** All RICO claims asserted against FCA, General Motors, Mercedes, Audi, and Volkswagen are **DISMISSED**, specifically: Counts 2 and 3 in the *Boyd* Complaint; Counts 2 and 3 in the *Whitaker* Complaint; and Counts 1, 2, 3, and 4 in the *Puhalla* Complaint.

The Court reserves ruling on the sufficiency of Plaintiffs' remaining claims against the Domestic Defendants in the Transferor Actions.

**DONE AND ORDERED** in Chambers, Miami, Florida, this 20 day of June, 2019.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record