**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
**MDL No. 2599**
**Master File No.: 15-MD-02599-MORENO**
**S.D. Fla. Case No. 1:14-cv-24009-MORENO**

IN RE: TAKATA AIRBAG PRODUCT
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

ECONOMIC LOSS TRACK CASES
AGAINST <u>MERCEDES-BENZ USA, LLC</u>

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND**
**INCORPORATED MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

MOTION ...........................................................................................................................1

MEMORANDUM OF LAW ...............................................................................................2

I.   INTRODUCTION ..............................................................................................................2

II.  FACTUAL BACKGROUND. ............................................................................................5

    A.  Overview of the Class Vehicles. ...........................................................................5

    B.  MBUSA Marketed the Class Vehicles as Safe. ...................................................7

    C.  The Inflator Defect Created a Serious Safety Hazard. .......................................11

    D.  MBUSA was Aware of the Inflator Defect and Failed to Act. ..........................12

    E.  MBUSA Plaintiffs. .............................................................................................13

III. LEGAL STANDARDS ...................................................................................................15

    A.  Choice of Law ....................................................................................................15

    B.  Rule 23 ...............................................................................................................15

IV. RULE 23(A) IS SATISFIED. ........................................................................................17

    A.  The Class is Ascertainable. ................................................................................17

    B.  Numerosity .........................................................................................................18

    C.  Commonality ......................................................................................................18

    D.  Typicality............................................................................................................20

    E.  Adequacy ...........................................................................................................21

V.  RULE 23(B)(3) IS SATISFIED. ...................................................................................22

    A.  Common issues of fact and law predominate for Plaintiffs' claims. .................23

        i.   Fraud Claims. ............................................................................................24

        ii.  Statutory Claims........................................................................................26

        iii. Breach of Implied Warranty Claims. .......................................................28

    B.  Common Issues of Law and Fact Predominate for Plaintiffs' Damages ...........28

    C.  Common Issues of Law and Fact Predominate for Plaintiffs' Proposed
        Multistate Classes. .............................................................................................32

        i.   There Are No Material Differences Between the Laws of Georgia, North Carolina,
            Rhode Island, and the Additional Fraud States Concerning Fraud.............................34

        ii.  There Are No Material Differences Between the Rhode Island Unfair Trade Practices
            and Consumer Protection Act and the Applicable Statutes in the Additional Statute
            States. ......................................................................................................................42

i

iii. The Substantial Similarity of Applicable State Laws Supports Class Certification. ....45

D.   A Class Action is Superior. ..........................................................................................47

VI.  CONCLUSION ...................................................................................................................48

ii

## MOTION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs move to certify the following multistate class for Plaintiffs' fraud claims against Defendant Mercedes-Benz USA ("MBUSA"), with Plaintiffs Paulette Calhoun, Daphne Bridges, and Theresa Marie Fusco Radican as class representatives:

> All persons who, prior to the date on which the Class Vehicle was recalled, bought a Class Vehicle in the state of Georgia, North Carolina, Rhode Island, Alabama, Colorado, Delaware, the District of Columbia, Tennessee, Utah, Virginia, West Virginia, or Wisconsin and who (i) still own the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

In addition, for Plaintiff Radican's claim under the Rhode Island Unfair Trade Practices and Consumer Protection Act, Plaintiffs move to certify the following multistate class, with Plaintiff Radican as the class representative:

> All persons who, prior to the date on which the Class Vehicle was recalled, bought a Class Vehicle in the state of Rhode Island, Connecticut, Hawaii, Maine, Nebraska, Oklahoma, Vermont, or West Virginia and who (i) still own the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

And Plaintiffs move for certification of the following single-state classes for Plaintiff Susan Knapp's claims under Iowa law (Counts 9 and 25), Plaintiff Bettie Taylor's claims under Mississippi law (Counts 9 and 33), Plaintiff Daphne Bridges's claim under the North Carolina Unfair and Deceptive Trade Practices Act (Count 39), Plaintiffs John and Nancy Phillips's claims under Oregon law (Counts 9 and 41), and Plaintiff William Goldberg's claims under Washington law (Counts 9 and 54):

> All persons who, prior to the date on which the Class Vehicle was

1

recalled, bought a Class Vehicle in the state of _____ (Iowa, Mississippi, North Carolina, Oregon, or Washington) and who (i) still own the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

Excluded from all proposed Classes are MBUSA; its parents, subsidiaries, affiliates, officers and directors; any entity in which MBUSA has a controlling interest; and all judges assigned to this litigation and their immediate family members.  Additionally, Plaintiffs move to appoint the following attorneys and firms as Class Counsel under Fed. R. Civ. P. 23(g): Peter Prieto of Podhurst Orseck, P.A.; Curtis Miner of Colson Hicks Eidson; Todd A. Smith of Smith LaCien LLP; David Boies of Boies, Schiller & Flexner LLP; Elizabeth Cabraser of Lieff Cabraser Heimann & Bernstein LLP; James E. Cecchi of Carella Byrne Cecchi Olstein Brody & Agnello, PC; and Roland Tellis of Baron & Budd, PC ("Proposed Class Counsel").

Given the certification of eight prior settlement classes in this MDL, the only open question is the manageability of a class trial, because all other Rule 23 requirements are the same across the litigation and settlement context. This Court's recent experience trying an automotive-defect class action, as well the successful trials of two other multi-state automotive-defect class actions over the past year, conclusively demonstrates that a class trial would be manageable here too.

## MEMORANDUM OF LAW

### I.   INTRODUCTION

Each MBUSA Class Vehicle came equipped with a defective, dangerous airbag. Because of a uniform design flaw—the use of the propellant ammonium nitrate in the airbag's inflator—the defective airbag in each Class Vehicle exposed vehicle occupants to an unreasonable safety risk. Far from enhancing safety, the airbags have an unacceptably dangerous propensity to deploy aggressively or rupture, spraying metal shrapnel toward vehicle occupants. MBUSA knew about

this jarring defect before the Class Vehicles were sold. But switching to a safer, defect-free airbag, especially mid-production cycle, would have been costly and delayed the production and sale of its vehicles. So, MBUSA stuck with the defective airbags. But it never disclosed the defect to purchasers during the Class period. Rather, it uniformly marketed the Class Vehicles as safe, even promoting the defective airbags as safety features.

Unfortunately, this is not the first time an automaker has prioritized profits over safety and deceptively marketed its vehicles. Four recent prior instances gave rise to similar class actions in this District and Circuit, each resulting in a decision granting class certification. *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016); *Cardenas v. Toyota Motor Corp.*, No. 18-22798-CIV, 2021 WL 5811741 (S.D. Fla. Dec. 6, 2021) (Moreno, J.); *Tershakovec v. Ford Motor Co.*, 546 F. Supp. 3d 1348 (S.D. Fla. 2021), *amended in part*, No. 17-21087-CIV, 2021 WL 3711444 (S.D. Fla. Aug. 20, 2021) (Moreno, J.); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529 (S.D. Fla. 2015). There is no reason to depart from these precedents here.

Nor is this the first time that the Court has considered class certification in this MDL. The Court has certified eight classes for settlement purposes. (**ECF Nos**. **2162** (BMW), **2154** (Mazda), **2166** (Subaru), **2168** (Toyota), **2385** (Honda), **2388** (Nissan), **3182** (Ford), **4214** (Volkswagen).). Although the settlements alleviated the need to consider manageability, all other class certification issues—including all Rule 23(a) requirements and predominance under Rule 23(b)(3)—are the same, regardless of the litigation or settlement context. There is no reason to reach a different conclusion on these Rule 23 issues here.

The common evidence of MBUSA's wrongful conduct overwhelmingly supports class certification. Rule 23(a)(1) numerosity is satisfied because each proposed Class is comprised of a sufficient number of Class Vehicle owners, making joinder impracticable. There are many

common questions of law and fact arising from the uniform defect, MBUSA's knowledge thereof, and MBUSA's uniform omissions, thus satisfying Rule 23(a)(2) commonality. Rule 23(a)(3)'s typicality requirement is satisfied because MBUSA subjected each Class member to the same common omissions, and all Class members suffered the same injury as a result of the uniform defect and MBUSA's misconduct. And Rule 23(a)(4)'s adequacy of representation requirement is fulfilled because Plaintiffs' interests are fully aligned with the Classes they seek to represent, and Plaintiffs are represented by well-qualified counsel who meet the requirements of Rule 23(g) and are diligently prosecuting the claims on behalf of each Class.

The requirements for certification under Rule 23(b)(3) are satisfied because common issues of law or fact predominate over questions affecting individual Class members, and class treatment is superior to other methods of adjudication. Common issues predominate because the salient legal and factual questions in this case will be resolved with proof common to all Plaintiffs and members of each Class. Plaintiffs will prove their case with, among other things, common evidence that Class Vehicles suffer a uniform defect; MBUSA was aware of the defect at the time the vehicles were sold; MBUSA had a duty to disclose its knowledge but failed to do so; and the facts that MBUSA failed to disclose were material. All of this evidence, and more, will have a direct impact on every Class member's effort to establish liability and on every Class member's entitlement to relief.

Predominance is buttressed by the nature of the common proof required to calculate Class loss. Plaintiffs' damages expert presents a model for estimating Class-wide loss based on a conjoint survey, which this Court recently held is a reliable method of estimating damages in the automotive-defect context. *Cardenas*, 2021 WL 5811741, at *13.

Class treatment is superior under Rule 23(b)(3) because nearly all Class members have claims that are too small to litigate individually, and, indeed, the courthouse doors will be closed to almost all of these consumers unless a Class is certified. MBUSA has vigorously defended against Plaintiffs' claims, and no consumer can prosecute this case without the pooling of resources offered by the class mechanism. Further, adjudicating claims in a single proceeding before this Court, which is already intimately familiar with the subject matter of this case, is much more efficient than a multiplicity of suits here and elsewhere that would unduly burden the judicial system. A class action is a superior method of adjudicating Plaintiffs' claims.

Plaintiffs' case will rise or fall on common proof, that is, on facts common to all members of each proposed Class. The glue that binds all Class members together is MBUSA's conduct towards each Class as a whole. The defect is uniform across all Class Vehicles, as is the remedy. Given this common evidentiary focus, and because all required elements of Fed. R. Civ. P. 23(a) and (b)(3) are satisfied, the Court should certify the proposed Classes.

## II.   FACTUAL BACKGROUND.

The common evidence relevant to each Class member's claim establishes the following.

### A.   Overview of the Class Vehicles.

The Class Vehicles are, as defined in the operative complaint, as all vehicles in the United States that (a) were equipped with Defective Airbags as original equipment and (b) were manufactured, distributed, or sold by MBUSA. **(ECF No. 4026)** (Second Amended Complaint), ¶ 168.  The term "Defective Airbags" is defined in this matter as all airbag modules manufactured by Takata that use non-desiccated ammonium nitrate as the propellant in their inflators (the "Inflator Defect"), including all airbags subject to various recalls and NHTSA Orders. *Id.*, ¶ 169. A simplified depiction of an airbag inflator is included below:



A list of Class Vehicles is included in Appendix A. **(ECF No. 4195-2)** (Appendix A MBUSA Class Vehicles). MBUSA sold more than one million Class Vehicles in the United States equipped with Defective Airbags, ranging from model year 2005 through 2017, and including dozens of different vehicle models. *Id.*, ¶¶ 68, 171. The named Plaintiffs purchased MBUSA vehicles in Alabama, Georgia, Iowa, Mississippi, North Carolina, Oregon, Rhode Island, and Washington. *Id.* ¶ 166.

MBUSA has now issued recalls admitting that the Class Vehicles suffer from a "safety defect," wherein "[u]nder certain circumstances during a crash that necessitates frontal airbag deployment, the defect in your driver side and passenger-side frontal airbag inflators may cause the airbag to explode during airbag deployment and could result in sharp metal fragments striking the driver or other occupants, possibly causing serious injury or death." *See* **(ECF No. 4339-1)** (September 2019 Safety Recall 2019090009 Notice); *see also* **(ECF No. 4339-2)** (Amended Annex A to NHTSA Third Amendment to the Coordinated Remedy Order, Dec. 9, 2016, at 9, 13, 17, 20, 23, 29, 35, 36 (listing affected Mercedes-Benz vehicles)).[1]

---

[1] **(ECF No. 4195-1)** refers to exhibits to the Declaration of Peter Prieto filed in support of this motion.

**B.      MBUSA Marketed the Class Vehicles as Safe.**

MBUSA handles virtually every aspect of selling MBUSA vehicles in the United States. *See* **(ECF No. 4339-3)** (Aikman 30(b)(6) Dep. Tr.) at 24:12–15 ("**Q.** Can you give me a general description of what MBUSA's business is?  **A.** Yeah.  It's the sales, marketing, and distribution of Mercedes-Benz vehicles in the U.S."); *id.* at 31:7 (the different departments of MBUSA are "sales, service, marketing, vans, legal, finance").  MBUSA sells new and used Mercedes-Benz vehicles across the country through its authorized dealerships.  *See id.* at 28:20 – 29:1 (MBUSA "vehicle preparation facilities" receive cars off of boats and send them to dealerships); *see also* **(ECF No. 4026)** (Second Amended Complaint), ¶ 70.  MBUSA advertises its vehicles on television, over radio, in print, online, and even on billboards.  *See* **(ECF No. 4339-3)** (Aikman 30(b)(6) Dep. Tr.) at 59:5–9 (decision-making regarding consumer marketing is "made at the MBUSA level").  MBUSA also sends parts to its authorized dealerships and other repair shops, and develops and distributes owner's manuals, warranty booklets, product brochures, and other information through its network of authorized dealerships across the entire country.  *See id.* at 27:4–5 ("We have parts distribution centers throughout the U.S.").  MBUSA even provides training information to personnel that repair and service MBUSA vehicles, such as the Class Vehicles at issue here.  *See id.* at 29:8–14 (MBUSA has "learning and performance centers" that offer training on sales and service issues).

Throughout each stage of its ubiquitous control over MBUSA vehicles in the United States, MBUSA promotes its vehicles' safety—yet none of MBUSA's advertisements or public statements acknowledged that its Class Vehicles were equipped with Defective Airbags.  **(ECF No. 4026)** (Second Amended Complaint), ¶ 87.  For example, in press releases on the MBUSA website, MBUSA bragged about the "Hallmark Mercedes high level of safety," and "high-strength safety passenger compartment."  *Id.*, ¶¶ 264(b), (c).  MBUSA also widely disseminated marketing

and advertising information to consumers via the internet, including YouTube videos touting its superior airbag technology.   *See, e.g.*, https://www.youtube.com/watch?v=U6gNknUQbio (*last visited* Feb. 8, 2022).

The Class Vehicle brochures contained similar misrepresentations about vehicle safety and omitted mention of the highly dangerous Takata inflator defect.  The 2011 C-Class brochure, for instance, described a "legacy of safety innovation," top-rated safety," and an orchestrated system that is designed to make the most of the precious milliseconds it takes to avoid, or survive, a collision."  **(ECF No. 4026)** (Second Amended Complaint), ¶ 264(e).  The 2011 M-class brochure specifically promised "10-way air bag protection," and the 2012 S-Class brochure claimed that the S-Class was engineered "to redefine every measure of how an automobile can protect its occupant," and contained "visionary safety advances."   *Id.*, ¶¶ 264(f), (g).

Brochures and advertisements uniformly promoting the safety and airbags of MBUSA vehicles are collected in Appendix B. **(ECF No. 4204)**  Examples include:

- "Renowned Mercedes-Benz Safety:  The 2008 C-Class comes with all the safety features that people have come to expect from Mercedes-Be–z - from four-wheel independent suspension and four-wheel disc brakes to six air bags, ABS anti-lock, traction control and ESP stability control." **(ECF No. 4339-4)** (MBUSA_00147812);

- "What better luxury is there than peace of mind? It's why 70% of the C-Class body structure is built from High-Strength and Ultra-High Strength Steel. And why the body is equipped with innovations like dual-stag front air bags, crumple zones that deform in a controlled manner to help absorb the force of a collision and Active Front Head Restraints that automatically move up and slightly forward to help reduce whiplash-type neck injuries."  **(ECF Nos. 4339-6; 4339-7; 4339-8)** (MBUSA_00133185);

- "Up to 11 Air Bags for Front and Side Protection: The 2010 E-Class now comes with a new knee air bag for the driver that minimizes leg injuries in frontal collisions, while new pelvic air bags work with the existing curtain and side air bags to provide extra protection for front passengers in dangerous side-impact collisions. With front air bags as well, the E-Class now boasts nine supplemental restraints, and rear side air bags are optionally available."  **(ECF No. 4339-9)** (MBUSA_00147128);

- "Mercedes-Benz Safety is Standard:  The GL-Class line comes standard with ESP® stability control, ABS anti-lock brakes, two-stage adaptive air bags for the driver and front

passenger, driver's knee air bag, seat-mounted side air bags in front and rear, curtain side air bags and adaptive belt tensioners and belt force limiters. In addition, NECK-PRO active front head restraints move forward nearly two inches and upward by about an inch in the event of a severe rear collision, helping to support the head and reduce the likelihood of whiplash injuries. A rollover sensor can activate the belt tensioner and curtain air bags if the vehicle senses an imminent rollover." **(ECF No. 4339-10)** (MBUSA_00138963–64);

- "Mercedes-Benz C-Class and M-Class are now amongst the few vehicles that achieved the top result of five stars. Finally, the results confirm that Mercedes-Benz customers can feel exceptionally safe in their cars." **(ECF No. 4339-11)** (MBUSA_00146717);

- "Air Bag Design Pioneer: Mercedes-Benz was the first carmaker to make a driver's frontal air bag standard equipment as part of its restraint system. Today, all Mercedes models come with a standard front passenger air bag and front side impact air bags, which help protect occupants during severe side impacts. Dedicated sensors determine the severity of the side impact, and, within milliseconds, trigger the respective side impact air bag. The bags are fully inflated about 15 milliseconds later. Front air bags are inflated in about 30-45 milliseconds." **(ECF No. 4339-12)** (MBUSA_00138488).

MBUSA employees reviewed and approved brochures and marketing materials before they were issued to the public, and they agreed that it would be important to include information about the functioning of airbags in such disclosures. *See* **(ECF No. 4339-13)** (Analil Dep. Tr.) at 235:19–24 (MBUSA supervisor of safety engineering confirming "[t]here's a safety review process" before materials are "disseminated to the public"); *id.* at 240:2–15 (MBUSA supervisor of safety engineering agreeing that "airbags are an important safety feature," and that "I would want to know if I had a defective airbag").

MBUSA also affixed window stickers (also known as "Monroney" labels[2]) to Class Vehicles describing the equipment and features of the vehicles, knowing that MBUSA-authorized dealers would then sell Class Vehicles to consumers with these labels affixed to the Class Vehicles. Indeed, as MBUSA has long been aware, its dealers are prohibited by law and MBUSA policy from removing the Monroney labels prior to the delivery of the vehicle to the end consumer.

---

[2] Monroney Labels are named for Oklahoma Senator Olmer Stillwell "Mike" Monroney, who sponsored the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231–1233.

The Monroney labels, which MBUSA caused to be drafted, uniformly and misleadingly assured consumers that Class Vehicles had working airbags. Each sticker had a section with the heading "SAFETY," under which were listed any collision avoidance systems, running lamps, and the various airbags present in the vehicle. This information suggested to any reasonable consumer that the Takata airbags installed in the Class Vehicles did not suffer from a defect and would perform their intended function during a collision. MBUSA's corporate representative testified that MBUSA affixed Monroney stickers to Class Vehicles. **(ECF No. 4339-14)** (Brunner 30(b)(6) Dep. Tr.) at 39:3–8; *id.* at 18:14–25:24; 50:15–23 (discussing exemplar labels); **(ECF No. 4339-15)** (Exemplar Monroney Labels). Neither MBUSA's corporate representative, nor anyone else he had spoken to at MBUSA, had ever seen a Monroney label that did not have a specific call-out for airbags—whether frontal airbags in particular or the airbag system—for the entire time period the Class Vehicles were available for sale to the public. **(ECF No. 4339-14)** (Brunner 30(b)(6) Dep. Tr.) at 24:2–25:24.

Because airbags were standard safety features in the Class Vehicles, MBUSA was not required to include them on the Monroney labels. *Id.* at 39:9–40:13; 50:25–52:1. That MBUSA nonetheless chose to advertise to consumers that the Class Vehicles featured frontal airbags demonstrates that MBUSA was aware of the materiality of the safety feature to consumers. *Id.* at 23:22–25:10.

In addition to being uniform, the misrepresentations on Monroney labels were false and misleading because the Takata airbags installed in Class Vehicles were, in fact, defective and posed an unreasonable risk to the safety of vehicle occupants. *See* **(ECF No. 4339-15)** (Exemplar Monroney Labels).

**C.      The Inflator Defect Created a Serious Safety Hazard.**

Major automakers began to experience issues with the Takata inflator defect as early as 2003—including one incident that led to a fatality in Arizona.  **(ECF No. 4026)** (Second Amended Complaint), ¶ 248.  Additional ruptures occurred in 2004 and 2007 involving Honda vehicles, and Honda filed public reports with United States safety regulators in connection with these four ruptures which MBUSA had access to, and was undoubtedly aware of.  *Id.*, ¶ 249.  Honda issued its first recall in connection with Takata airbags in November 2008, noting that "excessive internal pressure" could cause the "inflator to rupture" and spray metal fragments through the airbag.  *Id.*, ¶ 250.  Honda issued a second recall in 2009, and larger recalls in 2010, 2011, and 2013.  *Id.*, ¶ 251.  After Takata filed a DIR in April 2013 admitting concerns over propellant moisture absorption and deterioration, six major automakers issued recalls of 3.6 million vehicles containing Takata airbags—yet MBUSA still took no action.  *Id.*, ¶ 252.  MBUSA similarly took no action in the summer or fall of 2014 when seven Takata airbag rupture incidents were widely reported, when NHTSA demanded a national recall of many automakers in November 2014, or when 10 major automakers (but again, not MBUSA) met in December 2014 to address the Takata airbag issue. *Id.*, ¶ 253–55.  Indeed, NHTSA was forced to affirmatively contact MBUSA regarding its use of Takata airbags in September 2015, and eventually issued a recall on MBUSA Class Vehicles in its December 9, 2016, Third Amended Coordinated Remedy Order.  *Id.*, ¶ 258.

Takata's inflator defect has led to the recall of over 67 million vehicles, plagued the automotive industry for over almost 20 years, and caused at least 22 deaths and hundreds of injuries.  *Id.*, ¶ 259–60; *see also* **(ECF No. 4339-22)** (Renz Rept.), at ¶ 59 & n.22, n.23.  Yet despite the massive scope of this fraudulent scheme and its proportional harm to consumers, MBUSA failed to take any affirmative action to protect its customers' lives by disclosing these

known issues.  These failures have resulted in more than 1 million defective airbags being sold to consumers by MBUSA, each of which presents "an unreasonable risk of serious injury or death." *See, e.g.*, **(ECF No. 4339-16)** (Third Amendment to the Coordinated Remedy Program, MBUSA_00001453).  This conclusion is confirmed by MBUSA's own communications with vehicle owners, which stated that "Mercedes-Benz USA has decided that a defect, which relates to motor vehicle safety, exists in certain Model Year 2005 - 2009 vehicles."  **(ECF No. 4339-17)** (October 2016 Recall Notice 2016090001); *see also* **(ECF No. 4339-18)** (July 2016 Recall Notice 2016070003) ("Mercedes-Benz USA has decided that a defect which relates to motor vehicle safety exists in certain Model Year 2008 - 2011 Mercedes-Benz vehicles, based on the defect decision of TK Holdings, Inc ('Takata') regarding certain airbags produced by Takata."); **(ECF No. 4339-19)** (October 2018 Recall Notice 2018100009 ("Mercedes-Benz USA has decided that a defect, which relates to motor vehicle safety, exists in certain Model Year 2008 - 2009 C-Class vehicles and Model Year 2010 GLK-Class vehicles.")).

## D.     MBUSA was Aware of the Inflator Defect and Failed to Act.

MBUSA should have known that its vehicles contained defective Takata inflators  because of the well-known issues that other major automakers had with Takata airbags, and because MBUSA made affirmative representations to consumers and certified that the Class Vehicles met all applicable safety standards.  Indeed, as the recalls began to mount for other manufacturers, MBUSA internally became concerned about the impact on its vehicles—as acknowledged by MBUSA's head of engineering services.  *See* **(ECF No. 4339-20)** (Tait Dep. Tr.) at 54:20–21 ("I would say in the very beginning of Takata recall, I think we're always concerned.").

These concerns proved justified, as MBUSA's vehicles have begun to reflect what MBUSA knew was inevitable—airbag inflator field ruptures.  On January 2, 2021, MBUSA submitted an Airbag Inflator Rupture Incident Report to the NHTSA in which it confirmed a

rupture of a PSPI-2 inflator in a 2012 Mercedes Benz C250 Sedan in an accident that occurred in Florida in November 2020." **(ECF No. 4339-21)** (MBUSA_00122649).   And Plaintiffs' Expert Robert Renz also found that Takata's Master Engineering Analysis File data showed six ruptures triggered in Mercedes-Benz vehicles during testing.  *See* **(ECF No. 4339-22)** (Renz Rept.), at ¶ 65.

### E.   MBUSA Plaintiffs

These Plaintiffs have stepped forward to serve as class representatives:

| Plaintiff | State of Purchase | Claims to Certify |
|---|---|---|
| Paulette Calhoun | Georgia | Fraud (Count 9) |
| Susan Knapp | Iowa | Iowa Consumer Frauds Act (Count 25) Fraud (Count 9) |
| Bettie Taylor | Mississippi | Breach of Implied Warranty of Merchantability (Count 33) Fraud (Count 9) |
| Daphne Bridges | North Carolina | North Carolina Unfair and Deceptive Trade Practices Act (Count 39) Fraud (Count 9) |
| John F. & Nancy D. Phillips | Oregon | Oregon Unlawful Trade Practices Act (Count 41) Fraud (Count 9) |
| Theresa Marie Fusco Radican | Rhode Island | Rhode Island Deceptive Trade Practices Act (Count 45) Breach of Implied Warranty of Merchantability (Count 44) Fraud (Count 9) |
| William Goldberg | Washington | Washington Consumer Protection Act (Count 54) Fraud (Count 9) |

All Plaintiffs have alleged that MBUSA falsely advertised that their Class Vehicles were safe, without disclosing the presence of Defective Airbags in each vehicle.  *See, e.g.,* **(ECF No. 4026)** (Second Amended Complaint) at ¶ 105 ("Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety generally. The sales representative at Hendrick Motors emphasized the superior features, including safety features of the Mercedes C-250.").  Plaintiffs have also alleged that had MBUSA disclosed the presence of the Defective Airbags in the Class Vehicles, they would not have purchased these vehicles or would not have paid as much as they did for them.  *See, e.g., id.* ¶ 136 ("If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.").[3]

All of these allegations have been confirmed and supported by Plaintiffs' discovery responses and deposition testimony, which demonstrate that Plaintiffs have been injured by MBUSA's affirmative acts of deception and material omissions.  Plaintiffs have testified that they quite understandably would not have purchased their Class Vehicles at all if MBUSA had disclosed to them that the vehicles contained Defective Airbags.  *See, e.g.,*  **(ECF No. 4339-35)** (Knapp Dep. Tr.) at 28:21–30:14 (agreeing with interrogatory answer stating she would not have purchased vehicle if she knew of the Defective Airbags); **(ECF No. 4339-42)** (Goldberg Dep. Tr.) at 93:2–4 (same); **(ECF No. 4339-50)** (Phillips Dep. Tr.) at 145:6–10 (same); **(ECF No. 4339-52)** (Radican Dep. Tr.) at 158:3–10 (same); **(ECF No. 4339-53)** (Taylor Dep. Tr.) at 86:8–10 (same).

A number of Plaintiffs similarly testified that they overpaid for their Class Vehicles because they obviously would have negotiated a lower purchase price for a vehicle that contained

---

[3] The relevant allegations of all Plaintiffs who purchased MBUSA Class Vehicles are contained in the following paragraphs of the **(ECF No. 4026)** (Second Amended Complaint):  105, 110, 128, 136, 154, 157, 161.

a defective part. *See, e.g.*, **(ECF No. 4339-60)** (Bridges Dep. Tr.) at 139:14–16 ("I would say that I would have possibly purchased it; however, I would have negotiated better as well as had the problem resolved."); **(ECF No. 4339-61)** (Calhoun Dep. Tr.) at 221:3–5, 222:12–17 (testifying that had she known of the airbag defect, she "probably wouldn't have" purchased her vehicle or would have tried to negotiate a lesser price for it).

### III.  LEGAL STANDARDS

#### A.  Choice of Law

Plaintiffs' claims are governed by the laws of the states in which the Class Vehicles were purchased. *In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2016 WL 6072406 (S.D. Fla. Oct. 14, 2016); *accord Tershakovec*, 546 F. Supp. 3d at 1371. This is because "the injury occurs where the car is sold." *Tershakovec*, 546 F. Supp. 3d at 1371; *see also In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1314 & n.1 (S.D. Fla. 2020) (reasoning that Georgia applies the doctrine of *lex loci delicti* in tort cases, where "a tort action is governed by the substantive law of the state where the tort occurred," such that, in this case, "the alleged torts occurred in the state where the vehicles were purchased or leased") (citations omitted).

#### B.  Rule 23

"The party seeking class certification bears the burden of establishing the propriety of class certification." *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 693 (S.D. Fla. 2015). Class certification is appropriate when all the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are satisfied. *See* Fed. R. Civ. P. 23; *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1321 (11th Cir. 2008). The requirements of Rule 23(a) are:

> 1. The class must be so *numerous* that joinder of all members is impracticable ("numerosity");

2. There must be questions of fact or law *common* to the class ("commonality");

3. The claims (or defenses) of the representative parties must be *typical* of the claims (or defenses) of the class ("typicality"); and

4. The representative parties must *fairly* and *adequately* protect the interests of the class ("adequacy").

*Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 323 (S.D. Fla. 1996).  And Rule 23(b)(3), the provision under which Plaintiffs seek certification, requires a finding that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Finally, while not explicitly mentioned by Rule 23, the class must be "adequately defined and clearly ascertainable."  *Little v. T–Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012).

District courts have "broad discretion" in determining whether to certify a class.  *Sharf v. Fin. Asset Resolution, LLC*, 295 F.R.D. 664, 669 (S.D. Fla. 2014). "It is well-established that class actions are a particularly appropriate and desirable means of redressing common claims for uniform legal violations that affect large numbers of persons in the same way." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 603 (S.D. Fla. 2003) (citing *Kirkpatrick v. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir. 1987); *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983)). The Supreme Court has recognized that class actions promote judicial efficiency by permitting "plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

## IV.    RULE 23(A) IS SATISFIED.

### A.  The Class is Ascertainable.

The proposed class definition is adequate because "its membership is capable of determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021).  The criteria for Class membership are that a person purchased a Class Vehicle in a specific state during a specific time period.  These are precise and objective criteria. *See, e.g.*, *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 535–36 (S.D. Fla. 2015) (finding ascertainable a class of persons who bought or leased 2011-2015 Ford Explorers during the class period from authorized Ford dealers); *Rosen v. J.M. Auto Inc.*, 270 F.R.D. 675, 678–79, 685 (S.D. Fla. 2009) (finding ascertainable a class consisting of "every owner or lessee of a 2007 Lexus ES 350 who purchased or leased the vehicle in Florida").  And it is feasible to identify Class members using state vehicle registration data that provides the name and address of the registrant and his or her vehicle identification number.[4] If the Classes are certified, the parties will access this robust data source, and individual inquiries will not be required.

---

[4] Vehicle registration data can be purchased from IHS Markit, which obtains registration data from all states and the District of Columbia. See https://ihsmarkit.com/products/automotivemarket-data-analysis.html. This is a common source for identifying Class members in class actions involving automobiles and where the automaker does not have up-to-date ownership information.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 14-MC-2543 (JMF), 2020 WL 7480323, at *3, *7–8 (S.D.N.Y. Dec. 18, 2020) (certifying class that was defined in part based on vehicle ownership information identified in the IHS Markit/Polk vehicle registration data); *see also Mercado v. Volkswagen Group of Am., Inc.*, 518CV02388JWHSPX, 2021 WL 8773053, at *2–3 (C.D. Cal. Nov. 4, 2021) (ordering the "Departments of Motor Vehicles within the United States and Puerto Rico . . . to provide approval to Polk/IHS Markit, or any other company so retained by the parties and/or the Claims Administrator, to release the names and addresses of Settlement Class Members in this action associated with the titles of the Vehicle Identification Numbers at issue in this action for the purposes of disseminating the Class Notice to the Settlement Class Members"); *Fath v. Am. Honda Motor Co., Inc.*, No. 18-CV-1549, 2019 WL 6799796, at *8 (D. Minn. Dec. 13, 2019) ("Defendants will be permitted to now obtain from R.L. Polk & Co. (n/k/a IHS Markit), or a similar entity, the most currently available names and addresses of all current and former owners

### B.  Numerosity

To satisfy the numerosity requirement, Plaintiffs must show that the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although this requirement is not tied to any fixed numerical threshold, Plaintiffs must "proffer some evidence of the number in the purported class or a reasonable estimate." *Leszcvnski v. Allianz Ins.*, 176 F.R.D. 659, 669 (S.D. Fla. 1997).  MBUSA sold more than one million Class Vehicles nationwide, so each statewide Class consists of tens of thousands, if not hundreds of thousands, of Class Vehicles and Class Members.  This far exceeds the requirement that the putative class be so numerous that joinder of all members is impracticable is clearly met in this matter. Fed. R. Civ. P. 23(a); *see Legg v. Spirit Airlines, Inc.*, 315 F.R.D. 383, 387 (S.D. Fla. 2015).

### C.  Commonality

Under Rule 23(a)(2), a class has sufficient commonality if there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement of Rule 23(a)(2) is a "low hurdle" easily surmounted. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009). It only requires "at least one issue common to all class members." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 604 (S.D. Fla. 2003); *see also Muzucco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 515 (S.D. Fla. 2013); *Brown*, 212 F.R.D. at 604 ("Plaintiffs' legal claims need not be completely identical and factual differences concerning treatment or damages will not defeat a finding of commonality."). Where, as here, Defendants have "engaged in a standardized course of conduct that affects all class members," commonality is satisfied.  *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685–86 (S.D. Fla. 2004).

---

and lessees of Settlement Class Vehicles in order to begin developing the Class List so as to provide prompt Notice to Class Members after Preliminary Approval of the Settlement.").

Here, Plaintiffs' claims involve common questions of fact and law, all of which will be answered with common proof, including:

- Whether the Class Vehicles were sold to Plaintiffs with airbags containing the Inflator Defect;

- Whether MBUSA knew or should have known about the Inflator Defect;

- Whether MBUSA engaged in deceptive acts or practices;

- Whether MBUSA intentionally misrepresented, concealed, suppressed, and/or omitted material facts concerning the Inflator Defect; and

- Whether MBUSA's unlawful conduct damaged Plaintiffs and Class Members.

Commonality is therefore easily satisfied. *See In re Nissan N. Am., Inc. Litig.*, No. 3:19-CV-00843, 2023 WL 2749161, at *4 (M.D. Tenn. Mar. 31, 2023) (finding plaintiffs satisfied commonality where fraud, warranty, and consumer protection claims based on an automotive defect were "capable of class-wide resolution" even where "different class vehicle sensors [may have had] different configurations as a result of different software updates"); *Speerly v. Gen. Motors, LLC*, --- F.R.D. ---, No. 19-11044, 2023 WL 2572457, at *4, *7 (E.D. Mich. Mar. 20, 2023) (finding commonality based on alleged automobile transmission design defects, pursuant to plaintiffs' various legal theories under the laws of 26 different states, including consumer fraud claims); *Cardenas v. Toyota Motor Corp.*, No. 18-22798-CIV, 2021 WL 5811741, at *12–14 (S.D. Fla. Dec. 6, 2021) (finding commonality based on an alleged automobile HVAC defect where plaintiffs alleged common issues—such as defendants' omissions and whether a reasonable person would have been deceived by said omissions—would be established on a classwide basis through common evidence); *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-8629 FMO, 2019 WL 1940619, at *5 (C.D. Cal. Mar. 27, 2019) (finding common questions including whether automaker knew about the defect and concealed the defect); *Sanchez-Knutson*, 310 F.R.D. at 537 (holding plaintiffs satisfied commonality based on an alleged defective condition allowing exhaust to enter

the passenger compartment of vehicles); *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 523–24 (C.D. Cal. 2012) (finding commonality based on plaintiffs' claims of the same alleged suspension defect in class vehicles); *Rosen v. J.M. Auto Inc.*, 270 F.R.D. 675, 681 (S.D. Fla. 2009) (finding commonality where all class members owned the same class vehicle which contained the allegedly defective airbag system); *see also Edwards v. Ford Motor Co.*, 603 F. App'x 538, 540 (9th Cir. 2015) (affirming common questions under Rule 23(a)(2) including whether a defect existed and whether defendant had a duty to disclose the defect); *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) (reasoning that whether a defendant's "conduct would deceive an objective reasonable consumer is a common issue for all the putative class members, amenable to classwide proof"); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005) (finding no error of law with district court's finding of commonality based on the same alleged automobile engine design defect).[5]

### D. Typicality

For similar reasons, the Classes also meet the typicality requirement of Rule 23(a)(3), which requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *see also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 686 n.23 (S.D. Fla. 2004) (recognizing the overlap between commonality and typicality). Typicality is satisfied where "a sufficient nexus [exists] between the legal claims of the named class representatives and those of individual class members." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012). Courts find "[t]his nexus exists if

---

[5] *See also In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 355 (N.D. Cal. 2018) (finding plaintiffs alleging consumer protection and warranty claims met the commonality requirement where the same alleged latency defects were present in the cable modems and defendant allegedly knew of the defects); *cf. In re JUUL Labs, Inc., Mktg. Sales Practices & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 960 (N.D. Cal. 2022) (finding commonality satisfied pursuant to plaintiffs' statutory and common law fraud claims where common questions, including whether defendants' statements and omissions were deceptive, "will be determined on common basis based on classwide evidence and proof").

the claims of the class representative and the class members 'arise from the same event or pattern or practice and are based on the same legal theory.'" *Cox v. Porsche Fin. Servs., Inc.*, 330 F.R.D. 322, 332–33 (S.D. Fla. 2019) (quoting *Ault*, 692 F.3d at 1217).

Here, Plaintiffs' claims "arise from the same event or pattern or practice." *Id.* Like other members of the Classes, Plaintiffs were deceived through a uniform course of conduct by MBUSA. Indeed, Plaintiffs' claims arise from the same Inflator Defect—and MBUSA's common efforts to conceal the Inflator Defect—as the Classes' claims. Moreover, Plaintiffs suffered the same economic injury as all members of the Classes by overpaying for their defective Class Vehicles. The legal and factual arguments Plaintiffs advance regarding MBUSA's liability are the same as the arguments that other Class members would advance in support of their claims. Thus, a "sufficient nexus" exists between Plaintiffs' claims and the Classes' claims, and typicality is satisfied. *Ault*, 692 F.3d at 1216.

### E. Adequacy

Pursuant to Rule 23(a)(4), Plaintiffs must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied where the named plaintiffs possess the "integrity and personal characteristics necessary to act in a fiduciary role representing the interests of the class, and ha[ve] no interests antagonistic to the interests of the class." *Sanchez-Knutson*, 310 F.R.D. at 540. Pursuant to Rule 23(g), Plaintiffs must also establish adequacy of counsel. In assessing adequacy of counsel, the Court must consider: (i) the work counsel has done in investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)). Courts in the Eleventh Circuit have held that

"[t]he adequacy of the class counsel is presumed, absent specific proof to the contrary." *Cox*, 330 F.R.D. at 333.

Here, Plaintiffs have demonstrated that they possess the integrity and personal characteristics necessary to act as fiduciaries for the Classes. Each of the named Plaintiffs has actively been involved in the litigation of this matter, and they have vigorously prosecuted (and will continue to vigorously prosecute) claims against MBUSA on behalf of the Classes. All have responded to written discovery requests, sat for lengthy depositions, selected competent counsel to represent the interests of the Classes, and otherwise fully participated in the litigation process. Further, there is no conflict of interest that would prevent Plaintiffs or their counsel from representing the proposed Classes.

Moreover, the firms that have led this MDL on behalf of the Plaintiffs are some of the largest and most experienced class actions firms in the country. *See* **(ECF No. 4339-63)** (firm resumes). These firms have invested significant time and resources litigating the claims in this action over the past eight years. As can be seen by the fulsome docket in this matter, counsel have vigorously pursued this action, meeting all case deadlines, capitalizing on their knowledge as experienced class action litigators and pressing forward with the prosecution of the case. Accordingly, the requirements of Rules 23(a)(4) and 23(g) are satisfied, Plaintiffs and Class Counsel are adequate, and the Court should appoint Proposed Class Counsel to represent the Classes.

## V.     RULE 23(B)(3) IS SATISFIED.

Pursuant to Rule 23(b)(3), certification is appropriate here because (1) common questions of law or fact predominate over questions affecting individual class members only; and (2) class treatment is superior to other methods available for adjudicating the controversy.

### A.  Common issues of fact and law predominate for Plaintiffs' claims.

"Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'"  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)). This predominance requirement "is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260 (11th Cir. 2003). At the same time, "[i]t is not necessary that all questions of law or fact be common, but only that some questions are common and that they predominate over individual questions." *Klay*, 382 F.3d at 1254 (internal quotation marks omitted). In addition, the common questions need not be dispositive of the entire action because "predominate" as used in the rule should not be equated with "dispositive." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 694 (S.D. Fla. 2002).  When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)).

Predominance is satisfied here because the core issues in this action—whether the Class Vehicles were equipped with defective airbags, whether MBUSA was aware of the Inflator Defect prior to marketing the Class Vehicles as safe, and whether there is a difference in market price between Class Vehicles as delivered and as marketed—are subject to generalized proof and will be established using common evidence applicable to Plaintiffs and all members of the Class. The

evidence of MBUSA's conduct—which will be the same for each Class Member because MBUSA's conduct was uniform with respect to all Class members—as well as expert testimony on the market price premium will have a direct, identical impact on every Class member's effort to establish liability and entitlement to relief. *Klay*, 382 F.3d at 1255.  Because MBUSA's challenged conduct is identical in at least one key respect—it never disclosed the Inflator Defect to consumers prior to the sale of Class Vehicles—the predominance requirement is met. *See, e.g.*, *Tershakovec*, 546 F. Supp. 3d at 1377 (finding predominance satisfied where defendant engaged in "uniform course of conduct"); *Allapattah Servs.,* 333 F.3d at 1261 (holding that predominance was satisfied and "the issue of liability was appropriately determined on a class-wide basis" where the subject "agreements were materially similar" and whether the defendant "breached that obligation was a question common to the class").  As the Supreme Court has recognized, predominance is satisfied in the consumer fraud context where, as here, the focus of the Classes' claims is on MBUSA's common course of conduct. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer . . . fraud"). The same analysis applies to each of the claims that Plaintiffs seek to certify, as explained below.[6]

### i. Fraud Claims.

Plaintiffs will prove fraudulent concealment with common evidence establishing that (i) Class Vehicles were sold with the same Inflator Defect; (ii) MBUSA was aware of the Inflator Defect; (iii) MBUSA inaccurately marketed the Class Vehicles as safe and had a duty to disclose its knowledge but failed to do so; and (iv) the facts that MBUSA failed to disclose were material.

---

[6] In accordance with this Court's ruling in *Tershakovec*, 546 F. Supp. 3d at 1382, Plaintiffs are not seeking class certification of the pending unjust enrichment claims. In addition, Plaintiffs are not seeking class certification of the claims under the Georgia Fair Business Practices Act and Georgia Uniform Deceptive Trade Practices Act (Counts 13 and 14).

When a defendant's challenged marketing conduct is uniform, as it is here with MBUSA's uniform failure to disclose the Inflator Defect, "fraud can be demonstrated on a class-wide basis." *Steigerwald v. BHH, LLC*, No. 1:15 CV 741, 2016 WL 695424, at *9 (N.D. Ohio Feb. 22, 2016) (certifying nationwide fraud class). And when an omission or misrepresentation is material, an inference of reliance can be established through circumstantial evidence. *See, e.g.*, *Vine v. PLS Fin. Servs., Inc.*, 807 F. App'x 320, 329 (5th Cir. 2020) (affirming class certification of a fraud claim and holding that "common issues can still predominate if common evidence of fraudulent misrepresentation 'gives rise to a reasonable inference that that misrepresentation induced [the class members' actions] and caused their losses'") (quoting *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 641 (5th Cir. 2016) (en banc)). A reasonable factfinder could infer that consumers would be less willing to purchase a Class Vehicle equipped with a veritable grenade in the steering wheel in place of a safety device than a defect-free vehicle. *See Ebin v. Kangadis Fam. Mgmt. LLC*, 45 F. Supp. 3d 395, 399 (S.D.N.Y. 2014) (certifying common law fraud claim because it was "inconceivable that any individual would not have relied on the [product's misleading] labeling in its purchase, since otherwise the individual would merely be purchasing a random tin of unknown fluid"); *cf. Longden v. Sunderman*, 123 F.R.D. 547, 550 (N.D. Tex. 1988) (certifying common law fraud claims in several states). Under such circumstances, the law "does not require an individualized showing of reliance." *Tershakovec* 546 F. Supp. 3d at 1380; *cf. Quackenbush v. Am. Honda Motor Co., Inc.*, No. C 20-05599 WHA, 2021 WL 6116949, at *6 (N.D. Cal. Dec. 27, 2021) (certifying claims for fraudulent omissions).

And in certain states, such as Washington, the law permits a rebuttable presumption of reliance for fraudulent omission claims. *See Deegan v. Windermere Real Estate/Center-Isle, Inc.*, 391 P.3d 582, 588 (Wash. Ct. App. 2017) ("[R]eliance is 'virtually impossible to prove' in cases

involving nondisclosure of material facts" and "Washington courts have adopted a rebuttable presumption of reliance for omissions of material fact in franchise fraud and securities fraud cases[.]") (footnotes and citations omitted).  Thus, this Court appropriately certified a class for Washington common law claims in *Tershakovec*, 546 F. Supp. 3d at 1382.

### ii.    Statutory Claims.

Common issues of law and fact also predominate for Plaintiffs' claims under consumer protection statutes.  Take Plaintiff Radican's claim under the Rhode Island Deceptive Trade Practices Act (Count 45), for example. The Rhode Island Supreme Court has adopted an objective standard to determine whether conduct is deceptive, considering whether it "is likely to mislead consumers acing reasonably under the circumstances." *Long v. Dell, Inc.*, 93 A.3d 988, 1003 (R.I. 2014) (quoting *F.T.C. v. Verity International Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006)).  Courts have, therefore, certified claims under the statute, after finding the predominance requirement satisfied. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 109 (D. Mass. 2008).

Common issues of law and fact similarly predominate for Plaintiff Goldberg's claim under the Washington Consumer Protection Act (Count 54).  Under Washington law, such claims do not require a showing of reliance.  *See Vernon v. Qwest Commc'ns Int'l*, Inc., 643 F. Supp. 2d 1256, 1268 (W.D. Wash. 2009) (for Washington CPA claims, "Washington courts do not require a plaintiff to allege individual reliance on Defendants' conduct, particularly where the nondisclosure of a material fact is alleged.").  And the statute utilizes an objective standard for deceptiveness, which is susceptible to class-wide proof.  *See Peterson v. Kitsap Cmty. Fed. Credit Union*, 287 P.3d 27, 37–38 (Wash. 2012) ("To show that a party has engaged in an unfair or deceptive act or practice that violates the CPA, a plaintiff need not prove that the act in question was 'intended to deceive, but that the alleged act had the capacity to deceive a substantial portion of the public.'").

Likewise, courts have therefore certified for class treatment claims under the Iowa Consumer Frauds Act, such as those asserted by Plaintiff Knapp (Count 25), when a defendant has widely disseminated misleading information "on its website" and in hard copies given to plaintiffs, as MBUSA did here. *See Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411, 426 (D. Mass. 2018) (certifying a class under the Iowa Consumer Frauds Act, finding predominance satisfied under Rule 23(b)(3)); *Kelly v. Phiten USA, Inc.*, 277 F.R.D. 564, 567–68 (S.D. Iowa 2011) (certifying class of consumers who purchased defendant's products based on false advertising that products "provid[ed] certain health benefits" in violation of Iowa's Consumer Frauds Act).

Similarly, class certification is appropriate for Plaintiff Bridges's claim under the North Carolina Unfair and Deceptive Trade Practices Act (Count 39). Even though reliance is an element of a claim under the North Carolina consumer protection statute, predominance is satisfied because the challenged omission—MBUSA's refusal to disclose the Inflator Defect—"(1) is material or likely to deceive a reasonable consumer and (2) was uniformly made to the putative class." *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 161 (D.S.C. 2018) (citing *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 518 (6th Cir. 2015)).

And Plaintiff Phillips's claim for violation of the Oregon Unlawful Trade Practices Act (Count 41) also satisfies the predominance requirement because the causation/reliance element of the claim "is susceptible of classwide proof." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 1012 (citing *Strawn v. Farmers Ins. Co. of Oregon*, 258 P.3d 1199 (Or. 2011)). Courts have therefore certified such claims where the challenged misrepresentation or omission was disseminated to all class members and was material, as MBUSA's omission regarding the Inflator Defect was here. *Id.*

### iii.    Breach of Implied Warranty Claims.

Common issues of fact and law also predominate for Plaintiffs' implied warranty of merchantability claims.   All Class Vehicles were sold with the same latent Inflator Defect, exposing occupants to an unreasonable risk of an aggressive deployment or rupture. Because the existence of the defect "can be shown by common evidence"—indeed, MBUSA's own uniform recall notices are admissions conceding the defect—common issues of law and fact predominate, and class certification is warranted for the implied warranty claims. *Alger*, 334 F.R.D. at 428; *Tershakovec*, 546 F. Supp. 3d at 1383 (certifying implied warranty class); *Victorino v. FCA US LLC*, No. 16CV1617-GPC(JLB), 2019 WL 5268670, at *12 (S.D. Cal. Oct. 17, 2019) (granting class certification for breach of implied warranty under state law); *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-8629 FMO (EX), 2019 WL 1940619, at *10 (C.D. Cal. Mar. 27, 2019) (certifying the implied warranty claim for class treatment and finding that plaintiffs have met their burden of showing that common issues predominate); *Daniel v. Ford Motor Co.*, No. CV21102890WBSEFB, 2016 WL 8077932, at *7 (E.D. Cal. Sept. 23, 2016) (granting class certification and finding that Plaintiff met predominance with respect to her implied warranty claim). Put another way, each vehicle "would breach (or not) the [implied warranty] in materially the same way." *In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 WL 7734558, at *25 (N.D. Cal. Sept. 14, 2016), *on reconsideration in part*, No. 13-CV-03072-EMC, 2016 WL 6873453 (N.D. Cal. Nov. 22, 2016).  "[T]he big question of whether the product was defective at the time it was sold is a common one," and thus common questions predominate. *Tershakovec*, 546 F. Supp. 3d at 1383.

### B.  Common Issues of Law and Fact Predominate for Plaintiffs' Damages

Class certification is further appropriate because Plaintiffs have shown that damages are capable of measurement pursuant to a classwide methodology. *Carriuolo*, 823 F.3d at 989 ("Because that [damages] theory is consistent for all class members, the predominance requirement under Rule 23(b)(3) is satisfied."). Still, individualized damages calculations do not defeat certification. *See Carriuolo*, 823 F.3d at 988 ("[I]ndividualized damages calculations are insufficient to foreclose the possibility of class certification, especially when, as here, the central liability question is so clearly common to each class member . . . [n]othing in this Rule requires plaintiffs to prove predominance separately as to both liability and damages[.]"); *see also Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (finding the existence of individualized damage issues does not defeat predominance when damages can be modeled based on a measure of common proof).

Plaintiffs seek to recover the amount they overpaid for their Class Vehicles, which is an appropriate measure of recovery for Plaintiffs' claims.[7]

---

[7] *See* **Consumer Protection Statutes**: *Nguyen v. Nissan N. Am., Inc*., 932 F.3d 811, 819 (9th Cir. 2019);); *In re Toyota RAV4 Hybrid Fuel Tank Litig*., 20-CV-00337-EMC, 2021 WL 5915060, at *11 (N.D. Cal. Dec. 10, 2021); *Tershakovec v. Ford Motor Co*., 546 F. Supp. 3d 1348, 1380 (S.D. Fla. 2021), *amended in part*, 17-21087-CIV, 2021 WL 3711444 (S.D. Fla. Aug. 20, 2021); *In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig*., No. 3:18-MD-2828-SI, 2020 WL 1495304, at *29 (D. Or. Mar. 27, 2020); *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig*., 16-02709-MD-W-GAF, 2019 WL 1418292, at *25 (W.D. Mo. Mar. 21, 2019); *Falco v. Nissan N. Am. Inc*., CV1300686DDPMANX, 2016 WL 1327474, at *12 (C.D. Cal. Apr. 5, 2016); *In re Morning Song Bird Food Litig*., 12CV1592 JAH (RBB), 2013 WL 12144051, at *5 (S.D. Cal. Sept. 30, 2013); *Brooks v. Remington Arms Co., Inc*., 1:09-CV-01054, 2010 WL 6971894, at *3 (W.D. Ark. Oct. 27, 2010), *report and recommendation adopted sub nom. Rodgers v. Remington Arms Co., Inc*., 09-CV-1054, 2011 WL 2746150 (W.D. Ark. July 12, 2011); **Fraud**: *Coghlan*, 240 F.3d at 452–53; *Hunter v. SMS, Inc*., 843 F.2d 1391 (6th Cir. 1988); *Rokowsky v. Gordon*, 531 F. Supp. 435, 439 (D. Mass. 1982), *aff'd*, 705 F.2d 439 (1st Cir. 1983); *Tershakovec*, 546 F. Supp. 3d at 1380; *In re Gen. Motors LLC Ignition Switch Litig*., 339 F. Supp. 3d at 294, 302, 306; *Dastgheib v. Genentech, Inc*., 438 F. Supp. 2d 546, 553 (E.D. Pa. 2006); *Leftwich v. Gaines*, 521 S.E.2d 717, 724 (N.C. Ct. App. 1999).

All members of the Classes have been harmed in the same way by overpaying for their Class Vehicles because a defective vehicle is worth less than a non-defective vehicle. *See, e.g.*, *Carriuolo*, 823 F.3d at 989. Overpayment damages are a valid measure of damages in a consumer fraud case because they put Class members in the position they would have been in had the defendant revealed the true nature of its product prior to purchase. *Flynn v. FCA US LLC*, 2018 WL 2063871, at *7 (S.D. Ill. Jan. 31, 2018).

Plaintiffs and members of the Classes will prove overpayment damages using common evidence in the form of a conjoint analysis and market simulation designed by Plaintiffs' expert, Jean-Pierre Dubé, Ph.D. *See* **(ECF No. 4339-64)** (Dubé Rept.) at ¶¶ 9, 27–100, 109. Conjoint analysis is one of the most widely used and accepted methods of market research and quantitative market value measurement. *Id.* at ¶¶ 29–32. In a conjoint analysis, consumers are methodically surveyed and asked to assign values to particular product attributes. Conjoint analysis has been shown to provide valid and reliable measures of consumer choices, and these have been shown to provide valid and reliable forecasts of the relevant market value under scenarios related to those measured. *See id.* Indeed, automakers, including Defendants in this MDL, use conjoint analysis to develop prices for vehicles and features, and Dr. Dubé relied on several examples produced in discovery when designing his damages model. *See* **(ECF No. 4339-65)** (GM-MDL2599-001467943); **(ECF No. 4339-66)** (GM-MDL2599-001460356); **(ECF No. 4339-67)** (GM-MDL2599-001461886).

Through conjoint surveys tied to appropriate vehicle segments and advanced market simulations, Dr. Dubé was able to calculate overpayment or price-premium damages by identifying the difference in the value of Class Vehicles with the Inflator Defect compared to the

value of the Class Vehicles without the Inflator Defect at the time and point of purchase. **(ECF No. 4339-64)** (Dubé Rept.) at 25–27, 100–110; Appx. H.

Courts across the country, including in this District, routinely accept choice-based conjoint analysis as a reliable methodology for calculating overpayment damages on a classwide basis in consumer class actions. *See Cardenas*, 2021 WL 5811741, at *13 (certifying class based on conjoint analysis damages method); *Sanchez-Knutson*, 310 F.R.D. at 539 (accepting "conjoint analysis damages model for purposes of class certification, finding that it is sufficiently tied to Plaintiff's legal theory and her proffered evidence that her [vehicle] shares the same defect as all others in its product line, and meets the predominance requirement under the Supreme Court's holding in *Comcast*"). Recently, in *Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116, at *14 (C.D. Cal. Sept. 23, 2020), a California district court found that a choice-based conjoint analysis, similar to the analysis employed in this case, presented a classwide damages model that measured damages attributable to plaintiffs' theory of liability. The *Kaupelis* court held that "conjoint analysis is a methodologically plausible way of calculating damages" where—like here—the measurement of damages is "an estimation of the fair market value of the allegedly defective [product] in a world where the defect is disclosed." *Id.*

Dr. Dubé's expert report establishes that generally accepted marketing science and economic principles can be used to reliably measure common impact on the Class members. The product of Dr. Dubé's work is a percentage applicable to each Class Vehicle that can be methodically and objectively multiplied by the price that each Class Member paid for the vehicle to calculate damages. **(ECF No. 4339-64)** (Dubé Rept.) at 111–13. Applying "a simple formula" like this to "each class member's [vehicle purchase price]" is "sufficient for the predominance and superiority requirements to be met." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670–71 (7th

31

Cir. 2015) (quoting Newberg on Class Actions, § 12:2); *accord Flynn v. FCA US LLC*, 327 F.R.D.

206, 224 (S.D. Ill. 2018) ("Damages are susceptible of class-wide measurement if there is a 'single

or common method that can be used to measure and quantify the damages of each class member.'")

(quoting Newberg on Class Actions § 12:4).

### C. Common Issues of Law and Fact Predominate for Plaintiffs' Proposed Multistate Classes.

Common issues of law and fact will remain the predominant focus of this litigation under

Plaintiffs' proposed multistate classes. As detailed herein, Plaintiffs' common law fraud and

consumer protection act claims are each well-suited to grouping structures that will enable an

efficient and effective determination of Plaintiffs' claims.

Courts frequently certify multi-state classes where, as here, "applicable state laws can be

sorted into a small number of groups, each containing materially identical legal standards" *Klay*,

382 F.3d at 1262; *see also In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 680–83 (S.D.

Fla. 2015) (certifying claims under the laws of many states and citing authorities); *In re Checking*

*Account Overdraft Litig.*, 275 F.R.D. 666, 679–80 (S.D. Fla. 2011) (reasoning that multi-state class

certification proper even if "different claims or issues are subject to different bodies of law that . .

. present a limited number of patterns that the court . . . can manage by means of" sub-classing);

*In re Pharm. Indus. Avg. Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) (certifying 3

groups of consumer fraud act claims covering nearly every state after analyzing statutory and state

caselaw differences).[8]

---

[8] *See also, e.g.*, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 4621777, at
*11 (D. Mass. Oct. 16, 2017) (certifying multistate consumer protection and unjust enrichment
class); *Steigerwald v. BHH, LLC*, 2016 WL 695424, at *9 (N.D. Ohio Feb. 22, 2016) (certifying
express warranty and fraud claims under laws of 10 states); *Suchanek v. Sturm Foods*, 764 F.3d
750, 755–56 (7th Cir. 2014) (reversing denial of certification of single class under 8 similar
consumer fraud acts); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)
(affirming certification of warranty grouping of 8 states and rejecting defendant's arguments that

In so doing, the state laws at issue need not be perfectly uniform; rather, they must simply be similar enough to be divided into manageable sub-groups without material conflicts within the groups. *See, e.g.*, *In re Average Wholesale Price Litig.,* 252 F.R.D. at 93 ("Differences among applicable state laws are not necessarily fatal to certification of a proposed class action."); *see also Klay,* 382 F.3d at 1262 ("[I]f a claim is based on a principle of law that is uniform among the states, class certification is a real possibility."); American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010) (reasoning that a "court may authorize aggregate treatment of multiple claims . . . if the court determines that . . . different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court . . . can manage by means of identified adjudicatory procedures"). The detailed analysis below illustrates how the state laws at issue are fundamentally similar.

The Eleventh Circuit also recently clarified that Plaintiffs' ability to represent putative class members whose claims arise under the laws of states other than those in which Plaintiffs purchased their vehicles "is one of representative capacity under Federal Rule of Civil Procedure 23—not one of constitutional significance under Article III." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 21-10335, 2022 WL 16729170, at *4 (11th Cir. Nov. 7, 2022). A class that includes purchasers

---

"idiosyncratic" differences among state law precluded certification because "[a]s long as a sufficient constellation of common issues binds class members together," state law variations "will not automatically foreclose class certification under Rule 23(b)(3)"); *In re Prudential Ins. Co. of Am. Sales Practices Litig*., 148 F.3d 283, 315 (3d Cir. 1998) ("[c]ourts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit."); *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 484 n.12 (N.D. Ill. 2009) (certifying subclasses for 6 state consumer fraud acts with "nearly identical elements"), *aff'd*, 606 F.3d 391 (7th Cir. 2010); *Yarger v. ING Bank*, 285 F.R.D. 308, 323 (D. Del. 2012) (applying Delaware consumer fraud law to class members from 10 states because of no "material conflict"); *Barden v. Hurd Millwork Co.*, 249 F.R.D. 316, 321 (E.D. Wis. 2008) (certifying claims under group of like express warranty laws); *Overka v. Am. Airlines*, 265 F.R.D. 14, 20 (D. Mass. 2010) (certifying single class from 34 states because laws were "substantially common" with "manageable" differences).

whose claims are governed by the laws of the Additional Fraud States satisfies Rule 23's requirements because, as demonstrated below, the laws of Alabama, Colorado, Delaware, the District of Columbia, Tennessee, Utah, Virginia, West Virginia, and Wisconsin as to fraud (the "Additional Fraud States") are not materially different than the laws of Georgia, North Carolina, and Rhode Island. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013) ("[T]he crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues."); *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010) ("[I]t falls to the plaintiff to demonstrate the homogeneity of different states' laws, or at least to show that any variation they contain is manageable."); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("[I]f a claim is based on a principle of law that is uniform among the states, class certification is a realistic possibility.").   The same reasoning applies to a class that includes purchasers whose claims are governed by the consumer protection statutes of Connecticut, Hawaii, Maine, Nebraska, Oklahoma, Vermont, and West Virginia (the "Additional Statute States") because the Rhode Island Unfair Trade Practices and Consumer Protection Act and the applicable statutes in the Additional Statute States are materially indistinguishable.

> **i.      There Are No Material Differences Between the Laws of Georgia, North Carolina, Rhode Island, and the Additional Fraud States Concerning Fraud.**

As demonstrated below, there are no material differences in the elements of a fraud claim under the laws of Georgia, North Carolina, Rhode Island, and the Additional Fraud States:

- **Georgia**: *Williams v. Dresser Indus.*, 120 F.3d 1163, 1167 (11th Cir. 1997) ("Under Georgia law, a plaintiff suing for recovery for fraudulent representations must prove five essential elements: (1) the defendant made representations; (2) knowing they were false; (3) intentionally and for the purpose of deceiving the plaintiff; (4)

which the plaintiff reasonably relied on; (5) with the proximate result that the plaintiff incurred damages.") (citing *Bacote v. Wyckoff*, 251 Ga. 862, 865, 310 S.E.2d 520, 523 (1984)); *Seckinger-Lee Co. v. Allstate Ins. Co.,* 32 F. Supp. 2d 1348, 1353 (N.D. Ga. 1998) (same).

- **North Carolina**: *Forbis v. Neal*, 649 S.E.2d 382, 387 (N.C. 2007) ("[T]he following essential elements of actual fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. Additionally, any reliance on the allegedly false representations must be reasonable.") (citations and internal quotations omitted).

- **Rhode Island:** *W. Reserve Life Assur. Co. of Ohio v. Conreal LLC*, 715 F. Supp. 2d 270, 282 (D.R.I. 2010) ("To establish a prima facie case of common law fraud in Rhode Island[,] the plaintiff must prove that the defendant made a false representation intending thereby to induce plaintiff to reply thereon, and that the plaintiff justifiably relied thereon to his or her damage.") (quotations omitted); *see also Fraioli v. Lemcke*, 328 F. Supp. 2d 250, 268 (D.R.I. 2004) (same); *Women's Dev. Corp. v. City of Central Falls*, 764 A.2d 151, 160 (R.I. 2001) (same).

- **Alabama:** *Rivers v. Liberty Mut. Ins.*, No. 2:19CV1092-MHT, 2020 WL 6395452, at *2 (M.D. Ala. Nov. 2, 2020) ("Under Alabama law, '[t]he elements of fraud are: (1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate

35

consequence.'") (quoting *Brushwitz v. Ezell*, 757 So. 2d 423, 429 (Ala. 2000));
*McCutchen Co., Inc. v. Media General, Inc.*, 988 So.2d 998, 1001 (Ala. 2008)
(same).

- **Colorado:** *Wood v. Houghton Mifflin Harcourt Pub. Co.*, 569 F. Supp. 2d 1135,
  1140 (D. Colo. 2008) ("The elements of common law fraud under Colorado law
  are: '[1] that the defendant made a false representation of material fact; [2] that the
  party making the representation knew it was false; [3] that the party to whom the
  representation was made did not know of the falsity; [4] that the representation was
  made with the intent that it be acted upon; and [5] that the representation resulted
  in damages.'") (quoting *Brody v. Bock*, 897 P.2d 769, 775–76 (Colo. 1995)); *Coors
  v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005) (same).

- **Delaware:** *Royal Indem. Co. v. Pepper Hamilton LLP*, 479 F. Supp. 2d 419, 430
  (D. Del. 2007) ("Under Delaware law, the elements of common law fraud are: '1)
  a false representation, usually one of fact, made by the defendant; 2) the defendant's
  knowledge or belief that the representation was false, or was made with reckless
  indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from
  acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the
  representation; and 5) damage to the plaintiff as the result of such reliance.'")
  (quoting *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del. 1992)); *Czarnik v.
  Illumina, Inc.,* 437 F. Supp. 2d 252, 259–60 (D. Del. 2006) (same).

- **District of Columbia:** *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 95
  (D.D.C. 2016) ("The essential elements of common law fraud are: (1) a false
  representation (2) in reference to material fact, (3) made with knowledge of its

falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation.'") (quoting *Va. Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.,* 878 A.2d 1226, 1233 (D.C. 2005)); *Va. Acad. of Clinical Psychologists*, 878 A.2d at 1233 (same) (quoting *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)).

- **Tennessee:** *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 526 (6th Cir. 2007) ("The elements of common-law fraud are '(1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, (3) an injury caused by reasonable reliance on the representation, and (4) the requirement that the misrepresentation involve a past or existing fact.'") (quoting *Kincaid v. SouthTrust Bank,* 221 S.W.3d 32, 40 (Tenn. Ct. App. 2006)); *Jones v. Wilson & Assocs., PLLC*, No. 12-2510-JDT-CGC, 2013 WL 12095137, at *8 (W.D. Tenn. Feb. 5, 2013) (same).

- **Utah:** *Ennis v. Alder Prot. Holdings, LLC,* No. 2:19-CV-00512, 2021 WL 409785, at *4 (D. Utah Feb. 5, 2021) ("In Utah, '[t]he elements that a party must allege to bring a claim sounding in fraud are '(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.'") (quotations

omitted); *Chappell v. SkyWest Airlines, Inc.*, No. 4:21-CV-00083-DN-PK, 2021 WL 5882256, at *1 (D. Utah Dec. 13, 2021) (same).

- **Virginia:** *Carlucci v. Han*, 907 F.Supp.2d 709, 740 (E.D. Va. 2012) ("[A] plaintiff asserting a claim of actual fraud must demonstrate (1) a false representation by the defendant, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the misled party, and (6) resulting injury to the party misled.") (citations omitted); *Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 690 (E.D. Va. 1990) (same).

- **West Virginia:** *Wolford v. Children's Home Soc'y of W. Va.*, 17 F. Supp.2d 577, 584 (S.D.W. Va. 1998) ("In West Virginia, the essential elements of common law fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (4) that the plaintiff was damaged because he relied upon it.'") (citations omitted); *accord In Town Hotels Ltd. P'ship v. Marriott Int'l, Inc.,* 246 F. Supp. 2d 469, 487–88 (S.D. W.Va. 2003).

- **Wisconsin:** *Bell v. Edward D. Jones & Co.*, 962 F. Supp. 1188, 1192 (W.D. Wis. 1996) ("Under Wisconsin law the elements of common law fraud have been defined as follows: '1. A false representation; 2. Made with the intent to defraud and for the purpose of inducing another to act upon it; and 3. Actually inducing another to rely and act upon the representation causing injury or damage.'") (quotations omitted); *accord Jersild v. Aker*, 766 F. Supp. 713, 717–18 (E.D. Wis. 1991) (same).

Additionally, in all pertinent jurisdictions, a duty to disclose arises from a defendant's exclusive or superior knowledge as to undisclosed material facts:

- **Georgia:** *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 638 (E.D. Mich. 2019) ("Under Georgia law, the obligation to communicate may arise . . . from the particular circumstances of the case. The particular circumstances of the case may give rise to an obligation to communicate where there is a concealment of intrinsic qualities of the article which the other party by exercise of ordinary prudence and caution could not discover.") (citing *Amin v. Mercedes-Benz, LLC*, 301 F. Supp. 3d 1277, 1296 (N.D. Ga. 2018)).

- **North Carolina:** *Robinson v. Gen. Motors LLC*, No. CV 20-663-RGA-SRF, 2021 WL 3036353, at *8 (D. Del. July 19, 2021), *report and recommendation adopted*, No. 1:20-CV-00663, 2021 WL 7209365 (D. Del. Nov. 30, 2021) (holding that an automaker's duty to disclose arises when "a defendant has superior knowledge of an alleged defect" under North Carolina law) (citing Bear Hollow LLC v. Morberk, L.L.C., 2006 WL 1642126, at *6 (W.D.N.C. June 5, 2006)).

- **Rhode Island:** *W. Rsrv. Life Assur. Co. of Ohio v. Caramadre,* 847 F. Supp. 2d 329, 337 (D.R.I. 2012), *aff'd sub nom. W. Rsrv. Life Assur. Co. of Ohio v. ADM Assocs., LLC*, 793 F.3d 168 (1st Cir. 2015) (applying Restatement (Second) that a duty to disclose arises if a party to a transaction "knows that the other is about to enter into it under a mistake as to [material facts], and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts").

- **Alabama**: *Hurry v. Gen. Motors LLC*, 3:21-CV-673-ECM, 2022 WL 3587349, at *14 (M.D. Ala. Aug. 22, 2022) ("A duty to disclose may be found to exist when one person has superior knowledge of a material fact and the failure to disclose that fact would induce another person to take an action he or she would not take if they knew that fact.") (citations omitted); *Hines v. Riverside Chevrolet-Olds, Inc.*, 655 So. 2d 909, 919 (Ala. 1994) ("Because the [plaintiffs] were members of a group or class of persons who General Motors expected or had special reason to expect would be influenced by its decision not to disclose information about the repainting of damaged automobiles, General Motors and the [plaintiffs] had a sufficient relationship on which to base a duty to disclose."), *overruled in part on other grounds by State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998).

- **Colorado:** *In re Est. of Gattis*, 318 P.3d 549, 554 (Co. Ct. App. 2013) (holding that "a seller who has actual knowledge of a latent defect" has a duty to disclose the defect "where disparate knowledge exists").

- **Delaware:** *Aviation W. Charters, LLC v. Freer*, No. CVN14C09271WCCCCLD, 2015 WL 5138285, at *6–7 (Del. Super. Ct. July 2, 2015) (holding that defendant had a duty to disclose where it "was in a position of superior knowledge" as to material fact).

- **District of Columbia:** *Loughlin v. United States*, 230 F. Supp. 2d 26, 49 (D.D.C. 2002) ("If defendant had superior knowledge of contamination—potential or actual—plaintiffs' claim for failure to disclose would have to survive."); *Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 51 (D.D.C. 2011) ("The duty to speak also attaches in an instance where a material fact is unobservable or undiscoverable

by 'an ordinarily prudent person upon reasonable inspection.") (internal quotation marks omitted).

- **Tennessee:** *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 639 (E.D. Mich. 2019) (holding that "manufactures have a duty to disclose safety issues" under Tennessee law) (internal quotation marks omitted); *Bearden v. Honeywell Intern. Inc.*, 720 F. Supp. 2d 932, 941 (M.D. Tenn. 2010) ("A seller must disclose enough information to prevent its statements from being misleading, it must disclose any condition or defect that it knows or should know about that renders the product defective or dangerous, and it must disclose basic, material information if it knows that the buyer is about to act without knowledge of the information and is without reasonable means to acquire the information itself.") (internal quotation marks omitted).

- **Utah:** *Mitchell v. Wells Fargo Bank,* 355 F. Supp. 3d 1136, 1162 (D. Utah 2018) (holding that duty to disclose existed where defendants "were in a superior position to know the truth of the statements made to Plaintiffs").

- **Virginia:** *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir. 1999) (holding that a duty to disclose arises "if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist").

- **West Virginia:** *Robinson*, 2021 WL 3036353, at *8 (holding that an automaker's duty to disclose arises when "a defendant has superior knowledge of an alleged defect" under West Virginia law) (citing *Michael v. Estate of Kovarbasich*, 2015 WL 5725814, at *12 (N.D. W.Va. Sept. 29, 2015), *report and recommendation*

41

*adopted in part sub nom. Michael v. Consolidation Coal Co.*, 2017 WL 1197828 (N.D.W. Va. Mar. 31, 2017), *aff'd*, 773 F. App'x 767 (4th Cir. 2019)).

- **Wisconsin:** *Ollerman v. O'Rourke Co., Inc.*, 288 N.W.2d 95, 107 (1980) (holding that a duty to disclose arises when material facts "are known to the vendor, which are material to the transaction, and which are not readily discernible to the purchaser").

ii.     **There Are No Material Differences Between the Rhode Island Unfair Trade Practices and Consumer Protection Act and the Applicable Statutes in the Additional Statute States.**

The Rhode Island Unfair Trade Practices and Consumer Protection Act and the consumer protection statutes in the Additional Statute States are all based on the Federal Trade Commission Act. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008). Each statute broadly prohibits unfair or deceptive trade practices. *See* R.I. Gen. Laws § 6–13.1–2 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."); Conn. Gen. Stat. § 42–110b(a) ("No person shall engage in ... unfair or deceptive acts or practices in the conduct of any trade or commerce."); Haw. Rev. Stat. § 480–2(a) ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."); Me. Rev. Stat. tit. 5, § 207 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."); Neb. Rev. Stat. § 59–1602 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."); Okla. Stat. tit. 15, § 753(20) ("A person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act . . . when, in the course person: . . . [c]ommits an unfair or deceptive trade practice as defined in Section 752 of this title); Vt. Stat. Ann. tit. 9, § 2453(a) ("[U]nfair or deceptive acts or practices

in commerce, are hereby declared unlawful."); W. Va. Code § 46A–6–104 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.").

Thus, it is unsurprising that the elements of a claim under these statutes are the same:

- **Rhode Island:** *Rhode Island Laborers' Health & Welfare Fund ex rel. Trustees v. Philip Morris, Inc.*, 99 F. Supp. 2d 174, 188 (D.R.I. 2000) ("A private cause of action under RIUTPA exists for '[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful' by the Act.") (quoting R.I. Gen. Laws § 6–13.1–5.2).

- **Connecticut:** *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 141 (D. Conn. 2015) ("To state a claim under CUTPA, [a plaintiff] must plead that he (1) suffered an ascertainable loss of money or property, (2) that was caused by, (3) an unfair method of competition or an unfair or deceptive act in the conduct of any trade or commerce.").

- **Hawaii:** *Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003*, 407 F. Supp. 3d 1016, 1035–36 (D. Haw. 2019) ("To state a UDAP claim, a consumer must allege: (1) a violation of HRS § 480-2; (2) injury to plaintiff's business or property resulting from such violation; and (3) proof of the amount of damages.") (citations omitted).

- **Maine:** *Campbell v. First Am. Title Ins. Co.*, 644 F. Supp. 2d 126, 134 (D. Me. 2009) (holding that a plaintiff must establish that "she suffered 'any loss of money or property, real or personal,' as a result of an unfair or deceptive practice").

43

- **Nebraska:** *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1042 (8th Cir. 2011) ("The parties agree that, to prove a violation of the NCPA, [plaintiff] needed to show: (1) [defendant] 'engaged in an act or practice that constitutes an unfair method of competition or a deceptive trade practice in the conduct of any trade or commerce'; (2) [defendant's] 'conduct affect[ed] the public interest'; (3) [defendant] 'was injured in its business or property by [plaintiff]'s unfair method of competition or deceptive trade practice'; and (4) damages.") (citations omitted).

- **Oklahoma:** *Horton v. Bank of Am., N.A.*, 189 F. Supp. 3d 1286, 1291–92 (N.D. Okla. 2016) ("To state a claim under the OCPA, a plaintiff must show '(1) that the defendant engaged in an unlawful practice as defined [under 15 O.S. § 753]; (2) that the challenged practice occurred in the course of defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury.'") (citations omitted); *accord Patterson v. Beall*, 19 P.3d 839, 846 (Ok. 2000) (same).

- **Vermont:** *Gregory v. Poulin Auto Sales, Inc.*, 44 A.3d 788, 791 (Vt. 2012) ("The three elements of a VCFA claim are as follows: (1) there must be a representation, practice, or omission likely to mislead the consumer; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be 'material,' that is, likely to affect the consumer's conduct or decision with regard to a product.") (internal quotation marks omitted).

- **West Virginia:** *Bennett v. Skyline Corp.*, 52 F. Supp. 3d 796, 812 (N.D.W. Va. 2014) ("The elements of a cause of action under § 46A–6–106(a) include unlawful

44

conduct by the seller, an ascertainable loss on the part of the consumer, and a causal connection between the ascertainable loss and the conduct forming the basis of the lawsuit.") (citations omitted); *accord Heater v. Gen. Motors, LLC*, 568 F. Supp. 3d 626, 633 (N.D.W. Va. 2021) (same).

Finally, the Rhode Island statute and the applicable laws in the Additional Statute States are similar in that they "do not require the element of reliance." *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 98.

### iii.     The Substantial Similarity of Applicable State Laws Supports Class Certification.

Given the substantial similarity in the laws of Georgia, North Carolina, and Rhode Island and the Additional Fraud States with respect to fraud, as well as the substantial similarity between the Rhode Island Unfair Trade Practices and Consumer Protection Act and the consumer protection statutes in the Additional Statute States, the claims of Plaintiffs Calhoun, Bridges, and Radican "parallel those of the putative class members [in the Additional States] in the sense that, assuming a proper class is certified, success on the [fraud] claim under [Georgia, North Carolina, and Rhode Island] law [as well as the Rhode Island consumer protection claim] will more or less dictate success under [the Additional States'] law." *In re Asacol Antitrust Litig.*, 907 F.3d at 49.  This overlap among controlling legal standards satisfies the requirements of Rule 23 and supports certifying the multistate class that Plaintiffs have proposed.  *See In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-CV-6549, 2022 WL 4298767, at *11 (S.D.N.Y. Sept. 19, 2022) (reaffirming certification of multistate class because any variation among state laws was manageable); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 33 (E.D.N.Y. 2020) (certifying multistate class under Arkansas, California, Colorado, Montana, and Vermont); *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 680–83 (S.D. Fla. 2015)

(certifying claims under the laws of many states and citing authorities); *Suchanek v. Sturm Foods*, 764 F.3d 750, 757 (7th Cir. 2014) (reversing denial of certification of single class under 8 similar consumer fraud acts because "[t]he claims of every class member will rise or fall on the resolution" of the common question of whether the defendant's "packaging was likely to deceive a reasonable consumer"); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565–66, 568–70 (S.D.N.Y. 2014) (certifying fraud class because "elements of the common law of fraud are sufficiently similar across jurisdictions"); *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 484 n.12 (N.D. Ill. 2009) (certifying subclasses for 6 state consumer fraud acts with "nearly identical elements"), *aff'd*, 606 F.3d 391 (7th Cir. 2010); *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) (certifying 3 groups of consumer fraud act claims covering nearly every state after analyzing statutory and state caselaw differences).

And manageability is further demonstrated by two recent trials involving economic-loss claims against automakers under the laws of several states: *Siqueiros v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2022 WL 3974752, at \*1 (N.D. Cal. Aug. 31, 2022) (final pretrial order describing trial of claims under laws of North Carolina, Idaho, and California); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 998091, at \*10 (E.D. Mich. Mar. 31, 2022) (denying summary judgment and proceeding to trial on common issues for vehicles purchased or leased in Arizona, California, Colorado, Florida, Illinois, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, or Wyoming).   Likewise, this Court's firsthand experience within the past month presiding over a class trial involving an automotive defect claim confirms that such a trial is manageable.  *See Cardenas v. Toyota Motor Corp.*, No. 18-22798-CIV (S.D. Fla.).

### D.  A Class Action is Superior.

Plaintiffs have also demonstrated that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts in the Eleventh Circuit consider the following factors when evaluating superiority: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action." *Klay*, 382 F.3d at 1269.  Each of these factors supports a finding of superiority here. There is no evidence that any class member has shown an interest in individually controlling this action and there is no overlapping litigation involving these claims on behalf of these Class members. Further, given the extended procedural history of this case and the familiarity of the Court with the facts and issued raised, it is desirable for this Court to adjudicate these issues in this forum. Finally, the central legal and factual issues giving rise to the Classes' claims can be managed and adjudicated on a class basis without difficulty because they depend upon a core set of documents, fact witness testimony and expert testimony. *See Carriuolo*, 823 F.3d at 989 ("Because common questions of law and fact predominate, class-wide adjudication appropriately conserves judicial resources and advances society's interests in judicial efficiency.").

Classwide adjudication of the core common legal and factual issues in a single proceeding is more efficient than thousands of repetitive proceedings addressing the same facts and issues and unnecessarily consuming judicial resources in multiple *fora*—which could lead to inconsistent rulings. *See* 2 William B. Rubenstein, NEWBERG ON CLASS ACTIONS, § 4:74 (5th ed. 2011) (noting

that "a finding of predominance is typically . . . coupled with a finding that a class is manageable"). Accordingly, treatment as a class action is the superior method of adjudicating the claims here.

## VI. CONCLUSION

For the reasons set forth in Plaintiffs' initial motion for class certification and reply **(ECF Nos. 4195, 4318)**, the Rhode Island Unfair Trade Practices and Consumer Protection Act of Plaintiff Radican and the fraud claims of Plaintiffs Calhoun, Bridges, and Radican satisfy the numerosity, typicality, commonality, and adequacy requirements of Rule 23(a) and the predominance and superiority requirements Rules 23(b)(3), thus warranting class treatment. This Rule 23 analysis applies with equal force to a class that also includes purchasers whose claims arise under the laws of the Additional Fraud States and Additional Statute States because, as demonstrated above, the laws of Georgia, North Carolina, and Rhode Island concerning fraud are substantially similar to the laws of the Additional Fraud States, and the Rhode Island consumer protection statute is substantially similar to the applicable consumer fraud statutes in the Additional Statute States. Accordingly, Plaintiffs respectfully request that the Court certify the following Rule 23(b)(3) class for Plaintiffs' fraud claims, with Plaintiffs Calhoun, Bridges, and Radican serving as Class Representatives:

> All persons who, prior to the date on which the Class Vehicle was recalled, bought a Class Vehicle in the state of Georgia, North Carolina, Rhode Island, Alabama, Colorado, Delaware, the District of Columbia, Tennessee, Utah, Virginia, West Virginia, or Wisconsin and who (i) still own the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

And for Plaintiff Radican's claim under the Rhode Island Unfair Trade Practices and Consumer Protection Act, Plaintiffs respectfully request that the Court certify the following class, for which Plaintiff Radican is an appropriate Class Representative:

All persons who, prior to the date on which the Class Vehicle was recalled, bought a Class Vehicle in the state of Rhode Island, Connecticut, Hawaii, Maine, Nebraska, Oklahoma, Vermont, or West Viriginia and who (i) still own the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

Finally, Plaintiffs respectfully request that the Court certify Plaintiff Knapp's claims under Iowa law (Counts 9 and 25), Plaintiff Taylor's claims under Mississippi law (Counts 9 and 33), Plaintiff Bridges's claim under the North Carolina Unfair and Deceptive Trade Practices Act (Count 39), Plaintiffs Phillips's claims under Oregon law (Counts 9 and 41), and Plaintiff Goldberg's claims under Washington law (Counts 9 and 54).

Dated: April 7, 2023

Respectfully submitted,

**PODHURST ORSECK, P.A.**

*/s/ Peter Prieto*
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
John Gravante (FBN 617113)
Matthew P. Weinshall (FBN 84783)
SunTrust International Center
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
Email: pprieto@podhurst.com
apodhurst@podhurst.com
srosenthal@podhurst.com
jgravante@podhurst.com
mweinshall@podhurst.com

***Chair Lead Counsel for Plaintiffs***

| | |
|---|---|
| **COLSON HICKS EIDSON**<br>Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>　　　*Plaintiffs' Personal Injury Track Lead Counsel* | **SMITH LACIEN LLP**<br>Todd A. Smith<br>tsmith@smithlacien.com<br>70 W Madison St Suite 5770,<br>Chicago, IL 60602<br>(312) 509-8900<br><br><br>　　　*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shulman (Fla Bar No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel:  (914) 749-8200<br>Fax: (914) 749-8300<br><br>Email: dboies@bsfllp.com<br><br>　　　mshulman@bsfllp.com<br><br><br>Stephen N. Zack (Fla. Bar No. 145215)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br><br>Tel:  (305) 539-8400<br><br>Fax:  (305) 539-1307<br><br>Email: szack@bsfllp.com<br><br>　　　mheise@bsfllp.com<br><br>　　*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**<br>Elizabeth Cabraser<br>ecabraser@lchb.com<br><br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T:    415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>New York, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |

| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC**<br><br>James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ 07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br><br>*Plaintiffs' Steering Committee* | **BARON & BUDD, PC**<br><br>Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br><br>Encino, CA 91436<br><br>T: 818-839-2333<br><br><br>J. Burton LeBlanc<br><br>9015 Bluebonnet Blvd.<br><br>Baton Rouge, LA 70810<br><br>T: 225-761-6463<br><br><br><br>*Plaintiffs' Steering Committee* |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on April 7, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Peter Prieto*  
    Peter Prieto